UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____

| | |
|---|---|
| In re FEDEX GROUND PACKAGE ) | CAUSE NO. 3:05-MD-527 RM |
| SYSTEM, INC., EMPLOYMENT ) | (MDL-1700) |
| PRACTICES LITIGATION ) | |
| ---------------------------------------------- ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| ALL ACTIONS ) | |
| ) | |
| *Currithers*, 3:05-CV-532 (MI) ) | |
| ) | |

_____

## OPINION and ORDER

The plaintiffs in several states have filed motions requesting the court,
pursuant to Federal Rule of Civil Procedure 23(c)(1)(C), to amend its March 25,
2008 order (doc. # 1119) denying class certification and enter an order certifying
the plaintiffs' proposed classes. The plaintiffs argue that (1) at the time of class
certification, one significant legal issue common to all the FedEx Ground Package
System, Inc. drivers[1] didn't exist: the collateral estoppel effect of the California
Estrada decision on the issue of employment status and (2) they have filed
motions for summary adjudication relying on common evidence to show that
FedEx not only reserves the right to control but actually controls its drivers. In
this order, the court addresses the Michigan plaintiffs' motion to amend (doc. #
1318) as it relates to the second argument — use of common evidence to show

_____

[1] The court intends the terms "driver" and "contractor" to be synonymous, and the use of
either term isn't meant to contain any connotations with respect to a person's status as an
"employee" or "independent contractor."

actual control — with the acknowledgment that this court's ruling on the Michigan plaintiffs' motion will provide the court with a basis for ruling on the other states' pending motions to amend class certification.

After reviewing the Michigan plaintiffs' motion for summary adjudication of employment status and the parties' related briefs and supporting evidence, the court finds that questions of law or fact common to the members of the class don't predominate over questions affecting only individual members and so denies the Michigan plaintiffs' motion to amend on this ground. The court will address class certification on the collateral estoppel issue by separate opinion.

I. BACKGROUND

FedEx Ground, together with its operating division FedEx Home Delivery, provides small-package pick-up and delivery services through a network of pick-up and delivery drivers/contractors. FedEx Home Delivery provides small package delivery service primarily to residential customers, and FedEx Ground focuses on the pick-up and delivery of small packages to businesses. The named plaintiffs are three former single-work area contractors who entered into Operating Agreements with FedEx Home Delivery. Percival Currithers was a contractor from May 2005 through December 2005; Tyrone Hawkins was a contractor from May 2002 through May 2008; and Daniel LaVake was a contractor from May 2004 through March 2006. They all worked out of the Sterling Heights/Warren FedEx Home Delivery terminal in Michigan under FedEx Senior Manager Lori Mayer.

The plaintiffs previously sought to certify the following proposed Michigan class under Federal Rule of Civil Procedure 23(b)(3) for their claims of breach of implied contract, unjust enrichment, and declaratory judgment:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since October 25, 1998, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Michigan.

In the March 25, 2008 order (doc. # 1119), the court denied the Michigan plaintiffs' request for class certification. The court found that "[t]o decide whether one party is another's employer, Michigan courts use an 'economic reality test' that entails consideration of control, payment of wages, hiring and firing, and the responsibility for the maintenance of discipline[; n]o single factor is dispositive." Doc. # 1119, pp. 80-81. Most instructive to the court's analysis was <u>Kidder v. Miller-Davis Co.</u>, 564 N.W.2d 872 (Mich. 1997) — a case governed by Michigan's economic realities test. In <u>Kidder v. Miller-Davis</u>, even though a contract existed, the court examined the control each potential employer actually exerted over the workers — not just over the plaintiff, but over all the workers at the site. 564 N.W.2d at 880. This court found:

> [W]hile FedEx Ground's right to control its drivers under the Operating Agreement is an issue common to all class members, that common issue does not predominate because individual issues will have to be considered — matters of actual control, not just the right to control — for each of more than 350 class members.

Doc. # 1119, pp. 83-84. Accordingly, the court found that class treatment was inappropriate.

The plaintiffs in Michigan seek to amend the class certification order arguing, in part, that the issue of actual control can be proven by common evidence, so common issues predominate and class certification is warranted. The plaintiffs point to the summary judgment record and say that their use of common proof establishes that the plaintiffs are actually controlled in like manner by FedEx Ground Package System, Inc. through its uniform Operating Agreement, policies and procedures, and consistent practices. They assert the facts relevant to the control test aren't facts that vary from driver to driver or require any individualized evidence, and common proof will show that FedEx exercised systematic, consistent controls over its drivers. The plaintiffs point to <u>Kidder v. Miller-Davis</u> and reason that the court looked at the control the employer asserted over all workers, not the control exerted over each individual worker, and, therefore, proof of systematic control over the plaintiffs as a whole is all that is needed to support their claims.

FedEx responds that the employment classification question before the court can only be resolved by evaluating individual issues pertaining to the more than 350 putative class members. Hundreds of Michigan contractors operated out of nineteen different facilities run by nineteen different terminal managers within two separate divisions of the company. FedEx explains that not all Michigan

contractors are treated the same on a day-to-day basis and the terminal managers have considerable discretion to operate their terminals as they see fit.

## II. SUMMARY JUDGMENT EVIDENCE

The court details the parties' evidence below to provide an understanding of the type of evidence that would be submitted to determine Michigan drivers' employment status on a class-wide basis. Because the court is viewing the evidence in the context of the plaintiffs' summary judgment motion, the court construes the facts in light of the summary judgment standard by construing all facts and reasonable inferences in favor of FedEx.[2]

The plaintiffs entered into a Home Delivery Operating Agreement with FedEx to provide daily delivery service and "to conduct his/her business so that it can be identified as being a part of the [FedEx] system." OA, Background. The Operating Agreement states that "[b]oth [FedEx] and Contractor intend that Contractor will provide these services strictly as an independent contractor, and not as an employee of [FedEx] for any purpose." OA, Background. The Operating Agreement is to "set forth the mutual business objectives of the two parties intended to be served by th[e] Agreement – which are the results the Contractor

---

[2] The court acknowledges that the plaintiffs have filed a motion to strike FedEx's separate statement of genuine issues for Michigan (doc. # 1588) and a motion to strike FedEx's third statement of genuine issues and additional material facts (doc. # 1916) filed in support of FedEx's opposition briefs to the plaintiffs' motions for summary judgment. Because the court is addressing class certification, it is unnecessary to rule on the plaintiffs' motions at this time. The court simply notes that it has reviewed the plaintiffs' arguments and in setting forth the summary judgment evidence, relies on the designated evidence, as opposed to merely relying on the statement of facts set forth by the parties.

agrees to seek to achieve – but the manner and means of reaching these results are within the discretion of the Contractor." OA, Background. "[N]o officer or employee of [FedEx] shall have the authority to impose any term or condition on Contractor or on Contractor's continued operation which is contrary to this understanding." OA, Background. The "Contractor agrees to direct the operation of the Equipment and to determine the methods, manner and means of performing the obligations specified in this Agreement. [FedEx] shall be considered to have such exclusive possession, use and control of the Equipment required by D.O.T. regulation . . . . " OA, ¶ 1.4.

