UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

```
_____
                                        )
In re FEDEX GROUND PACKAGE              )        Cause No. 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT                )               (MDL-1700)
PRACTICES LITIGATION                    )
----------------------------------------)
THIS DOCUMENT RELATES TO:               )
                                        )
ALL ACTIONS                             )
                                        )
_____ )
```

OPINION AND ORDER

This matter is before the court on the plaintiffs' omnibus brief in support of summary adjudication asking the court to give collateral estoppel effect to the California Estrada decision in all the MDL proceedings (doc. # 1194). The plaintiffs contend that the Statement of Decision in Estrada v. FedEx Ground Package Sys., Inc., Los Angeles Superior Court, Case No. BC210130, aff'd, 64 Cal. Rptr. 3d 327 (Cal. App. Ct. 2007), precludes FedEx from denying that it has reserved the right to control and has exercised actual control over the manner and means used by the plaintiff drivers in performing their duties for FedEx under the terms of the Operating Agreement and common FedEx policies, procedures, and practices that implement the Operating Agreement's terms. For the reasons that follow, the court denies the plaintiffs' request to give preclusive effect to Estrada in the MDL cases.

I. BACKGROUND

In <u>Estrada</u>, the court found that FedEx had the right to control and exercised actual control over a California class consisting of FedEx single service area pick-up and delivery drivers. The MDL plaintiffs argue that the court's findings in <u>Estrada</u> have preclusive effect in both the certified and non-certified classes as to FedEx's right to control and, where applicable, its actual exercise of control.

FedEx disagrees that <u>Estrada</u> has any preclusive effect. First, FedEx says that certain material facts relied on in <u>Estrada</u> are different from those applicable in the MDL cases. FedEx made a number of operational changes directly affecting its relations with contractors after <u>Estrada</u>, such as the "Document Reengineering Initiative" that clarified the line between policies and procedures. FedEx also contends that the facts in the MDL proceedings will be different than those relied on by the <u>Estrada</u> court because the <u>Estrada</u> class was more narrow than the classes certified here and anecdotal evidence was offered during the <u>Estrada</u> trial involving California terminal managers' and drivers' individual experiences.

Second, FedEx contends the states in the various MDL proceedings apply different legal standards than the California court applied. Because the class certification orders analyzed each jurisdiction's law individually, FedEx reasons that the court's analysis confirms that various jurisdictions treat the factors relevant to the right to control differently.

Third, FedEx states that application of collateral estoppel to the MDL proceeding would be contrary to public policy. The <u>Estrada</u> judgment, FedEx says,

is inconsistent with one or more previous judgments in favor of FedEx. Also, the Estrada appellate court reversed the trial court's equitable order enjoining FedEx from misclassifying single service area drivers under its then-current business model because the plaintiffs lacked standing to seek such relief. Accordingly, FedEx contends a decision applicable to a defined class of California FedEx single service area drivers that doesn't apply even throughout California shouldn't be given nationwide preclusive effect.

In Estrada v. FedEx Ground Package Systems, Inc., Los Angeles Superior Court, Case No. BC210130, the court certified a class of FedEx pickup and delivery contractors who at any time between May 1996 and July 2001 performed services for FedEx in the State of California driving full-time in a single work area (SWA) dispatched from a California-based terminal pursuant to the Operating Agreement. *See* Statement of Decision dated July 26, 2004, pp. 1-2. Drivers who operated in multiple work areas (MWAs), corporate entities, and others were excluded from the class. Decision, p. 2. Two of the named plaintiffs were SWA drivers and another was an MWA driver; although excluded from the class, the MWA driver continued in the litigation individually seeking a determination of employment status. Decision, pp. 2-3.

On July 26, 2004, after a nine-week bench trial with forty-six witnesses, the California Superior Court issued its Statement of Decision finding that the drivers in the plaintiff class were employees, but that the MWA plaintiff was an independent contractor. Decision, p. 3. The Estrada court based its decision on

the employment test set forth in <u>S.G. Borello & Sons, Inc. v. Department of Indust.</u> <u>Relations</u>, 769 P.2d 399 (Cal. 1989), which this court has noted is similar to the "economic realities test" applicable to FMLA claims. *See* Doc. # 1119, pp. 62-63. The principal factor is the "right to control the manner and means of accomplishing the result desired." <u>S.G. Borello & Sons v. Department of Indust.</u> <u>Relations</u>, 769 P.2d at 404 (citations omitted). "[I]t is the right to control, not the exercise of the right, which bears on the status of the work arrangement." <u>Id.</u> at 408 n.9.

The <u>Borello</u> court explained that "the 'control' test, applied rigidly and in isolation[] is often of little use in evaluating the infinite variety of service arrangements." <u>Borello</u>, 769 P.2d at 404. "[T]he right to control work details is the 'most important' or 'most significant' consideration," but isn't dispositive. <u>Id.</u> For example, the right to discharge at will, without cause, provides strong evidence in support of an employment relationship. <u>Id.</u> "Additional factors have been derived principally from the Restatement Second of Agency," and include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

<u>Id.</u> (citations omitted).

4

The Borello court also suggested that other factors could be considered, such as the alleged employee's opportunity for profit or loss depending on his managerial skill. Id. at 407. The individual factors generally "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." Id. at 404.

The trial court's findings in Estrada were based upon all the standards set forth in Borello, but the court was primarily guided by the right to control the manner and means of accomplishing the result desired, whether there had been integration into FedEx's operation, and whether there was an opportunity for profit or loss based upon managerial skill. Decision, p. 3. The court relied on class evidence and testimony from FedEx management, not localized anecdotes. Decision, pp. 3-4. For all practical purposes, the court found that all terminals were run in a similar manner. Decision, p. 4. The court noted that the binding effect of FedEx's policies or procedures was based upon the subjective evaluation of management using common sense and thus, any determination "would be very situational." Decision, p. 8. By leaving such subjective interpretation to management's discretion, the court reasoned that the relationship between the SWA drivers and FedEx "metamorphas[es] into a tightly controlled hierarchal employment model." Decision, p. 9. The court declined to examine individualized instances of control or lack of control, but instead focused on the interpretive power of FedEx, which allows FedEx to determine what is and isn't applicable. Decision, p. 10.

After listing several FedEx practices and occurrences presented at trial that showed FedEx's control, the court reasoned:

> There is no necessity for the court to determine if each alleged event was the purposeful design of [FedEx] or the act of a 'rogue' terminal manager. What is important is that by reason of the interpretive power of [FedEx], such actions can and do flourish with the tacit approval of higher management based upon the uncertainty of the standards which [FedEx] determines to be applicable or non-applicable, depending on the situation. . . .

> The lack of objective, precisely defined guidelines either reflects a totally disorganized business, which [FedEx] is certainly not, or a highly motivated, well organized entity, which it is, that utilizes control and order in order to meet its successful economic goals. . . .