FedEx agreed standards of service are specifically set forth in the Operating Agreement. To achieve FedEx's business objections, the drivers agree to:

> (a) Provide daily pick-up and delivery service to consignees and shippers on days and at times which are compatible with their schedules and requirements within Contractor's Primary Service Area, . . . and in such other areas as Contractor may be asked to service,[3] all consistent with the competitive standards within the industry (provided, however, that on any day where the volume of packages available for delivery or pick-up in Contractor's Primary Service Area exceeds the volume that Contractor can reasonably be expected to handle on such day, [FedEx] may reassign a portion of such packages to another contractor);
> (b) Make reasonable efforts to retain and increase the base of shippers and consignees served and the number of packages per shipper within Contractor's Primary Service Area;
>
> (c) Handle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage;

---

[3] The FXG OA states: "and in such other areas as Contractor may be asked to service, *in the event Contractor elects to participate in the Flex Program . . .*" (emphasis added).

(d) Cooperate with [FedEx's] employees, customers and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment, and provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal;

(e) Foster the professional image and good reputation of [FedEx] . . . including adhering to vehicle identification and operator appearance standards . . .;

(f) Conform to all applicable federal, state and local laws, regulations and ordinances;

(g) Cause the Equipment to be operated safely and in compliance with all applicable laws and regulations; and

(h) Conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times.

OA, ¶ 1.10. The parties agree that "Contractor shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results . . . and no officer, agent or employee of [FedEx] shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results." FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15. For example, FedEx can't "prescribe the hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance." FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15; *see also* FedEx Policy-007 (stating that the OA and its addenda "must be adhered to by all officers, managers, agents and employees" of FedEx and they don't have "the authority to direct the contractor as to the manner or means employed" to achieve the business objectives and results specified in the OA).

FedEx drivers' work is a regular part of FedEx's business. In general, Home Delivery Contractors are responsible only for residential delivery of packages, not pick-ups; deliveries typically are made Tuesday through Saturday. Drivers must wear the FedEx uniform, and the Operating Agreement provides that the uniform should be "maintained in good condition" and the driver will "keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by [FedEx]." OA, ¶ 1.12. Although the Operating Agreement states that the driver "shall not be required to purchase or rent any products, equipment, or services from [FedEx] as a condition to entering into [the agreement,]" OA, ¶ 7, FedEx supplies most of the tools, instrumentalities and services the drivers use, including marketing, uniforms, scanners, shipping documentation, and D.O.T. inspections, that drivers can obtain through deductions pursuant to FedEx's Business Support Package/Contractor Assistance Program; 99 percent of drivers participate in this program. FXHD OA, ¶ 7 and Addendum 6; FXG OA, ¶ 7 and Addendum 7.

The drivers are responsible for supplying their vehicles, but the vehicles must be painted "FedEx White," bear FedEx logos and advertising, and meet FedEx's minimum specifications — *e.g.*, maximum height, width, and length; maximum bumper height; interior shelving requirements; and in some cases, age restrictions; among other specifications. The Operating Agreement provides that "subject to the determination of [FedEx] of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the

discretion of Contractor." OA, ¶ 1.1. At least for some drivers, FedEx has been flexible with vehicle specifications and the drivers can determine what make and model of truck to purchase or lease. Lori Mayer, Sterling Heights/Warren area Senior Manager, declared that FedEx "does not require Contractors to buy any particular type of vehicle, nor does [FedEx] require Contractors to purchase or lease their vehicles from particular vendors." Mayer Decl., ¶ 17 (stating that FedEx merely makes suggestions to contractors about what vehicles would be good and where they can be purchased). Senior Vice President of Terminal Operations, Michael Mannion, testified that FedEx reserves the right to approve or reject a particular vehicle because its size isn't sufficient to provide service to the primary service area. Mannion Dep., p. 239. FedEx managers "look at every single situation separately with every contractor and really understand[s] what his business plan is going to be" when determining the proper size of a truck to be used to service a particular area. Mannion Dep., p. 239. There is also an exception process for vehicles that don't meet FedEx's minimum requirements. Flesher Dep., pp. 143-145.

The drivers can use their equipment for other purposes when not actually carrying FedEx packages as long as identifying marks and logos are masked or removed, OA, ¶ 1.5; Mayer Decl., ¶ 18 ("Contractors may use their vehicles for other business or personal uses as long as they cover up the [FedEx] logos."); FedEx provides special paper to drivers that allow them to conceal the FedEx logo. Mayer Decl., ¶ 18.

FedEx inspects the drivers' vehicles to ensure they comply with FedEx appearance standards and Department of Transportation (DOT) guidelines.[4] OA, ¶ 1.12 ("[T]he Equipment shall be maintained in a clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry."); *see also* 49 C.F.R. § 396.3 (requiring inspection, repair, and maintenance of motor vehicles). DOT exercises oversight jurisdiction in this respect for vehicles of 10,001 or more pounds. Scapellato Rept. (Nov. 8, 2007), p. 11. For such vehicles, FedEx expert James Scapellato stated that FedEx, "as the responsible motor carrier, must periodically examine or inspect an owner-operator's vehicle to determine safety compliance with vehicle parts and accessories standards and out-of-service criteria ." Scapellato Rept. (Jan. 8, 2007), p. 21. FedEx presents evidence that it's within a terminal managers' discretion whether to deadline a vehicle based on appearance standards and some terminal managers have allowed drivers to use their trucks even though they didn't comply with these standards.

Drivers are paid weekly and compensation rates and formulae are set forth in Operating Agreement Addendum 3; they include daily rates, piece rates, and various bonuses, including a bonus for years of service. The compensation

---

[4] For example, on June 2, 2006, after an annual inspection, a Michigan manager told the driver: "There were two things . . . marked out of service on your truck. . . . We'll have to load you in another vehicle. . . . Your truck won't be able to go back in service until these repairs are made." Pl. Exh. 6:476. On January 28, 2005, a Michigan manager discussed maintenance reports with a driver: "You need to make sure they are done by the 10th of the month. You are taking a chance of having your vehicle deadline[d] for maintenance if you don't." Pl. Exh. 6:494.

amounts vary by individualized factors such as the type of vehicle used, number of packages delivered and stops serviced, weight and nature of the packages, mileage traveled, temporary core zone density, time of service, drivers' willingness or ability to take on additional stops/routes, and bonuses. OA, ¶ 4 and Addendum 3. The temporary core zone density is paid for drivers providing services in low-density, low package volume areas; the core zone payment is reduced or eliminated as density or volume increases. Until 2007, core zone compensation was prorated if the driver provided pick-up or delivery services for less than seven hours in one day. FedEx removed the hours reference and now conditions full payment of the core zone settlement on the driver making a minimum number of stops in a given day, which generally factors in, at least in part, an assumption of expected daily work hours per driver. The compensation rates aren't negotiated, except that drivers can choose not to sign yearly modified settlement addendum and others have requested and received changes to their core zone density settlement and core zone. *See* CRL-55, p. 2 ("A [driver] may . . . request a service ride to evaluate temporary core zone density settlement . . . and core zone.").