Decision, pp. 10-11. "The court [found] that [FedEx], not only has the right to control, but has close to absolute actual control over the SWAs based upon interpretation and obfuscation" of the Operating Agreement's terms. Decision, p. 4. The court explained that FedEx exerted control by uncertainty, reasoning that the Operating Agreement is comprised primarily of platitudes and guidelines, leaving its "interpretation in the sole hands of [FedEx], without any meaningful recourse to the SWAs but with potential severe penalties and remedies that are intentionally kept uncertain and murky." Decision, p. 4. The Operating Agreement created the "constraints of an employment relationship . . . in the guise of an independent contractor model." Decision, p. 5.

The court cited numerous provisions of the Operations Management Handbook providing FedEx with control over the SWA drivers, including 9.5 hours of minimum service required, reconfiguration of work areas, mandatory flexing,

prohibition against informal flexing, a requirement that drivers return to their terminal daily, and required business plan discussions. Decision, pp. 6-7. The FedEx Ground Manual required drivers to wear uniforms and terminal managers to observe and note the appearance of the driver and equipment and conduct customer service rides. Decision, p. 7. FedEx could determine when to reconfigure a route or terminate a contract because of a "service failure," a definition determined by FedEx based "upon situational subjectivity and a panoply of sources[,]" providing FedEx with "almost absolute control." Decision, p. 10. The evidence showed that FedEx had some discretion to control who a driver hires or who a driver may sell a route to beyond the DOT requirements. Decision, p. 14. The evidence also showed that the drivers' work hours were constrained by customer pick up and delivery windows contracted by FedEx's sales force. Decision, pp. 14-15.

The court explained that FedEx recommends leases of trucks and the type of trucks to obtain, provides a Business Support Package to obtain scanners, uniforms, and other items required by FedEx, provides a Contractor Assistance Program for loans relating to operating expenses, and offers a Service Guarantee Account. Decision, p. 21. These programs "place a great deal of control in the hands of [FedEx] so that the SWAs can obtain the equipment, items and upgrades in order to be able to do their work" through deductions from their weekly settlement checks; the court analogized these programs to a "company store." Decision, pp. 20-21.

The court found that the SWA drivers and MWA drivers part company because there is little or no opportunity for profit or loss as a SWA driver, while there is such opportunity for MWA drivers. Decision, p. 17. The court acknowledged that the MWA drivers, like SWA drivers, are under strict controls by FedEx, but they differ because the MWA drivers' ability to profit is unlimited, making them independent contractors according to the Estrada court. Decision, pp. 17-18. The court noted that even though a SWA driver may become a MWA driver by purchasing additional routes, they cannot do so without FedEx's consent. Decision, p. 15.

The California court of appeals affirmed the trial court's finding that the SWA drivers are employees; the MWA plaintiff wasn't a party to the appeal. Estrada v. FedEx Ground Package Sys., Inc., 64 Cal. Rptr. 3d 327, 330 (Cal. Ct. App. 2007). The court of appeals initially reviewed various provisions of the Operating Agreement providing FedEx with control, Id. at 331-332, but reasoned that in addition to the Operating Agreement's terms, both parties at trial "presented anecdotal and other evidence through the testimony of numerous drivers, FedEx managers, and experts . . . to show FedEx's power to interpret the Operating Agreement." Id. at 332, 338. The court noted that the anecdotal evidence "was relevant to the class as whole, not just to the drivers who happened to be the subject of a particular anecdote." Id. at 338.

The court of appeals held that the trial court's finding were supported by the evidence and reasoned:

FedEx's control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair, supports the trial court's conclusion that the drivers are employees, not independent contractors. The drivers must wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with FedEx's logo. The larger items-trucks and scanners-are obtained from FedEx approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks. Many standard employee benefits are provided, and the drivers work full time, with regular schedules and regular routes. The terminal managers are the drivers' immediate supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers' resulting loss of income. The customers are FedEx's customers, not the drivers' customers. FedEx has discretion to reject a driver's helper, temporary replacement, or proposed assignee.

Drivers—who need no experience to get the job in the first place and whose only required skill is the ability to drive—must be at the terminal at regular times for sorting and packing as well as mandatory meetings, and they may not leave until the process is completed. The drivers are not engaged in a separate profession or business, and they are paid weekly, not by the job. They must work exclusively for FedEx. Although they have a nominal opportunity to profit, that opportunity may be lost at the discretion of the terminal managers by "flexing" and withheld approvals, and for very slight violations of the rules.

Id. at 336-337 (footnotes omitted). The court also reasoned that "[a]lthough the Operating Agreement provides for termination with cause, it also provides for nonrenewal without any cause at all - and substantial evidence established that FedEx discharges drivers at will." Id. at 336. Despite the terms in the Operating Agreement supporting independent contractor status, the court reasoned that "the evidence shows that FedEx's conduct spoke louder than its words." Id.


II. DISCUSSION

9

The Full Faith and Credit statute requires federal courts to give state judicial proceedings the same full faith and credit the courts of the issuing state would give them. 28 U.S.C. § 1738. Accordingly, federal courts must accord preclusive effect to issues decided by state courts. Allen v. McCurry, 449 U.S. 90, 96 (1980). "Whether a judgment of a state court results in issue preclusion depends upon the law of that state." McNealy v. Caterpillar, Inc., 139 F.3d 1113, 1116 (7th Cir. 1998) (citation omitted); *see also* Rogers v. Desiderio, 58 F.3d 299, 301 (7th Cir. 1995) ("The preclusive effect of a state judgment in federal litigation depends on the rendering state's law."). California law therefore controls this court's collateral estoppel analysis.

Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. Lucido v. Superior Court, 795 P.2d 1223, 1225 (Cal. 1990). The doctrine precludes a party to a prior litigation from relitigating issues decided against him, even if the claims involved aren't the same. Vandenberg v. Superior Court, 982 P.2d 229, 237 (Cal. 1999). Precluding parties from contesting matters they have had a full and fair opportunity to litigate "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Alberto-Culver Co. v. Trevive, Inc., 199 F. Supp. 2d 1004, 1008 (C.D. Cal. 2002) (*citing* Montana v. United States, 440 U.S. 147, 153-154 (1979)).

A prior decision precludes relitigation of an issue under California's doctrine of collateral estoppel only if five threshold requirements are satisfied:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

Lucido v. Superior Court, 795 P.2d at 1225; *accord* Pacific Lumber Co. v. State Water Res. Control Bd., 126 P.3d 1040, 1054 (Cal. 2006). "The party asserting collateral estoppel bears the burden of establishing these requirements." Lucido v. Superior Court, 795 P.2d at 1225.

"[E]ven where the minimal prerequisites for invocation of the doctrine are present, collateral estoppel is not an inflexible, universally applicable principle; policy considerations may limit its use where the . . . underpinnings of the doctrine are outweighed by other factors." Vandenberg v. Superior Court, 982 P.2d at 237 (quotations and citations omitted). Beyond the threshold requirements, the court also must decide whether application of the collateral estoppel bar would be fair to the parties and constitute sound judicial policy, taking into account the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation. Lucido v. Superior Court, 795 P.2d at 1226-1227. "[I]n deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel." Johnson v. GlaxoSmithKline, Inc., 83 Cal. Rptr. 3d 607, 616

(Cal. Ct. App. 2008) (*citing* <u>Clemmer v. Hartford Ins. Co.</u>, 587 P.2d 1098 (Cal. 1978)).