Drivers also can receive a "Contractor Customer Service" bonus — a monthly performance-based bonus that drivers receive when they achieve certain safety and customer service goals — *i.e.,* no at-fault accidents, no verified customer complaints. FXHD OA Addendum 8; FXG OA Addendum 6. FedEx notes that the CCS bonus structure has changed over time — certain requirements have been eliminated in the current version of the Operating Agreement — and the

bonus applies differently to Ground and Home Delivery drivers. For example, at Ground, there is also a weekly "Pick-Up Service Bonus" included in the CCS bonus. The requirements for the Pick-Up Service bonus also have changed over time; the current version indicates that drivers will receive the bonus when they don't miss any pick-ups, all scheduled pick-ups are made within the drivers' requested windows (with a twenty-minute grace period at the end of the pick-up window), and the scanner is used to process all pick-up stops (with the allowance of two instances of non-compliance per month for late pick-ups and/or manual reconciliations for improper use of the scanner). FXG OA, Addendum 6.

FedEx offers its drivers certain benefits, such as direct deposit, a retirement plan, matching contributions to a "Service Guarantee Account,"[5] a college scholarship for drivers with children, and a time-off program based on seniority. FedEx has no responsibility to make deductions for, or to pay, health, welfare, and pension costs, withholding for income taxes, unemployment insurance premiums, social security taxes, or any other similar charges with respect to the drivers or drivers' employees. OA, ¶ 4.2. The drivers are issued a Form 1099 at the end of each year. In accordance with that tax structure and for income-tax purposes, Mr. Currithers and Mr. LaVake maintained detailed records of their business expenses.

---

[5] This is a program whereby FedEx maintains an interest-bearing fund for the driver to save for unexpected expenses, which may be withdrawn at the driver's discretion. FXHD OA, ¶ 5; FXG OA, ¶ 8.

FedEx provides formal training to its drivers, but whether training is required varies from driver-to-driver. As of 2005, new FedEx drivers with six months' verified experience as a commercial motor vehicle driver within the previous five years aren't required to participate in Quality P&D Learning (QPDL), which, as FedEx explains, wasn't widely available until 2003 and isn't training, but a precondition to becoming a driver. Since November 2007, FedEx accepts training obtained from an "approved" FedEx vendor in lieu of prior experience or the FedEx QPDL course.

Before contracting with FedEx, each named plaintiff had some commercial driving experience. Mr. Currithers attended a truck-driving school and worked for different FedEx contractors for six months before he took over the route of another contractor at the terminal and purchased that contractor's vehicle. Mr. Hawkins contracted with FedEx after working as a supplemental driver at the terminal for a little over a month and, before contracting with FedEx, he worked for the New York Times delivering newspapers for over six years. Before Mr. LaVake contracted with FedEx, he had driven for a construction company and held a commercial driver's license. Mr. Currithers, Mr. Hawkins, and Mr. LaVake all participated in some pre-contract classroom training; it appears only Mr. Currithers took the QPDL course.

The Operating Agreement provides that the "Contractor shall have the obligation to assure that all persons who operate the Equipment are fully trained and capable of meeting the customer service standards set forth in this

Agreement." FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. Contractors must participate in an orientation program during their first thirty days to become familiar with various service quality procedures. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14 ("[FedEx] shall, during the first 30 days of the term of this Agreement, familiarize Contractor with various quality service procedures developed by [FedEx]."); *see also* FedEx Owner-Operator Familiarization Program (Pl. Exh. 5:306) (stating that the program is approximately ten hours). For example, when Mr. Hawkins signed on with FedEx, his manager trained with him on the road for three days. They "covered the proper ways to make a delivery, leaving doortags, maps and turn by turns. . . . He was show[n] the proper way to scan and how to send data [when] he has completed scanning. . . ." MI Exh. 6:237. Further, drivers may enter the CARE training program to expunge a verified customer complaint from their record; managers often recommend that drivers attend such training for that purpose.

FedEx managers are expected to conduct at least two business discussions per year with each driver; the goal of having two business discussions per year was clarified as not mandatory in August 2005 because it is a procedure, not a mandatory policy. OPR 560 (procedure); UNV-001 (describing difference between policies and procedures). The business discussions are a means for managers to provide recommendations and counseling to drivers in the performance of their contracted work. Lori Mayer declared that FedEx's business discussions weren't mandatory, but mere suggestions, and FedEx doesn't require contractors to even take part in these discussions. Mayer Decl., ¶ 21. The plaintiffs, however, have

14

filed a lengthy record of these business discussions and a sampling of such discussions with other Michigan drivers showing that at times the discussions appear mandatory and at other times they appear to be mere suggestions.

When the contractors were told during business discussions that they were in jeopardy of losing their contract for performance issues, FedEx says it was because the plaintiffs didn't meet mutually agreed upon standards of service. For example, Mr. LaVake, Mr. Currithers, Mr. Hawkins, and other drivers were warned they were putting their contracts in jeopardy by having DNAs (packages where delivery was not attempted). *See, e.g.*, MI. Exh. 6:230 (Manager to Mr. Currithers: "If you keep DNAing packages your contract will be in jeopardy. So I need you to provide service to our customers."); MI Exh. 6:326 (Manager to Mr. Hawkins: "You are putting your contract in jeopardy by having DNA's."); MI Exh. 6:401 (Mr. LaVake: I will "deliver what I can[,] but I am not working past 6 p.m." Manager: "By having DNA's[,] you are putting your contract in jeopardy.").

Further, the evidence shows that business discussions were at times initiated by the drivers and covered a wide-range of topics that varied from driver-to-driver, including:

- acknowledging a job well done: MI Exh. 6:242-243 (Manager: "I told Ty [Hawkins] that I felt he did an excellent job of customer service . . ."); MI Exh. 6:228 (Manager to Mr. Currithers: "I did your audit two days ago, and you did very well hiding packages, and few of your stops/packages were placed inside the garage[;] that's very good."); MI Exh. 6:382 (Manager to Mr. LaVake: "I did your Driver Release audit yesterday, and you did . . . excellent. . . . [G]ood job . . .").

- discussing customer complaints: MI Exh. 6:287 (Manager to Mr. Hawkins: "Ty, I received a complaint . . . She said she gets formula from you regularly and you usually leave it at the front door. This time you left it near the garage with no doortag. . . . You may lose your CCS bonus over this . . . I'm going to need you to retake the CARE class just as a reminder of what to do. . . .");

- providing customer service: MI Exh. 6:318 (Manager: "Ty [Hawkins], you need to knock and/or ring the bell at all of your deliveries. This is the proper driver release procedure . . ."); MI Exh. 6:274 (Manager to Mr. Hawkins: "We are supposed to deliver evening deliveries between 5-8 . . . Just make sure you're watching for these so that you . . . can get to them between the delivery hours . . . .");

- making suggestions for improvement: MI Exh. 6:317 (Mr. Hawkins to manager: "I did what you told [me;] I went and delivered the businesses that were my last stops and had a good day afterward. . . ."); MI Exh. 6:233 (Manager: "I thanked Ray [Brown] and Tyrone [Hawkins] for their time, and hoped that the recommendations were helpful. Ray and Tyrone both agreed to attempt to use the information, and thanked me for taking the time to help Tyrone during the day.");

- addressing drivers' concerns: MI Exh. 6:389 (Manager to Mr. LaVake: "I spoke with Rick Harris yesterday in contractor relationships about your concern . . . whether or not you're getting all the packages in your proprietary zip. . . . I hope you know that any time you have a concern you can come to me with it. . . . Are you getting all of the Lapeer packages now?"); MI Exh. 6:218 (Ty Hawkins: "Can you try to fix my maps/turn by turn[?]" Manager: "I will do that tomorrow; I will create start/end point, and that should take care of that problem. . .");