Whether FedEx reserved a right to control its California SWA drivers was actually litigated in <u>Estrada</u> and decided by that court in determining the plaintiffs' employment status. "[A]n issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding." <u>Hernandez v. City of Pomona</u>, 207 P.3d 506, 514 (Cal. 2009). FedEx appealed the decision and the appellate court affirmed the trial court's findings. The California Supreme Court denied FedEx's petition for review. The decision therefore is final and on the merits. *See e.g.*, <u>McAlister v. Essex Property Trust</u>, 504 F. Supp. 2d 903, 911 (C.D. Cal. 2007) ("A judgment is not final while there is time to appeal or while an appeal is pending . . . and is not on the merits if based on a technical or formal defect."). Accordingly, of the five threshold requirements necessary to satisfy collateral estoppel only the first is at issue here: whether the issue sought to be precluded is identical to that decided in the former proceeding. FedEx also contends that even if this requirement is met, application of the collateral estoppel bar would be unfair and wouldn't constitute sound judicial policy.

## A. Identity of Issues

For collateral estoppel to apply, "the legal matter raised in the second proceeding must involve the same set of events or documents and the same

bundle of legal principles that contributed to the rendering of the first judgment." Flores v. Transamerica HomeFirst, Inc., 113 Cal. Rptr. 2d 376, 381 (Cal. Ct. App. 2001) (citation omitted); *see also* Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000) ("Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules.'" (*quoting* 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4425, at 253 (1981).). Collateral estoppel doesn't apply when there are changed conditions or new facts that didn't exist at the time of the earlier judgment, or when the previous decision was based on different substantive law. United States Golf Ass'n v. Arroyo Software Corp., 81 Cal. Rptr. 2d 708, 713 (Cal. Ct. App. 1999) (*citing* People v. Ocean Shore R.R., 196 P.2d 570 (Cal. 1984)); *see also* Wimsatt v. Beverly Hills Weight Loss Clinics Int'l, Inc., 38 Cal. Rptr. 2d 612, 615 (Cal. Ct. App. 1995) ("[W]here the previous decision rests on a 'different factual and legal foundation' than the issue sought to be adjudicated in the case at bar, collateral estoppel effect should be denied.").

"The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." Hernandez v. City of Pomona, 207 P.3d at 511-512; *see also* Lucido v. Superior Court, 795 P.2d at 1225 (same). "Collateral estoppel bars relitigation of the same issues; it does not require identity of legal theories or causes of action." Evans v. Celotex Corp., 238 Cal. Rptr. 259, 261-262 (Cal. Ct.

App. 1987). "Precisely defining the issue previously decided and the one sought to be precluded is critical." <u>Johnson v. GlaxoSmithKline, Inc.</u>, 83 Cal. Rptr. 3d at 620.

### 1. Changed Conditions or Varying Facts

FedEx argues that collateral estoppel doesn't apply because of the following changed circumstances or varying facts: the Document Reengineering Initiative that FedEx began in 2005, the differences in class definition between the <u>Estrada</u> class and the MDL classes, and the <u>Estrada</u> court's reliance on evidence unique to the California class.

### a. Document Reengineering Initiative

After <u>Estrada</u>, FedEx maintains it initiated a number of operational changes affecting its relations with contractors. In 2005, FedEx began a "Document Reengineering Initiative" to overhaul its policies, procedures, and forms. That initiative was meant to clarify the line between policies (statements "outlining a mandatory course of action") and procedures (statements "providing the how and when or how often for implementing the policies"), so that FedEx employees would better understand FedEx's expectations. Among the changes was Policy-007, introduced after <u>Estrada</u>, reinforcing that FedEx employees must adhere to the Operating Agreement in their interactions with contractors, the terms of the Operating Agreement may not be modified, and, most significantly, "*[n]o officer,*

*agent or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results.*" FedEx Exh. B-02 (emphasis in original). Policy-007 repeats the language of Section 1.15 of the Operating Agreement as a policy and states that a violation of its terms may result in disciplinary action.

FedEx points to the following examples of other changes made to its procedures:

(1) The reengineered OPR-716 (formerly the same number) excludes any restriction on independent contractors informally trading or "flexing" packages amongst themselves and allows contractors to trade packages to increase or decrease volume. *Compare* FedEx Exh. B-14, *with* FedEx Exh. B-27.

(2) The reengineered CRL-555 (formerly OPR 555) makes clear that comments based on customer service rides constitute "recommendations," not mandatory instructions, and that "[t]he contractor is solely responsible for exercising independent discretion and judgment to achieve business objectives" addressed by possible recommendations. *Compare* FedEx Exh. B-04, *with* FedEx Exh. B-26.

(3) The reengineered CRL-551 (formerly OPR-551) states that qualified drivers must have a minimum of six months driving experience (as opposed to a year) or have completed QPDL training (as instituted in 2003), and further states that contractors who do not intend to drive need not meet these qualifications. *Compare* FedEx Exh. B- 03, *with* FedEx Exh. B-25.

(4) The reengineered CRL-551 (formerly OPR-551) also excludes any restriction on independent contractors' ability to hire relatives to drive for them. *Compare* FedEx Exh. B-03, *with* FedEx Exh. B-25.

(5) The reengineered SAF-056 (formerly the same number) made clear that contractors had the option of satisfying their ongoing D.O.T. safety obligations by attending meetings offered by outside vendors instead of meetings offered by FXG at each of the terminals. *Compare* FedEx Exh. B-20, *with* FedEx Exh. B-28.

FedEx has also implemented other programs to enhance contractor's opportunity for profits, including the Enhanced Primary Plus Program, which encourages SWA drivers to grow their business and become MWA drivers. FedEx eliminated prohibitions on SWA drivers obtaining a second route within the first year of contracting and increased the maximum number of routes a contractor could own at any one terminal. *See* Marticke Dep., pp. 140-144 (providing further explanation of these changes).

There is evidence to show that reengineered policies and procedures were generally communicated to terminal mangers nationwide, addressed in regional seminars and FedEx Ground University programs, and made continuously available through FedEx Ground's intranet. James Krappa, who had taken over leadership of the DRI, testified that FedEx provided training to senior managers to go over the changes to the policies and procedures that resulted from the document re-engineering initiative. Krappa Dep., pp. 134, 302-304. Steve Handy, FedEx's Chief Learning Officer, testified that he didn't think they had any training on the DRI, but there was a communication to the field informing them of the changes. The changes were also a part of the university training and regional seminars and available on-line for managers to review. Handy Dep., pp. 92-94.