- discussing safety issues: MI Exh. 6:224 (Manager to Mr. Currithers: "[Y]ou did a good job today and [were] also safe. You wear your seat belt, set your parking brake, hazards usage also good. . . . Also you have to watch your speed on the country roads. . . ."); MI Exh. 6:376 (Manager to Mr. LaVake: "I want to discuss a few issues . . . First is speed. You really need to slow down [-] on those rural roads especially[,] . . . to help protect our company image . . . Also you need to work on full stops @ stop signs. . . . If you get a complaint because of it you will [lose] CCS money!"); and

- explaining the need to flex: MI Exh. 3:384 (Mr. LaVake: "Now your flexing me into Capac? I only signed up for Lapper." Manager: No[,] we have been through this before [-] that is your proprietary. You get that zip then your flexs. . . . [W]hen we signed your contract[,] I explained flexing to you."); MI Exh. 3:400 (Mr. LaVake: I had DNAs because "I was over dispatched, so I didn't go to Metomora." Manager: Your contract "says we will flex other zip codes to you. . . . By not attempting to service the customers[,] you are putting your contract in jeopardy.").

Although the cited business discussions were with the named plaintiffs, those discussions are similar in nature to the business discussions that plaintiffs have presented involving other Michigan drivers.

FedEx drivers' performance is reviewed through various audits and customer service rides. Managers should conduct daily van service audits of every driver to ensure drivers are complying with FedEx procedures for undelivered packages; the resulting reports reflect any packages the driver didn't try to deliver and the driver's scanning compliance rate. FedEx also hires security specialists to perform random in-route van security reviews in which they inspect drivers' vehicles to verify that drivers are securing the vehicles when they deliver a package, *i.e.*, the vehicle isn't left running, the bulkhead door is closed, and packages are secured. *See* Loss Prevention Manual, Vehicle Security Review, at 18 (Pl. Exh. 4:587) (describing the procedure that should be followed by loss prevention staff during vehicle security reviews). It appears Mr. LaVake was the only named plaintiff subject to a van security audit.

Driver release audits were performed on each of the named plaintiffs. A driver release audit involves a manager going out on a driver's route for about ten

stops after the driver has left the terminal. The manager follows the driver, and sometimes interviews customers, to see whether customers' packages are being driver-released safely and properly protected as required under the Operating Agreement. *See* HD Driver Release Audits Participant Manual, TM-406PRes (12/03) (Pl Exh. 4:521) ("The driver release audit program focuses on how to better serve the external customer by ensuring the proper methods are used when driver releasing packages. . . . As a service manager, you have an important role in communicating the most effective methods of driver releasing packages, and ensuring the contractors see the importance of being customer focused."). After the driver-release audit, the manager generally offers suggestions for improvement. FedEx presents evidence that the procedure isn't uniformly applied company-wide and terminal managers have discretion in enforcing the policies. The frequency of the audits also has changed during the relevant period from quarterly to yearly and the procedure is done only at residences, which constitute the bulk of Home Delivery routes, but typically not Ground routes.

The manager must conduct two, but not more than four, customer service rides each year. The customer service rides provide managers with a chance to see that the drivers are complying with FedEx's customer service standards and to ensure that the drivers are safely operating their vehicles. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14 ("[Q]ualified [FedEx] terminal personnel may, at their option, visit customer locations with Contractor four times annually to verify that Contractor is meeting the standards of customer service provided in this Agreement."); *see*

*also* CRL-555, p. 2 (two customer service rides are required annually for each driver). Robert Ostrov, FedEx Vice President, Contractor Relations, testified that "[g]enerally speaking, the customer service rides are an attempt to generally observe how the contractor is running his route, running his business, without drilling down on the specifics[,]" such as, how he turns the vehicle off, what he does with his keys, how he puts the scanner in his belt, how he enters the rear portion of the truck, etc. Ostrov Dep., pp. 244-245.

A standard FedEx Customer Service Ride Worksheet allows the manager and driver to report general information about the drivers' performance in the following areas: package quality at delivery, quality assurance, driver release, professional appearance (uniform and vehicle), customer courtesy, and service. This worksheet was filled out for each of the named plaintiffs and other Michigan drivers. MI Exh. 6:9-85. FedEx managers conducting a customer service ride should also complete a worksheet entitled, "Primary Service Area Analysis Worksheet," documenting the time the driver arrives/departs from each stop, the number of minutes between stops, the number of minutes at each stop, the last three digits of the drivers' odometer reading at each stop, and the approximate distance the driver must walk from the vehicle to the locations where the driving is picking up or dropping off a package. CRL-555 at 3; *see also* MI Exh. 6:86-135. FedEx presents evidence that some managers vary in how they conduct customer service rides, the number of rides they perform each year, and what they review during the rides.

In addition to customer service rides, managers should also discuss the driver's business plan annually. CRL-560, p. 3. In the annual business plan, managers "document discussion areas, problems, solutions agreed upon, predetermined flex(es), and the expectations of an individual contractor." CRL-560, p. 3. The documentation provides a record of the mutual commitments undertaken by FedEx and the driver. CRL-560, p. 3. Mr. Hawkins, a contractor for almost six years, and Mr. Currithers, a contractor for seven months, participated in such discussions; Mr. LaVake, a contractor for one year and ten months, did not.

The evidence tends to show that Michigan terminals generally were complying with FedEx's policies requiring van service audits, customer service rides, and driver release audits, MI. Exh. 3:3-27; FedEx's evidence doesn't suggest otherwise. FedEx acknowledges the business discussions, customer service rides, and audits, but presents evidence that such procedures resulted in recommendations, not mandatory policies that must be followed. Mayer Decl., ¶ 23; Callahan Dep., p. 42 ("We make recommendations at the end of the day. Whether the contractor follows the recommendations, that's strictly up to him."); *see also* 2003 OPR 555, p. 2 ("Terminal management is to use [Contractor Customer Service Worksheet] as a consulting tool to provide recommendations to contractor."). In 2005, FedEx's policies underwent revisions, known as the Document Reengineering Initiative. As part of the process, FedEx reengineered CRL-555 (formerly, OPR 555) to make it clear that feedback based on customer

service rides constitutes "recommendations,"not mandatory instructions, and that "[t]he contractor is solely responsible for exercising independent discretion and judgment to achieve business objectives" addressed by possible recommendations. 2005 CRL-555, p. 1. Mr. McMurty testified that a contractor may refuse a customer service ride without consequence. McMurty Dep., pp. 95-96.

Similarly, Ms. Mayer stated that business discussions aren't mandatory and drivers can't be forced to participate in them or adopt any recommendations resulting from customer service rids, audits, or business discussions. Mayer Decl., ¶¶ 21, 23-24. Roger Newman, Managing Director, HD Great Lakes Region, testified that drivers "could run the work area the way that they choose." Newman Dep, p. 121.

FedEx presents testimony that application of FedEx's policies and procedures is left to the manager's discretion and can vary from terminal to terminal and from driver to driver. Former FedEx CEO Dan Sullivan testified that he "would expect [FedEx drivers] to follow policy within general parameters but provide a certain amount of discretion in the administration of these policies and procedures depending upon terminal location, the issues in each facility, those kinds of things which are all different." Sullivan Dep., p. 162. In explaining the manager's reliance on FedEx policies, Mr. Sullivan stated:

> Obviously, all policies are there for a reason. They should be considered by the management. The management should try to follow them, but the management also has discretion to do the right thing for the business, the right thing for the customer, the right thing for our people within the parameters of those policies and procedures .