The plaintiffs respond that the Operating Agreement hasn't changed in any significant way since the Estrada decision and that it's immaterial that FedEx re-labeled some of its "policies" as "procedures" or made slight modifications to the rules specifically addressed in Estrada. The plaintiffs argue that what matters is

16

that FedEx continues to reserve the right to interpret the Operating Agreement and policies. The plaintiffs offer the expert report of Robert F. Wood to show that the policy changes were merely cosmetic and haven't affected significant changes in the manner FedEx operates its business or treats its pick-up and delivery drivers. Pl. Exh. 11:26-27. Mr. Wood's opinion as to the policy changes is based on a review of the policies and testimony from FedEx employees. FedEx has moved to strike Mr. Wood's report, but the court needn't address FedEx's motion at this time because, instead of relying on his report, the court relies on the policies and testimony presented to determine if the changes FedEx made were substantive.

The plaintiffs reason that FedEx's system-wide policies and procedures are substantially the same as those at issue in Estrada, including policies and procedures on (1) evaluating drivers' personal appearance; (2) approving size, type, markings, and appearances of drivers' vehicles; (3) recruiting and training drivers in FedEx delivery and customer service methods, evaluating their work performance, and imposing discipline; (4) approving the use of additional vehicles, drivers and helpers, and routes; (5) shifting packages between drivers on a day-to-day basis (flexing) and reconfiguring driver routes permanently to balance the workloads between them; (6) determining the drivers' days and hours of work; (7) compensating drivers; and (8) terminating driver contracts. The plaintiffs also point out that FedEx continues to conduct customer service rides and driver release and road audits and to hold business discussions with its drivers to ensure that they are meeting FedEx's quality and safety standards.

The evidence is somewhat conflicting as to the effect FedEx's document reengineering initiative has had on FedEx's operations. Heather D'Alesandro, Manager of Succession Planning and former Managing Director of FedEx Ground University, initiated the DRI in March 2005. D'Alesandro Dep., pp. 8, 13. Ms. D'Alesandro explained that the initiative was implemented to "ensure [FedEx employees] understood what a policy was, what a procedure was, and what a reference material was, understood the importance between those variations, and understood consequences, when consequences existed and when they did not." D'Alesandro Dep., p. 9. The focus of the DRI was to help FedEx employees "better understand the expectations of [FedEx] documentation." D'Alesandro Dep., p. 92. FedEx managers "who interact with the contractors are absolutely going to conduct business with [them] in terms of the Operating Agreement[,] . . . so if they ever have a question, . . . they're always expected to act in terms of the Operating Agreement." D'Alesandro Dep., pp. 93-94. In doing so, FedEx more clearly defined a policy and, as a result, narrowed and reduced its policy statements. D'Alesandro Dep., pp. 108-110. FedEx also added clauses indicating that failure to comply with the policy statements might result in disciplinary action, including termination. D'Alesandro Dep., p. 109. The procedures were designed as a framework for implementing the mandatory policies. D'Alesandro Dep., p. 110.

Several FedEx officers testified that they weren't specifically aware of the DRI or changes associated with the DRI. Steve Handy, Ms. D'Alesandro's superior, oversaw the initiative. Handy Dep., p. 8. He testified that the DRI resulted in fewer

and clearer policies and procedures: "[i]n other words, the difference between a policy and a procedure was clarified, and we have easier-to-understand procedures." Handy Dep., pp. 80-81. He also testified that there weren't any substantive changes to the procedures he was responsible for changing, which included maintenance of facilities, check-in, and service measurement. Handy Dep., p. 81. He wasn't aware of any other specific substantive changes. Handy Dep., p. 82. FedEx's Divisional Vice President, Robert Holcombe, testified that there might have been a change, but he didn't recall the specific time frame. Holcombe Dep., p. 132. FedEx's Divisional Vice President, Scotty Ray, testified that he wasn't aware of any changes or alterations to the policies or procedures of the company as part of a document re-engineering initiative. Ray Dep., p. 76. Sr. Vice President of Operations, Michael Mannion, testified that he wasn't aware of anything that has occurred in the company with regard to the DRI. He said he couldn't "link the document reengineering to the changes that have been made." Mannion Dep., pp. 75, 89. Kevin Koken, FedEx Managing Director of the Midwest Region, testified that he had heard of the DRI, but wasn't aware of significant changes that were made as part of that process. Koken Dep., p. 134. He also wasn't aware of any training that was done with respect to the changes made as a result of the DRI. Koken Dep., p. 136.

"[C]ollateral estoppel 'was never intended . . . to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have

occurred which may have altered the legal rights or relations of the litigants.'"

Evans v. Celotex Corp., 238 Cal. Rptr. 259, 262 (Cal. Ct. App. 1987) (*citing* Hurd v. Albert, 3 P.2d 545 (Cal. 1931)). The changed circumstances must be material to the judgment. Alberto-Culver Co. v. Trevive, Inc., 199 F. Supp. 2d 1004, 1017 (holding that collateral estoppel didn't apply to defendant's repackaged product in trademark infringement action, but only after questioning whether it was a material change); *see also* Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86, 91 (1st Cir. 2007) (finding preclusive effect where the challenged policy didn't change in any significant way from one suit to the next).

The court in United States Golf Ass'n v. Arroyo Software Corp. held that collateral estoppel didn't apply because the relevant facts changed after the first decision. 81 Cal. Rptr. 2d 708, 713 (Cal. Ct. App. 1999). The USGA brought a previous lawsuit [*United States Golf Ass'n v. St. Andrews Sys., Data-Mix, Inc.*, 749 F.2d 1028 (3d Cir. 1984)], against a computer company that sought to issue USGA handicaps directly to individual golfers, using USGA formulas and associated distinctive service marks, without the USGA's permission. The *St. Andrews* court rejected the USGA's lawsuit against the company for misappropriation of its formulas. Three years after the *St. Andrews* decision, the USGA adopted new formulas. The USGA later sued Arroyo for misappropriating its name and service marks, and Arroyo asserted that collateral estoppel barred suit. The Arroyo court found that collateral estoppel didn't apply because after *St. Andrews*, the USGA completely changed its Handicap System by abandoning its

20

older formula and developing entirely new formulas. The court concluded that "[b]ecause . . . the underlying factual conditions . . . changed from the time of the decision in *St. Andrews*, it cannot be said that the issues before [the courts were] 'identical.'" 81 Cal. Rptr. 2d at 713.

When the changed circumstances are immaterial, collateral estoppel won't apply. Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86, 90 (1st Cir. 2007). The plaintiff in Ramallo Bros. Printing v. El Dia brought a second suit under the Sherman Act against newspaper publishers because they had a policy of only publishing corporate supplements printed by AGP. The plaintiff had sued the defendants earlier for a similar policy requiring all publications to be printed by Creative Minds, and the court found no antitrust violations. The defendants argued that collateral estoppel precluded the second suit, and the plaintiff responded that changed circumstances made collateral estoppel inapplicable. The court agreed with the defendant because the changed circumstances were legally insignificant:

> [I]t is immaterial that [plaintiff] sued in its capacity as a printer for third parties in the first case and in its capacity as an advertiser for its own company in the second. The challenged policy did not change in any significant way from one suit to the next; the policy was applied in the same manner whether [plaintiff] acted in its capacity as a printer for others or as a printer for itself; and the policy's legality under the antitrust laws in no way turned on what role-printer or advertiser-[plaintiff] was playing when it sought to insert a corporate supplement into [the newspapers].