> . . so that they are administered somewhat differently in each circumstance.

Sullivan Dep., pp. 163-164. FedEx's Executive Vice President and Chief Operating Officer Rodger Marticke testified that FedEx expects managers to "adhere to company policies to the extent that it makes good business sense." Marticke Dep., p. 92. Division Vice President, Central Division, and Former Managing Director, Central Region, James Primm testified that FedEx confers discretion on its senior managers in how to apply procedures so long as that discretion doesn't result in not achieving company results or violating federal law. Primm Dep., p. 212.

FedEx presents evidence that drivers have certain autonomy in servicing their routes. Initially, FedEx notes that some drivers conduct business with FedEx through sole proprietorships or corporations. For example, Mr. Currithers contracted with FedEx through his sole proprietorship, PVC Enterprises, and Mr. Hawkins conducted business through his corporation, Deliveries by Ty, LLC. FedEx made payments to these entities, not the individuals. Further, there is evidence that contractors can choose to either run their own routes, hire helpers, or hire replacement contractors. Newman Decl., ¶¶ 15, 17. For example, Mr. Currithers and Mr. Hawkins hired others to help run their routes either occasionally or on a daily basis. Mr. Currithers spent more than three weeks training a friend to run his route and hired him as a replacement driver for a month. Mr. Hawkins hired a helper to assist with loading his vehicle and with package delivery almost every day and hired other people to drive in his place

when he wanted a day off. Ms. Mayer declared that the drivers would decide who to hire, subject to certain qualifications, and how much to pay them. Mayer Decl., ¶ 16.

Non-driver helpers must be eighteen years old and pass a background check. *See* Procedure: Authorization Process for Non-Driving Helper, CRL-566 (Pl. Exh. 2:213). Replacement drivers are subject to FedEx approval in other respects. The Operating Agreement states that the driver may utilize others to assist them; all persons so utilized "shall be qualified pursuant to applicable federal, state and municipal safety standards and [FedEx] Safe Driving Program standards . . . ." OA, ¶ 2.2. The Operating Agreement further requires that the replacement driver be "fully trained, at Contractor's expense, to operate the Equipment" and the Contractor is responsible for ensuring that the driver "conform fully to the applicable obligations undertaken by Contractor pursuant to this Agreement." OA, ¶ 2.2. The Safe Driving Program sets minimum experience, age, licensure, driving record, criminal record, and drug-and-alcohol abuse requirements, as well as requires compliance with basic safety and maintenance requirements and a showing of satisfactory work history. OA, Safe Driving Addendum. FedEx policies state that all operators, including assistants and substitutes, must complete FedEx-approved training depending on work history, complete a road test, and submit a contractor/driver information sheet. *See* CRL-551 at 5-12 (Pl. Exh. 2:147-54) ("The individual must meet the minimum driver qualifications and requirements established by the Federal Motor Carrier Safety Regulations and

23

FedEx . . . The driver eligibility requirements listed below are the minimum requirements for all drivers . . . ."). Mr. Sullivan also testified that the drivers would need to meet certain FedEx standards, such as grooming requirements, but terminal managers have discretion in assessing whether individuals meet FedEx's requirements to provide service. Sullivan Dep., pp. 210, 212.

FedEx is a registered motor carrier operating under a U.S. DOT number and is subject to the DOT's regulatory control and oversight. Scapellato Rept. (Nov. 8, 2007), p. 11. Many of FedEx's driver requirements are imposed by federal law for vehicles 10,001 pounds or more; federal commercial driver's license and alcohol/drug testing requirements are required for vehicles 26,001 pounds or more. FedEx expert witness James Scapellato stated that "[a]s the regulated motor carrier, FedEx . . . is ultimately responsible for the safe operation of all commercial vehicles providing transportation services under its DOT number." Scapellato Rept. (Nov. 8, 2007), p. 14. "As a regulated motor carrier, FedEx . . . must insure that each and every owner operator who operates under its DOT authority, as well as any driver working for an owner operator, achieves a satisfactory degree of safety compliance . . ." Scapellato Rept. (Jan. 8, 2007), p. 6. For example, FedEx must keep a DOT file on each driver to provide "documentary proof that the driver . . . meet[s] standards imposed by federal safety requirements and that they can, by reason of experience, training, or both, safely operate the assigned commercial motor vehicle . . . ." Scapellato Rept. (Jan. 8, 2007), p. 14. FedEx, however, has "adopted into policy many higher safety standards than those minimums

prescribed in the federal motor carrier safety regulations to help business efficiency and reduce highway crashes." Scapellato Rept. (Jan. 8, 2007), p. 12.

FedEx presents other evidence to show that it didn't control the driver's work. For example, only drivers in the Home Delivery division — a minority of contractors in the state of Michigan — are given turn-by-turn directions, and evidence from Michigan terminal managers shows that the directions are a tool for the contractors to use; FedEx doesn't require that they be followed. *See* MI Exh. 6:237 (Manager told Mr. Hawkins: "We discussed the turn by turns as only a tool for the contractors to use. . . . Above all the key to running his route is that it can't be ran the way the turn by turns have it set-up. You have to reroute yourself."). The drivers aren't even required to use scanners to record package data, and instead, can input the information manually, Mayer Decl., ¶ 19, although the vast majority of drivers use the scanners. The drivers generally are required to record start/stop times, certain tracking information, and odometer readings.

The plaintiffs' evidence, though, shows that drivers were critiqued for not properly scanning information or uploading data on time. Mr. LaVake's manager told him: "[Y]ou didn't put the correct location [into the scanner] and you didn't ring or knock . . . This will cost you your bonus." MI Exh. 6:395. Mr. Hawkins was told: "[Y]ou scanned the call tags . . . incorrectly. . . . If you pick up a call tag, you must scan it 29." MI Exh. 6:289; *see also* MI Exh. 6:434 (Manager to other Michigan driver: "You not getting home in time [to upload] is not acceptable. . .

25

you are putting your contract in jeopardy.”; MI Exh. 6:602 (Manager to other Michigan driver: “I need you to make sure that your are recording the exact first initial of the first name when you enter it in the scanner. . . . Failure to follow proper signature procedure could lead up to the termination of your contract.”)).

The plaintiffs contend FedEx dictates drivers’ hours because they must stay on their route until all packages are delivered. Ms. Mayer told Mr. Hawkins: “You need to deliver all of your packages every day.” MI Exh. 6:322-323. To provide sufficient volume of packages to drivers so they could make full use of their equipment as provided by the Operating Agreement, FedEx structured the routes so the vehicle was in use nine to eleven hours per day; this measurement was called the “Service Flex Range” and would vary somewhat between facilities. FedEx replaced the “Service Flex Range” in the fall of 2005 with a metric called the “Delivery Stop Guideline” that eliminates the minimum and sets forth a maximum number of stops a driver who is fully utilizing his vehicle can reasonably be expected to handle on any given day.