Id. at 91 (footnote omitted). *See also* County of Los Angeles v. County Assessment Appeals Bd., 16 Cal. Rptr. 2d 479, 483 (Cal. Ct. App. 1993) (finding that collateral

estoppel applied even though the two case involved different tax years and different agreements; the agreements were materially identical and the situation to which they applied was the same).

Similarly in <u>Pignons S.A. de Mecanique v. Polaroid Corp.</u>, 701 F.2d 1 (1st Cir. 1983), the plaintiff brought a second suit against Polaroid alleging false advertising in violation of the Lanham Act. The first suit involved similar allegations of trademark infringement, false advertising, and unfair competition in violation of the Lanham Act; the court found against the plaintiff in that suit. In the second suit, the plaintiff argued that collateral estoppel was inapplicable because its new complaint concerned post-judgment advertisements and products. The court concluded that because the advertisements didn't differ in any significant respect from the first suit, collateral estoppel applied. <u>Id.</u> at 2.

FedEx argues collateral estoppel doesn't apply because of changes to its policies and procedures that were implemented as part of the DRI. This court, however, doesn't find that those changes are material such that they would have an effect on the outcome of the litigation. For example, FedEx revised Policy-007 to reinforce that "[n]o officer, agent, or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results." The Operating Agreement, which hasn't changed in any material respects since <u>Estrada</u>, contains similar language. Also, FedEx re-engineered CRL-555 (formerly OPR 555) to make clear that feedback based on customer service rides constitutes "recommendations," not mandatory

instructions. FedEx, however, is still conducting customer service rides and the "suggestions" are coming from managers who have discretion to recommend contract termination and non-renewal; that FedEx labels the discussions as suggestions doesn't change their intended effect.

Even more significantly, FedEx officers, some of whom were involved in the DRI, weren't aware of any substantive changes made to company policies or procedures. The court simply can't agree with FedEx that the DRI constituted a material change if FedEx officers and those specifically involved in the initiative can't say how any of the changes have affected FedEx's operations or its dealings with drivers. Because there is no showing that the changed policies and procedures likely would lead to a different result, they don't prevent application of collateral estoppel. This case is dissimilar to <u>United States Golf Ass'n v. Arroyo Software Corp.</u> where the changed facts were material to the outcome. Here, as in <u>Pignons v. Polaroid</u> and <u>Ramallo Bros. Printing v. El Dia</u>, the policies and procedures that were changed as a result of the DRI don't differ in any significant respect from the old. The DRI doesn't affect application of collateral estoppel.

### b. Class Definition

FedEx contends that because the <u>Estrada</u> class was more narrow than the class of drivers in the MDL proceedings — the <u>Estrada</u> class excluded those who serviced more than one work area and contractors that were incorporated — applying the ruling beyond the scope of the carefully defined class would make a

mockery of the lengthy and hotly contested class certification proceedings conducted in Estrada. That argument misconstrues the plaintiffs' request for collateral estoppel. The issue that the plaintiffs seek to bar FedEx from relitigating is whether the terms of the Operating Agreement — as well as the common corporate policies that implement those terms — give FedEx the right to control how the drivers perform their work.

FedEx's reserved right to control SWA drivers (whether incorporated or not) and MWA drivers is the same because they are signatories to the same Operating Agreement and subject to the same common FedEx policies, procedures, and practices. FedEx doesn't assert that it has different policies or practices for MWA drivers or corporate entities. Accordingly, if FedEx retains the right to control unincorporated SWA drivers, it retains the right to control incorporated SWA drivers and MWA drivers. In fact, the Estrada court found that MWA drivers were subject to the "same strict controls" as the SWA drivers, but were independent contractors because of their opportunity to profit. The right or actual exercise of control isn't always dispositive. The difference in class definition therefore doesn't preclude application of collateral estoppel as to the issue of FedEx's reserved right to control.

To the extent the plaintiffs seek to give preclusive effect to the Estrada court's finding of employment status, however, FedEx's argument has merit. In their summary judgment memorandum for the Alexander (CA) class, the plaintiffs contend that Estrada conclusively establishes the employee status of California

24

drivers at issue in the MDL proceeding. They argue that "[w]ith respect to its California drivers, [FedEx] is estopped from re-litigating the question of the employee status entirely." Doc. 1153, p. 6. Because the Estrada court's finding of employee status applied only to unincorporated SWA drivers, the court can't give that decision preclusive effect as to incorporated SWA drivers or MWA drivers, especially when the trial court found that those groups should be treated separately in making that determination. Accordingly, the Estrada court's employment finding simply doesn't apply to the broader defined classes in this MDL proceeding.

### c. Evidence Specific to California

FedEx contends the evidence relied on in Estrada was different than the evidence this court has indicated it will rely on when ruling on the plaintiffs' motions for summary judgment. In Estrada, the plaintiffs introduced testimony from eleven drivers and two terminal mangers, each of whom related personal anecdotes about their own experiences driving for FedEx. FedEx responded with testimony from seven more drivers and six terminal managers, who in turn related their own individual experiences. FedEx argues that that evidence can't be introduced in this case because in the class certification order, this court stated that it resolved *all* the class certification motions "with the . . . assumption that the plaintiffs will not, at the summary judgment or trial stages, present evidence

*other than the Operating Agreement and generally applicable FedEx policies.*" Doc. 1119, p. 153 (emphasis added).

The plaintiffs respond that the Estrada ruling was based on the terms of the 1994 Operating Agreement, which substantially remains in effect today, as well as FedEx's generally applicable corporate policies, procedures, and documents implementing those terms. Key to the trial court's conclusion, the plaintiffs assert, was the view that FedEx's corporate policies — which are intended to guide FedEx field mangers — are "laden with detailed descriptions of control" it may exercise over drivers consistent with the Operating Agreement. The plaintiffs say that the significance of the driver and manager testimony was simply to show that the terms of the Operating Agreement and FedEx's policies and procedures are implemented uniformly by FedEx.

The anecdotal evidence in Estrada wasn't admitted to show specific incidences of control, but "was admitted to show FedEx's power to interpret the Operating Agreement and was relevant to the [California] class as whole." Estrada, 64 Cal. Rptr. 3d at 338. The Estrada court based its ruling on common evidence applicable to California terminals and explained that even despite the terms in the Operating Agreement supporting independent contractor status, "the evidence shows that FedEx's conduct spoke louder than its words." Id. at 336.

"[I]f the very same facts and no others are involved in the second case, . . . the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change." Flores v. Transamerica HomeFirst,

Inc., 113 Cal. Rptr. 2d 376, 380 (Cal. Ct. App. 2002). Conversely, if the earlier proceeding required analysis of facts that were unique to that case, collateral cannot apply. *See* Id. (finding collateral estoppel didn't apply to unconscionability of an arbitration provision in a loan document because the documents in the two cases, although nearly identical, "were signed by different parties under different circumstances").