Undisputed evidence shows that start and end times were at least partially dictated by FedEx. Senior Vice President of Terminal Operations Michael Mannion testified that “[a] contractor is not supposed to leave the terminal [at the start of the day] until all his packages are available to him.” Mannion Dep., p. 305. Ground drivers who pick up customer packages must return to the terminal by a certain time. For example, a Michigan manager told a driver: “You will need to get in earlier to finish by 8 pm per your contract, you are putting your contract in

jeopardy . . . ." MI Exh. 6:440. Another manager told his driver: "You have a tendency to return to the terminal after 20:00 hour. You must be back in this building no later 20:00 hours in order [for] us to upload, [and to] meet our cut off time." MI Exh. 6:440. Home Delivery drivers aren't required to return to the terminal at the end of their day.

FedEx responds that individualized evidence shows that drivers aren't required to work certain hours and the named plaintiffs were never told that they had to work certain hours. Mr. Currithers testified that he wasn't required to appear at delivery stops at specific times (other than appointed deliveries that needed to be delivered within a window of time and occurred about once a month) or to work a certain set of hours. Rather, FedEx requires the contractors to stay out until all their packages are delivered and drivers can always choose to hire someone to fulfill their route obligations. Ms. Mayer declared: "I have never told [drivers], including Currithers, LaVake, and Hawkins, what hours they must work. Indeed, it has never been of consequence to me whether [drivers] work at all themselves, as long as they ensure that their contractual obligations are met." Mayer Decl., ¶ 13. Drivers simply are "accountable for making sure that their packages are delivered by someone pursuant to their contracts." Mayer Decl., ¶ 13. Mr. Newman testified that the drivers could come in when they wanted. Newman Dep., p. 121. Ms. Mayer told Mr. Hawkins: "I'm certainly not going to tell you what time you have to come in or leave by, but I'm suggesting that an earlier

start and dispatch time might be the solution for you to be able to provide the service that our customers expect." MI Exh. 6:322-323.

FedEx drivers are sometimes asked to flex packages. Flexing is the daily expansion or contraction of a drivers' work area; it is the movement of packages or stops from one work area to another in the event that the volume of packages or stops is greater than a contractor reasonably can handle. P&D Planning Seminar Participant Manual, TM-410PRes, Version 2.0. The Home Delivery Operating Agreement states that the contractors agree to "provide daily delivery and pick-up service . . . within Contractor's Primary Service Area . . . *and in such other areas as Contractor may from time-to-time be asked to service.*" FXHD OA, ¶ 1.10(a) (emphasis added). The Ground OA states that the driver agrees to provide such services "in such other areas as Contractor may be asked to provide service *in the event Contractor elects to participate in the Flex Program . . . .*" FXG OA, ¶ 1.10(a) (emphasis added). More than 99 percent of Ground drivers participate in the flex program. For both Ground and Home Delivery, the Operating Agreement states that "on any day where the volume of packages available for delivery or pick-up in the Contractor's Primary Service Area exceeds the volume that Contractor can reasonably be expected to handle on such day, *[FedEx] may reassign a portion of such packages to another contractor.*" OA, ¶ 1.10(a) (emphasis added).

FedEx emphasizes that flexing is optional for FedEx Ground and the drivers decide whether they participate in flexing. FXG OA, ¶ 9 ("By electing to participate,

Contractor agrees to accept packages from outside Contractor's Primary Service Area for pick-up and delivery, up to daily pick-up and delivery capacity . . . when requested to do so by FedEx Ground terminal management."). There also is evidence that drivers sometimes choose to informally flex packages among themselves.[6] One of FedEx's vice presidents, Severn McMurty, testified that contractors can refuse to have packages flexed at any time, McMurty Dep., p. 147, and FedEx presents evidence that some drivers have refused to flex without repercussions. Alexander Dep., pp. 144-145. The plaintiffs' business discussions, however, show that generally drivers were required to flex packages. For example, Mr. LaVake's managers told him that "[e]veryone is flexed, every day," MI Exh. 6:409-410; "I am sorry you don't like it, but we will continue to flex you." MI Exh. 6:384.

Ms. Mayer declared that packages aren't taken away from a Home Delivery Contractor's proprietary service area without a service failure or consent. Mayer Decl., ¶ 11 ("FHD can only give packages and stops within a Contractor's primary service area to someone else if the Contractor formally authorizes or requests such a package diversion, or if the Contractor otherwise acknowledges that he or she will be unable to deliver the package."). There also is evidence that some drivers, such as Mr. Hawkins, specifically asked that stops be flexed off their route on particular days so they could have a lighter workload. MI Exh. 6:302, 6:304.

---

[6] The reengineered OPR-716 (formerly of the same number) excludes any restriction on contractors' informally trading or "flexing" packages amongst themselves. *Compare* FedEx Exh. B-14 *with* FedEx Exh B-27.

FedEx may reconfigure a contractor's Primary Service Area upon giving five days written notice, unless the driver is able to show during the five-day notice period that he can continue to service the area as called for in the Operating Agreement. FXHD OA, ¶ 6.2; FXG OA, ¶ 5.2. The Operating Agreement requires remuneration to the contractor if the reconfiguration results in less customers or accounts, FXHD OA, ¶ 6.4, Addendum 5; FXG OA, ¶ 5.3; contractors can also sell excess stops as an alternative to reconfiguration. The reconfiguration generally takes place after what is called a "P&D Tune-up," which in part is done to determine whether the terminal's work areas are configured appropriately to maximize terminal capacity.

The evidence shows that reconfiguration isn't always dictated by FedEx. Some drivers are given the option to reconfigure. Mr. LaVake was told:

> [Manager:] They are thinking about sending Lapeer back to the Saginaw facility . . . Obviously, since that is your proprietary zip, I wanted to talk to you about it. You have a couple of different options. You could stay here and take on a different proprietary zip, you could go to Saginaw and deliver out of that terminal, *or you could simply say you don't want us to move your zip.* Of course, I'm hoping that's not the option you choose but it's certainly your right and we would proceed from there.

MI Exh. 6:390 (emphasis added). Some drivers may request reconfiguration or advise management of an agreed upon reconfiguration of their service areas. Mr. Hawkins testified that he was given fewer stops after he complained to his manager that he couldn't finish his route. Hawkins Dep., pp. 74, 93. Other drivers, such as Mr. Currithers, kept their primary service area during their entire

contract. Currithers Dep., p. 114. Accordingly, FedEx contends that the circumstances of flex and reconfiguration vary between drivers.

Further, drivers have the ability to expand their routes by acquiring additional service areas from FedEx or other contractors as they become available, subject to FedEx approval. The opportunity to acquire additional routes will largely depend on the terminal. *See* OA, ¶ 2.1 ("Contractor may, with the consent of [FedEx] and consistent with the capacity of the terminal serviced by Contractor, own and operate more than one vehicle, with any such additional vehicles to be driven by qualified operators employed by Contractor."). Multiple work area contractors have a greater opportunity to profit from their routes than single work area contractors. The percentage of multiple work area contractors differs between terminals; for example, the Michigan-Cadillac terminal is a 100 percent multi-work area facility, while the Michigan-Kalamazoo terminal is a zero percent multi-work area facility. Newman Decl., ¶ 27.