In Kramer v. Showa Denko K.K., 929 F. Supp. 733 (S.D. N.Y. 1996), consumers brought a products liability suit against the defendant manufacturer of L-tryptophan (SDK LT), claiming that the product caused EMS and was defective. In support of its collateral estoppel argument, the plaintiffs presented other SDK LT litigation [*DiRosa v. Showa Denko K.K.*, 52 Cal. Rptr. 2d 128 (Cal. Ct. App. 1996), and *Creamer v. Showa Denko K.K.*, uncited Georgia federal court case] they claimed demonstrated that the defendants had a full and fair opportunity to litigate these identical issues. The court found that "neither the *DiRosa* nor the *Creamer* juries necessarily decided identical issues to those currently pending before this Court." 929 F. Supp. at 750. The court explained:

> [Not all SDK LT was] manufactured in a standard, uniform fashion. Absent such a uniform manufacturing process, it is impossible to find that all SDK LT is of the same quality or subject to the same alleged manufacturing defects. Moreover, the only evidence that the parties have produced regarding the LT that [the plaintiff] ingested establishes that it did not come from the same lot as the LT consumed by the *Creamer* plaintiff. Given that the SDK LT taken by the plaintiffs in these two cases came from different lots, which were manufactured under different conditions, the facts and arguments considered by the *Creamer* jury are not identical to the facts and arguments present in the instant case. . . .

> [A]s in *Creamer*, it is not clear that DiRosa and Noel Kramer ingested SDK LT manufactured at the same time, in the same lot, and under the same manufacturing conditions.

Id. Accordingly, the court found that neither jury verdicts should be given collateral estoppel effect. Id.

Similarly, some of the evidence relied on in Estrada was specific to California drivers and managers. The Estrada court relied on common evidence from upper management and California terminal managers and drivers to show that FedEx retains discretion to interpret the Operating Agreement and commonly applicable policies and procedures — *i.e.*, FedEx's conduct spoke louder than its words. The Estrada court may have relied on common evidence, but it wasn't necessarily common evidence applicable to all FedEx drivers nationwide. *See* Statement of Decision, p. 12 (noting that certain evidence outside of California was not in the class purview). The Estrada court didn't rely simply on the terms of the Operating Agreement and FedEx policies and procedures, but instead looked outside the documents to determine their uniform application throughout California by FedEx upper management and terminal managers. Because the Estrada decision required analysis of facts that were specific to that case, collateral estoppel cannot apply.

This is especially true in non-certified cases where this court found that individualized evidence will be needed to decide if FedEx actually exercises the control it allegedly retained in the Operating Agreement and commonly applicable policies and procedures. The evidence of actual control presented in Estrada was

specific to that case and can't be a basis for application of collateral estoppel in other cases in which individualized evidence of actual control over the plaintiffs must be reviewed and considered in determining employment status.

*2. Different Legal Standards*

FedEx also contends that the collateral estoppel bar doesn't apply because different legal standards govern the various cases in the MDL proceeding. FedEx reasons that the class certification orders analyzed each jurisdiction's law individually and that the court's analysis confirms that various jurisdictions treat the factors relevant both to employment status and the right to control differently. For example, the right to control isn't dispositive in some certified states, and in other states, it alone can be determinative. In deciding whether a given party has a "right to control" indicative of employment, states evaluate varying factors and weigh those factors differently. As to MWA drivers, the <u>Estrada</u> court found the opportunity for profit and loss factor outweighed factors indicating control over drivers' actions, so control wasn't dispositive. At a minimum, FedEx contends the <u>Estrada</u> decision illustrates how variances in the factors considered and the weight given to them can lead to different outcomes.

The test used by California is similar to the "economic realities test" applicable to FMLA claims. Doc. # 1119, pp. 62-63. The principal factor is the right to control the manner and means of the work, but numerous other factors also bear on the court's determination. <u>S.G. Borello & Sons, Inc. v. Department</u>

of Indust. Relations, 769 P.2d 399, 404 (Cal. 1989). In applying the broad Borello test, the Estrada court considered and found in favor of the plaintiffs as to all the control factors. The plaintiffs contend this finding should have preclusive effect because whether the hiring party has the right to control the manner and means of the drivers' work is a central feature to the employment tests applied by the various states in the certified MDL classes.

"Issues of fact are not identical if the legal standards governing their resolution are significantly different, even if the factual setting of both suits is the same." Waltz v. United States Dep't of Agric., 251 F.R.D. 491, 497-498 (E.D. Cal. 2008) (*citing* Peterson v. Clark Leasing Corp., 451 F.2d 1291, 1292 (9th Cir. 1971)). Application of a different legal standard renders collateral estoppel inapplicable, even if the issues bear a similar label. *See, e.g.*, Amador v. Unemployment Ins. Appeals Bd., 677 P.2d 224, 232 (Cal. 1984) (commission's prior ruling that party was properly suspended for "insubordination" didn't preclude litigation of her former employer's "misconduct" challenge to her claim for unemployment compensation benefits; "[a] finding of misconduct is not 'necessarily' . . . included in a ruling that an employee has committed insubordination"); Jackson v. City of Sacramento, 172 Cal. Rptr. 826, 828-829 (Cal. Ct. App. 1981) (prior agency ruling that party was "disabled" didn't preclude examination of disability issue by another agency because qualifications for industrial disability under City retirement plan were more stringent than those of workers' compensation plan; each board had to decide distinct issues); Jim Beam

Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 734 (2d Cir. 1991) (finding no preclusive affect where "the issue of likelihood of confusion in a cancellation proceeding may be different from the issue of likelihood of confusion in an action for infringement" because "the factual frame of reference used by the adjudicating body is different").

Conversely, when the same issue arises in different legal contexts, collateral estoppel may apply if the standards are substantially the same. *See* Hernandez v. City of Pomona, 94 Cal. Rptr. 2d 1, 11 (Cal. 2009) Hernandez v. City of Pomona, 207 P.3d 506, 515-516 (Cal. 2009) (holding that the standard of reasonableness applicable in a section 1983 action based on excessive force is the same as the standard of reasonableness applicable in a state law negligence action); Alberto-Culver Co. v. Trevive, Inc., 199 F. Supp.2d 1004, 1010-1016 (C.D. Cal. 2002) (finding that collateral estoppel effect would be given in trademark infringement suit to determination by Board in registration proceeding on issue of likelihood of confusion; in determining likelihood of confusion, the Board considered seven of the eight factors applicable to trademark infringement). For preclusion to apply, the difference in the legal standards must not undermine the rationale of the doctrine. Bath Iron Works Corp. v. Director, OWCP, 125 F.3d 18, 22 (1st Cir. 1997).

The court in United States Golf Ass'n. v. Arroyo Software Corp., 81 Cal. Rptr. 2d 708 (Cal. Ct. App. 1999), held that collateral estoppel didn't apply because the proceedings required application of different substantive law. Id. at

714. The court explained that the misappropriation claim in the first lawsuit (*St. Andrews*) was decided under New Jersey law and required a finding of direct competition between the plaintiff and the defendant, while the second suit was brought under California law. The court ruled that "[b]ecause California law does not require a showing of direct competition between the parties . . ., the trial court was correct in holding . . . that the issues decided under New Jersey law in *St. Andrews* were not identical to those arising under California law in this case" Id.