FedEx also points out that the contractors have a proprietary interest in their routes and can sell them; Mr. Currithers sold his route after termination for $5,000, but kept his truck. The new driver must be acceptable to FedEx as qualified to provide services under the Operating Agreement: "Provided Contractor is in good standing hereunder, Contractor shall . . . have the right to assign his/her rights  and obligations hereunder to a replacement contractor acceptable to [FedEx] as being qualified to provide the services of Contractor under this Agreement." FXHD OA, ¶ 15; FXG OA, ¶ 18. The new driver must meet the same

minimum requirements and is subject to the same screening as a temporary helper driver, discussed above. CRL-551 at 5 ("An individual applying to be a contractor/temporary driver must be prescreened and/or extensively reviewed or tested prior to completing the CDAS online application."). A driver whose contract is terminated by FedEx for cause cannot assign his contractual rights to others.

The plaintiffs assert that FedEx has virtual at-will authority to terminate Michigan drivers because FedEx decides what constitutes a "breach" of the broadly written standards of service. The Operating Agreements permits termination under the following circumstances: (1) by the parties' mutual agreement; (2) in the event of the equipment operator's intentional misconduct or reckless or willful negligent operation of the vehicular equipment or the contractor's knowledge or reason to anticipate such operator's conduct; (3) by either party "if the other party breaches or fails to perform the contractual obligations imposed by [the] Agreement[;]"(4) in the case that FedEx ceases to do business in all or part of the respective terminal service area or as a result of decline in business, reduces operations in all or part of the service area; or (5) the contractor may terminate upon thirty days prior written notice. FXHD OA, ¶ 9.1; FXG OA, ¶ 12.1. Non-renewal of the contract is also permitted by either party upon thirty days written notice before the expiration of the term. FXHD OA, ¶ 8.2; FXG OA, ¶ 11.2. The Operating Agreement contains a mandatory arbitration clause if the contractor asserts a claim for wrongful termination of the agreement. FXHD OA, ¶ 9.3 and Addendum 7; FXG OA, ¶ 12.3.

The plaintiffs point to evidence showing that FedEx targeted drivers for termination if they opposed the independent contractor model or promoted unionization. Managers took a headcount of their drivers without the drivers' involvement to determine who favored independent contractor status (+), who did not (-) and those the managers were unsure about (?). In an email, FedEx Managing Director Patrick Super referenced a terminal headcount indicating a worst case scenario of an 87 percent negative rating and stated: "We have some more gutting to do come the new year." Richard Jean, SRM, Contractor Relations, stated in an email thread that a pick-up and delivery driver's recent party at his house "turned out to be more of a meeting than a party" and noting that this "could lead to union talk." The terminal manager was told to "prepare his file for contract termination." FedEx disputes this documentary evidence with testimony explaining what the managers meant — Mr. Super explained that his "feeling was that we would be . . . possibly reviewing independent contractors due to an overall performance level which was not upholding the contract," Super Dep., p. 130 — and evidence to show that such actions are inconsistent with FedEx policy and management views.

Further, FedEx points out that Mr. Currithers voluntarily terminated his contract, Mr. Hawkins' contract wasn't renewed for receiving numerous customer complaints and service failures, and according to FedEx, Mr. LaVake was terminated for creating a hostile work environment at the terminal and not meeting customer expectations. FedEx states that these drivers' experiences show

that the contract isn't terminable at-will. FedEx presents evidence that contract terminations are independently reviewed for breaches of the Operating Agreement and presents testimony that Contractor Relations frequently declines to concur in terminations and will deny a proposed termination if valid grounds for doing so under the Operating Agreement are lacking.

III. ANALYSIS

Citing to the summary judgment record, the plaintiffs ask the court to reconsider its order denying Michigan class certification, contending that common evidence will show that FedEx not only had the right to control the plaintiffs, but actually exercised that control on a class-wide basis.

*A. Standard*

The plaintiffs assert that this case is suitable for class certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Common questions predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." In re Bromine Antitrust Litig., 203 F.R.D. 403, 412 (S.D. Ind. 2001) (quotation marks and

citations omitted). "At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis." <u>Hyderi v. Wash. Mut. Bank FA</u>, 235 F.R.D. 390, 398 (N.D. Ill. 2006). To decide whether the liability issues are subject to class-wide proof, the court should consider the elements of plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on these issues. <u>Fletcher v. ZLB Behring LLC</u>, 245 F.R.D. 328, 332 (N.D. Ill. 2006).

The class common issues don't predominate "[i]f the liability issues are not subject to class-wide proof – but instead would require individual and fact intensive determinations." <u>Fletcher v. ZLB Behring</u>, 245 F.R.D. at 332. When "resolution of a common issue requires the court to resolve a variety of individualized issues, any efficiency that might be gained in a class action disappears." <u>Davidson v. Citizens Gas & Coke Utility</u>, 238 F.R.D. 225, 233 (S.D. Ind. 2006). The plaintiffs "bear the burden of proving that a class should be certified." <u>Clark v. Experian Info. Solutions, Inc.</u>, 256 Fed. Appx. 818, 821 (7th Cir. 2007) (unpublished).


*B. Michigan Law*

Courts use the economic realities test to determine employment status under Michigan law. <u>Kidder v. Miller-Davis Co.</u>, 564 N.W.2d 872, 876 (Mich. 1997); *see also* <u>Buckley v. Professional Plaza Clinic Corp.</u>, 761 N.W.2d 284, 290 (Mich. Ct. App. 2008) ("The economic reality test is the most common tool for

discerning whether an employee-employer relationship exists."). Employment status depends on the realities of the work performed and control is only one factor to consider. <u>Kidder v. Miller-Davis</u>, 564 N.W.2d at 876-877. The economic-reality test is a "more realistic attempt to define the employer-employee relationship through a 'balancing of all the relevant factors in each case,' than the rigid control test." <u>Id.</u> at 876 (*quoting* <u>Renfroe v. Higgins Mfg. Co., Inc.</u>, 169 N.W.2d 326, 329 n.3 (Mich. Ct. App. 1969)). The test considers the totality of the circumstances surrounding the work performed. <u>Mantei v. Michigan Public Sch. Employees Ret. Sys.</u>, 663 N.W.2d 486, 495 (Mich. Ct. App. 2003). When examining the totality of the circumstances, the court should generally consider the following factors: "'(1) [the] control of a worker's duties, (2) the payment of wages, (3) the right to hire and fire and the right to discipline, and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal.'" <u>Clark v. United Tech. Auto., Inc.</u>, 594 N.W.2d 447, 451 (Mich. 1999) (*quoting* <u>Askew v. Macomber</u>, 247 N.W.2d 288, 217-218 (Mich. 1976)).

Michigan courts have provided further guidance in determining employment status under the economic realities test by noting the following more expansive list of factors that a court may consider:

> First, what liability, if any, does the employer incur in the event of the termination of the relationship at will?

> Second, is the work being performed an integral part of the employer's business which contributes to the accomplishment of a common objective?

Third, is the position or job of such a nature that the employee primarily depends upon the emolument for payment of his living expenses?

Fourth, does the employee furnish his own equipment and materials?

Fifth, does the individual seeking employment hold himself out to the public as one ready and able to perform tasks of a given nature?

Sixth, is the work or the undertaking in question customarily performed by an individual as an independent contractor?

Seventh, control, although abandoned as an exclusive criterion upon which the relationship can be determined, is a factor to be considered along with payment of wages, maintenance of discipline and the right to engage or discharge employees.

Eighth, weight should be given to those factors which will most favorably effectuate the objectives of the statute.