Several courts have reasoned that when the earlier case was decided under another state's law, there was no identity of issue even if the law might have been similar. In <u>Boomer v. AT & T Corp.</u>, 309 F.3d 404 (7th Cir. 2002), a class of AT&T customers argued that AT&T was collaterally estopped from arguing that the arbitration clause in its service contract was valid. Another class had previously brought suit against AT&T in a California federal court, which found the clause to be unconscionable and so, unenforceable under California law. When the second class sued AT&T in federal court in Illinois, the Seventh Circuit refused to apply collateral estoppel to AT&T's defense because the issue in the second suit was whether the clause was valid under Illinois law. 309 F.3d at 422 n.10; *see also* <u>Cincinnati Ins. Co. v. Beazer Homes Investments, LLC</u>, 594 F.3d 441, 445 (6th Cir. 2010) (finding that a prior proceeding declaring that property damage was covered under South Carolina insurance law didn't collaterally estop the same insurer from relitigating whether the property damage was covered under Indiana insurance law) and cases cited therein; <u>475342 Alberta, Ltd. v. Starfire</u>, No.

95-2083-GTV, 1996 WL 370221, at *3 (D. Kan. June 19, 1996) (denying collateral estoppel where a prior court had applied Oklahoma and California contract law to the issue, but Kansas law applied in the subsequent case, stating "[b]ecause the law of different states applies, this court is not presented with an identical issue"); Stop & Shop Cos. v. Federal Ins. Co., 946 F. Supp. 99, 105-106 (D. Mass.1996), *rev'd on other grounds*, 136 F.3d 71 (1st Cir. 1998) (finding that insurance coverage dispute previously decided under California law couldn't preclude same issue from being decided under Massachusetts law).

Conversely, in Kreinik v. Showbran Photo, Inc., 400 F. Supp. 2d 554, 556 (S.D. N.Y. 2005), the court found that the employment tests under ERISA and New York common law were sufficiently similar to apply collateral estoppel. The Kreinik plaintiff brought claims under ERISA and New York common law to collect compensation and benefits allegedly due. The state-law claims were tried to a jury, which found that the plaintiff wasn't an employee, but an independent contractor. The court then had to determine whether the plaintiff was an employee under ERISA and whether the jury's finding had preclusive effect. The plaintiff argued that the court wasn't bound by the jury's finding because New York and ERISA have different standards for determining whether a worker is an employee. The court disagreed and found that New York and ERISA both use the same common-law test with similar factors and the relevant factors were incorporated in the court's jury instructions. Id. at 562-570. Accordingly, the court conclude it must follow the jury's earlier finding that the plaintiff wasn't an employee. Id. at 559;

33

*see also* <u>Raytech Corp. v. White</u>, 54 F.3d 187, 191-193 (3d Cir. 1995) (finding identity of issue requirement satisfied where Oregon's law of successor liability wasn't substantially or demonstrably different from the law of successor liability applicable in other jurisdictions).

The plaintiffs contend the <u>Estrada</u> ruling that SWA drivers are subject to FedEx's reserved right to control is entitled to preclusive effect, but they haven't shown that the various states involved in the MDL proceeding apply the right to control factor in the same manner as the <u>Estrada</u> court. The <u>Borello</u> court stated that the individual factors, including the reserved right to control, "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." 796 P.2d at 404. To determine the right to control, jurisdictions analyze varying factors and place different emphasis on a finding of control. The varying factors and analysis can lead to different results; one jurisdiction's finding of what is sufficient to establish a right to control may not be sufficient in another jurisdiction. This case is therefore distinguishable from <u>Kreinik v. Showbran Photo</u> because the plaintiffs in this case haven't shown that application of the right to control is significantly similar in the MDL cases. Even if courts apply the same employment test, the relevant factors might not be analyzed and applied uniformly. *See, e.g.*, <u>Brister v. A.W.I., Inc.</u>, 946 F.2d 350, 354 n.1 (5th Cir. 1991) (finding that even when issues are stated in nearly identical language, collateral estoppel is unavailable when there are disparate policies underlying each inquiry which result in definite differences in application

and result.). Accordingly, the different contexts in which the right to control may be analyzed by the various jurisdictions precludes application of collateral estoppel.

The plaintiffs haven't shown that the issue of FedEx's reserved right to control in <u>Estrada</u> and the MDL cases is identical. The <u>Estrada</u> court relied on facts specific to California terminals; the same evidence won't be relied upon in the MDL cases. Further, the plaintiffs haven't shown that California's analysis of the right to control factor is comparable to the analysis applied in the various MDL cases.

### B. Public Policy

Even if the technical requirements of collateral estoppel were all met, the doctrine should be applied only "where such application comports with fairness and sound public policy." <u>Vandenberg v. Superior Court</u>, 982 P. 2d 229, 241 (Cal. 1999). Application of collateral estoppel in a particular case should advance the public policies that underlie the doctrine: promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and protecting against vexatious litigation. <u>Roos v. Red</u>, 30 Cal. Rptr. 3d 446, 458 (Cal. Ct. App. 2005). Although California courts permit the offensive application of non-mutual collateral estoppel — estopping a defendant from relitigating issues that the defendant previously litigated and lost against a different plaintiff — this type of collateral estoppel

presents an increased danger of injustice and requires closer examination to determine whether application of the doctrine is fair. *See* <u>United States v. Mendoza</u>, 464 U.S. 154, 159 n.4 (1984) (describing offensive use of collateral estoppel); <u>MCA Records, Inc. v. Charly Records, Ltd.</u>, 865 F. Supp. 649, 653 (C.D. Cal. 1994) ("California courts have recognized the validity of an offensive use of collateral estoppel"); <u>Vandenberg v. Superior Court</u>, 982 P.2d at 237 (discussing potential dangers of nonmutual collateral esotppel); <u>White Motor Corp. v. Teresinski</u>, 263 Cal. Rptr. 26, 31 (Cal. Ct. App. 1989) ("[T]he offensive use of collateral estoppel is more closely scrutinized than the defensive use of the doctrine.").

### 1. Limited Relief in <u>Estrada</u>

FedEx asserts that application of collateral estoppel is contrary to public policy because the court of appeals in <u>Estrada</u> rejected the trial court's equitable order declaring SWA drivers to be employees and enjoining FedEx from "mis-classifying" them under its then-current business model. <u>Estrada v. FedEx Ground Package Sys.</u>, No. B187951, 2006 WL 3378246 (Cal. Ct. App. 2006). The <u>Estrada</u> plaintiffs only sought class certification as to their claims for reimbursement of expenses under Labor Code section 2802; they didn't seek class certification for injunctive relief. After the trial proceedings though, the plaintiffs filed an amended motion seeking not only damages, but declaratory relief and a permanent injunction on behalf of "California single work area pick-up and

delivery drivers who at any time since May 11, 1996 worked or currently work *or in the future* are employed to work under" FedEx's Operating Agreement (emphasis in original). The trial court granted the plaintiffs' motion and enjoined FedEx from "mis-classifying SWAs as independent contractors" so long as it employed substantially the same "employment model." Id. at *3. FedEx objected arguing that the plaintiffs, former FedEx drivers, didn't have standing to seek such relief.