Coblentz v. City of Novi, 719 N.W.2d 73, 85 (Mich. 2006) (citations and quotations omitted). No single factor is controlling, Clark v. United Tech. Auto., 594 N.W.2d at 451, and other factors can be considered as each individual case requires. Mantei v. Michigan Public Sch. Employees Ret. Sys., 663 N.W.2d at 495. For example, the court in Pedell, M.D. v. Heartland Health Care Ctr., No. 271276, 2007 WL 840876, at *6 (Mich. Ct. App. Mar. 20, 2007) (unpublished opinion), considered payment to the plaintiff's corporation, as opposed to the plaintiff directly, as a factor to consider in favor of independent contractor status.

When examining control, the court shouldn't only consider the right to control, but also the control actually exercised. The court in Kidder v. Miller-Davis examined the control each potential employer actually exerted over all the workers at the site when determining if plaintiff was an employee or independent

contractor. 564 N.W.2d at 880. The court further noted that the contract isn't dispositive of the status of the parties. Id. at 881. "Just as we have held that control is but one factor to consider under the economic-reality test, so is the contract but one factor. . . . [T]he agreement is neither dispositive nor controlling." Id. "The economic realities test is 'not a matter of terminology, oral or written, but of the realities of the work performed.'" Hool v. William A. Kibbe & Assoc., Inc., Nos. 255371 & 255390, 2005 WL 3115816, at *2 (Mich. Ct. App. Nov. 22, 2005) (unpublished opinion) (quoting Nichol v. Billot, 279 N.W.2d 761, 763 (Mich. 1979)).

The court in Mantei v. Michigan Public Sch. Employees Ret. Sys., 663 N.W.2d 486 (Mich. Ct. App. 2003), instead of relying solely on the parties' contract to determine employee status, examined the parties' actual relationship. Mr. Mantei was a retired principal from the public school district who started working for the school as a principal through a private-sector personnel-services company, Thumb Educational Services, Inc. The contract stated that Mr. Mantei was an agent and was to "comply with all established rules and regulations governing personnel within the District;" in the event of any alleged breach of the agreement by Mr. Mantei, Thumb would take any necessary disciplinary action and advise the school district of such action. Mr. Mantei's job responsibilities were the same before and after his retirement. He spent most of his days at the school, interacting with parents and staff, communicating directly with the superintendent regarding day-to-day concerns, evaluating other school employees, and providing administrative reports to the school district. The school district

provided him with an office, furniture, telephone, and support services, all on the school district's premises.

The school superintendent testified, though, that he didn't supervise or evaluate Mr. Mantei or have an ongoing personnel file as he did before Mr. Mantei's retirement. 663 N.W.2d at 496. Mr. Mantei wasn't required to report when he was leaving the building and the superintendent didn't have the authority to discipline him. "Thus, [Mr. Mantei] essentially exercised his independent professional judgment on a daily basis without direct supervision." Id. That Mr. Mantei was contractually bound to follow the rules and regulations of the school district and implement district policies, didn't necessarily mean that the school district had the right to control his work. The court determined that the petitioner "retained autonomy regarding the method and manner by which he fulfilled his obligations, thus undermining respondent's argument that the school district exercised control over petitioner." Id. at 497. The court held that even assuming "that the school district had some control over [Mr. Mantei] through its contract with Thumb, the ability to control is only one factor to consider under the economic-reality test, and the totality of the circumstances indicate that petitioner was not 'employed by a reporting unit.'" Id.

The plaintiffs urge the court to rely on Hyslop v. Klein, 270 N.W.2d 540, 542-544 (Mich. Ct. App. 1978), for the proposition that it need only examine the

right to control, not the actual exercise of control.[7] Applying the economic realities test, the Hyslop court held that the plaintiff farm-worker was an employee of the defendant farm-owner. In coming to this conclusion, the court examined a number of factors, including the degree of control the defendant had over the plaintiff's duties. Id. at 542. The court explained that the "correct test is not the actual exercise of control but the Right to control." Id. at 544 (citations omitted). The court stated:

> [T]he test is, and must be, based on the right (to control), not the exercise. Most often the distinction is of importance when a skilled or experienced workman appears to be doing his job without supervision or interference. By an 'exercise' test, he would seem to be uncontrolled; yet it will often be found that the employer, in any showdown, would have the ultimate right to dictate the method of work if there were any occasion to do so.

Id. (*citing* 1A Larson, § 44.10, pp. 8-19, 8-23, 8-24). But as noted in Hyslop, the Supreme Court disapproves of any "ultimate test." 270 N.W.2d at 542 n.3 (*citing* Askew v. Macomber, 247 N.W.2d 288, 291 (Mich. 1976)).

The court agrees with FedEx that the emphasis in Hysolp on the right to control, as opposed to actual exercise of control, stands in contrast to the weight of Michigan authority, which repeatedly has stated that the court should look to the totality of the circumstances and that no one factor is dispositive. The court therefore declines to rely on Hyslop for the proposition that the court can merely focuses its analysis on the right to control.

---

[7] The plaintiffs note that they inadvertently omitted this case from their class certification briefing.

## C. Application

This court can't resolve employment status under Michigan law by examining only common evidence. The plaintiffs present significant evidence that tends to show FedEx's supervision over all Michigan drivers' means and methods of carrying out their work, but before the court can determine employee status of the proposed putative class members, the court must examine the individual circumstances of those class members. Because no single factor is controlling and the court may consider different factors as each individual case requires, including actual exercise of control, the court simply cannot determine based on the evidence presented by the plaintiffs that all the class members should be treated alike; their experiences with FedEx will differ from terminal to terminal and driver to driver.

For example, while each driver may have engaged in business discussions, the topic, number, and tone of the discussions differ between drivers. Although the court could make generalizations about the nature of the discussions for all Michigan drivers and the degree of control exerted by FedEx, the economic realities test provides FedEx with an opportunity to show that it didn't actually exercise control over the individual plaintiffs. FedEx presents evidence that managers have discretion in how they conduct business discussions, how often, what issues are addressed, and their intended effect. FedEx's control over its drivers likely will vary between terminals and will be affected by the degree of autonomy the manager provides his drivers, requiring an individualized review of

driver and manager testimony, business discussions, customer service rides, drive release audits, and van service audits.

Other individualized issues that will affect the court's analysis of the actual control exerted by FedEx include the type and amount of training the driver received, whether the driver contracted with FedEx individually or through a proprietorship or corporate entity, whether the driver was forced to purchase or lease a particular vehicle, whether the driver was flexed or his work area reconfigured without his consent and over his objection, whether the driver had an annual review, whether the driver hired a helper or replacement contractor and his experience in obtaining FedEx's approval when hiring, whether the driver had to work certain hours, whether the driver was terminated at-will, and whether the driver sold his route upon termination.

The liability issues in this matter aren't subject to class-wide proof, but instead require individual and fact intensive determinations. Accordingly, the court DENIES the plaintiffs' motion to amend class certification order for Michigan drivers (doc. # 1318). The court INSTRUCTS the parties that have filed briefs on motions to amend class certification on the ground addressed in this order to file a supplemental statement within thirty days, not to exceed three pages, stating how their position differs from the positions addressed above.

SO ORDERED.

ENTERED:   March 30, 2010

_  /s/ Robert L. Miller, Jr._

Judge
United States District Court