The appellate court agreed with FedEx and reversed the trial court's equitable order. Proposition 64, a referendum adopted in California in November 2004, requires a private person seeking injunctive relief under the Unfair Competition Law to have suffered an injury in fact and have lost money or property as a result of the unfair competition, as well as complying with the requirements for class certification. The court held that the plaintiffs, who no longer had any business relationship with FedEx, didn't have standing to seek declaratory relief. Id. at *4. Further, because the plaintiffs only obtained class certification for reimbursement, the trial court was deprived of jurisdiction to grant injunctive relief. Id.

FedEx argues that the plaintiffs' request to give nationwide collateral estoppel effect to the Estrada decision can't be reconciled with the letter and spirit of that ruling. The point isn't that Proposition 64 wholly prohibits the offensive application of non-mutual collateral estoppel, FedEx asserts, it's that given the concerns underlying Proposition 64, a ruling against a defendant in one case should be applied against that defendant in other cases brought by non-parties

only in the narrowest and clearest of circumstances. The plaintiffs respond that reversal of the trial court's order granting declaratory and injunctive relief was premised on the narrow ground that the named plaintiffs didn't have standing to pursue claims for equitable relief under California's unfair competition law and that the court's ruling in no way prohibits the offensive use of collateral estoppel.

The court agrees with the plaintiffs. The denial of equitable relief in <u>Estrada</u> based on Proposition 64 doesn't alter the court's analysis of the preclusive effect of collateral estoppel in this case. The <u>Estrada</u> court didn't address collateral estoppel and its ruling merely stood for the proposition that the plaintiffs lacked standing because they didn't suffer an injury in fact and never sought class certification for equitable relief. The court declines to read into that decision a suggestion that <u>Estrada</u> shouldn't have preclusive effect if the requirements of estoppel are otherwise met.

### 2. Inconsistent Judgments

"[C]ourts have recognized that certain circumstances exist that so undermine the confidence in the validity of the prior proceeding that the application of collateral estoppel would be 'unfair' ." <u>Roos v. Red</u>, 30 Cal. Rptr. 3d at 452 (*citing* <u>Kremer v. Chem. Constr. Corp.</u>, 456 U.S. 461, 481 (1982)). One such circumstance exists "when the judgment in the prior action is inconsistent with previous judgments for the defendant on the matter." 30 Cal. Rptr. 3d at 452 (*citing* <u>Parklane Hosiery Co., Inc. v. Shore</u>, 439 U.S. 322, 330-331 (1979)). "[W]here

there are . . . determinations that are inconsistent on the matter in issue, it is a strong indication that the application of collateral estoppel would work an injustice." <u>Sandoval v. Superior Court</u>, 190 Cal. Rptr. 29, 37 (Cal. Ct. App. 1983) (*quoting* <u>State Farm Fire & Cas. Co. v. Century Home Compon., Inc.</u>, 550 P.2d 1185, 1191 (Or. 1976)); *see also* <u>Smedley v. Raymond Corp.</u>, No. C035823, 2002 WL 749332, at *3 (Cal. Ct. App. 2002) (unpublished) (reaffirming <u>Sandoval</u>).

FedEx cites to several decisions to show that it has prevailed on the issue of employment status of drivers on earlier occasions. The plaintiffs respond by noting that <u>Estrada</u> is the only class-based adjudication resolving the issue. The plaintiffs also distinguish most of the cases cited by FedEx based on their facts or procedural posture. The court agrees that most of the cases cited by FedEx are distinguishable and not on point, but some of the cases support a finding that collateral estoppel is inappropriate because they show that courts have disagreed about whether FedEx retains sufficient control over its drivers to establish an employee relationship.

For example, in <u>Encarnacion v. FedEx Ground</u>, No. 15DA301374 (Fla. Comm'n of Human Relations June 1, 2004), the commission found that a FedEx delivery driver wasn't an employee because FedEx didn't have the right to control the "means and manner" of the driver's performance. In <u>In re Ryan</u>, No. H2005-117-0132 (Ohio Unemployment Comp. Review Comm'n July 19, 2005), the commission found that a FedEx driver who entered into the Operating Agreement had the right to control and did directly control the manner and method by which

he performed services and, therefore, wasn't in the employment of FedEx. Another decision cited by FedEx, <u>RPS, Inc. v. Teamsters Local Union No. 355, Int'l Bhd. of Teamsters, AFL-CIO</u>, 5-RC-14905 (N.L.R.B. 2000), concerned the status of twenty single-work area drivers at FedEx's Bridgeville, Delaware terminal. The Board in <u>RPS v. Teamsters</u> found that the drivers were independent contractors under the common-law agency test. The plaintiffs contend that this case was a true aberration and cite to more recent cases from the N.L.R.B. finding that the FedEx Operating Agreement creates an employment relationship. The <u>RPS v. Teamsters</u> decision nevertheless illustrates the inconsistency in rulings on this issue. Under the Sixth Circuit common law agency test, the court in <u>Lemmings v. FedEx Ground Package Sys., Inc.</u>, 492 F. Supp. 2d 880, 888 (W.D. Tenn. 2007), found that a contractor's hired driver wasn't a FedEx employee, in part, because the contractor was neither an employee nor an agent of FedEx in establishing and implementing his employment practices.

These decisions, mostly agency findings, may be less persuasive than the well-reasoned <u>Estrada</u> decision, but they still are relevant in determining the fairness of applying collateral estoppel. The findings were issued in other jurisdictions and illustrate the inconsistency in judgments concerning the employment status of FedEx drivers. Applying collateral estoppel to all the MDL cases would be unfair in light of these inconsistent judgments.

### 3. *<u>Alexander</u>, 3:05-CV-528 (CA) Class*

40

The court declines to individually analyze the preclusive effect of the Estrada decision on the Alexander (CA) class. The plaintiffs sought collateral estoppel in all MDL proceedings and haven't specifically addressed how the analysis might differ for the Alexander class. Further, in the interest of fairness, the court won't preclude FedEx from litigating the right to control factor in Alexander when the plaintiffs haven't addressed the effect of the Estrada trial court's finding that the MWA plaintiff was an independent contractor under the Borello test.

III. Conclusion

For the reasons stated above, the court DENIES the plaintiffs' requests in their various motions for summary judgment to give preclusive effect to the Estrada court's finding of control in all the MDL proceedings. *See* Pl's Omnibus Memorandum of Law - Collateral Estoppel, doc. # 1194.

SO ORDERED.

ENTERED:   April 21, 2010

    /s/ Robert L. Miller, Jr.
Judge
United States District Court