UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| ---------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | |
| ALL ACTIONS | ) ) | |
| Civil No. 3:05-CV-530 RM (KS) | ) ) | |

OPINION and ORDER

   This matter is before the court on the parties' cross-motions for summary judgment concerning whether FedEx drivers[1] are employees or independent contractors under the Kansas Wage Payment Act, KAN. STAT. ANN. § 44-313 *et seq.* Numerous summary judgment motions pend in both the certified and non-certified class-actions. This opinion sets forth facts commonly applicable to all certified class actions and addresses the Kansas plaintiffs' motion for summary judgment (doc. ## 1163, 1248) and FedEx's cross-motion for summary judgment (doc. # 1215). The court also addresses FedEx's motion to strike individualized proof submitted in support of the plaintiffs' summary judgment motions (doc. #

_____

[1] The court intends the terms "driver" and "contractor" to be synonymous, and the use of either term isn't meant to contain any connotation about a person's status as an "employee" or "independent contractor."

1

1398) and the plaintiffs' motions to augment the record in support of their summary judgment motions (docs. ## 1992, 2064, and 2087).

The court GRANTS FedEx's motion to strike individualized proof to the extent the plaintiffs rely on the submitted documents in support of summary judgment to show individual contractors' experiences in class certification cases. The court cannot make generalizations about the class as a whole from a review of the actual control FedEx exercised over a segment of drivers.

The court exercises its discretion to DENY the plaintiffs' motions to augment the record. The documents the plaintiffs propose to submit are relevant to only a small segment of the plaintiff classes, cumulative of the evidence already submitted, or of little evidentiary value.

The court DENIES FedEx's requests for oral argument on the motions for summary judgment (doc. ## 1400 and 1471). The court finds that this matter can properly be resolved by a review of the parties' extensive evidentiary record and summary judgment briefing.

The court DENIES the plaintiffs' motion for summary judgment and GRANTS FedEx's cross-motion. The plaintiffs have all signed Operating Agreements labeling themselves as independent contractors, they can hire others to perform their assigned work and go work for another delivery company, and they can sell their routes to other qualified drivers; yet, they contend they are employees. The court sees it differently.

Upon review of the evidence in the light most favorable to the plaintiffs, the only reasonable inference is that FedEx hasn't retained the right to direct the manner in which drivers perform their work. FedEx supervises the drivers' work and offers numerous suggestions and best practices for performance of assigned tasks, but the evidence doesn't suggest that FedEx has the authority under the Operating Agreement to require compliance with its suggestions. Further, other factors strongly weigh in favor of independent contractor status; in particular, the parties intended to create an independent contractor arrangement, the drivers have the ability to hire helpers and replacement drivers, they are responsible for acquiring a vehicle and can use the vehicle for other commercial purposes, they can sell their routes to other qualified drivers, and FedEx doesn't have the right to terminate contracts at-will. Although some facts weigh in favor of employee status, after considering all the relevant factors, the court finds that the plaintiffs are independent contractors as a matter of law.

## I. COMMON FACTS APPLICABLE TO RIGHT TO CONTROL

The court sets forth the facts from the perspective of what control FedEx has the right to exercise over its drivers and not necessarily what control FedEx actually exercises on a daily basis. While FedEx managers might exercise more control than what is retained in the Operating Agreement and commonly applicable policies and procedures, the class was certified on the basis of right to

control, not actual exercise of control. The plaintiffs reiterated to this court during class certification that they could show right to control by reliance solely on the Operating Agreement and applicable policies and procedures and wouldn't go beyond those documents to prove their case. In short, the issue for today's purposes is what control FedEx had the right to exert pursuant to the parties' contractual relationship.

*FedEx's Business*

FedEx Ground, together with its operating division FedEx Home Delivery, provides small-package pick-up and delivery services through a network of pick-up and delivery drivers/contractors. FedEx Home Delivery provides small package delivery services primarily to residential customers, while FedEx Ground focuses on the pick-up and delivery of small packages to businesses. FedEx Services, Inc. sets pricing policy and rates for FedEx and supplies shared technology infrastructure support across all FedEx companies.

*Business Objectives in the Operating Agreement*

The Kansas plaintiffs, individually or through a sole proprietorship or corporation, entered into either a Ground or Home Delivery Operating Agreement with FedEx to provide daily pick-up and delivery service. Contractors agree to conduct their businesses so that they can be identified as part of the FedEx

system. OA, Background. The Operating Agreement states that "[b]oth [FedEx] and Contractor intend that Contractor will provide these services strictly as an independent contractor, and not as an employee of [FedEx] for any purpose." Id. The Operating Agreement is to "set forth the mutual business objectives of the two parties intended to be served by th[e] Agreement — which are the results the Contractor agrees to seek to achieve — but the manner and means of reaching these results are within the discretion of the Contractor." Id. "[N]o officer or employee of [FedEx] shall have the authority to impose any term or condition on Contractor or on Contractor's continued operation which is contrary to this understanding." Id. The "Contractor agrees to direct the operation of the Equipment and to determine the methods, manner and means of performing the obligations specified in this Agreement." Id. at ¶ 1.4.

The Operating Agreement specifically sets forth FedEx's standards of service. To achieve FedEx's business objectives, the drivers agree to:

(a) Provide daily pick-up and delivery service to consignees and shippers on days and at times which are compatible with their schedules and requirements within Contractor's Primary Service Area, . . . and in such other areas as Contractor may be asked to service,[2] all consistent with the competitive standards within the industry (provided, however, that on any day where the volume of packages available for delivery or pick-up in Contractor's Primary Service Area exceeds the volume that Contractor can reasonably be expected to handle on such day, [FedEx] may reassign a portion of such packages to another contractor);

---

[2] The FXG OA states: "and in such other areas as Contractor may be asked to service, in the event Contractor elects to participate in the Flex Program."

(b) Make reasonable efforts to retain and increase the base of shippers and consignees served and the number of packages per shipper within Contractor's Primary Service Area;

(c) Handle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage;

(d) Cooperate with [FedEx's] employees, customers and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment, and provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal;

(e) Foster the professional image and good reputation of [FedEx] . . . including adhering to vehicle identification and operator appearance standards . . .;

(f) Conform to all applicable federal, state and local laws, regulations and ordinances;

(g) Cause the Equipment to be operated safely and in compliance with all applicable laws and regulations; and

(h) Conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times.

Id. ¶ 1.10.

The parties agree that "Contractor shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results . . . and no officer, agent or employee of [FedEx] shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results." FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15. For example, FedEx can't "prescribe the hours of work, whether or when the Contractor is to take

breaks, what route the Contractor is to follow, or other details of performance."
FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15.

*Policies and Procedures*

FedEx has many written policies and procedures in place directed toward FedEx employees involving management of FedEx business operations. FedEx managers are expected to know the policies and procedures and generally are expected to follow them to the extent it makes good business sense to do so. In 2005, FedEx began a "Document Reengineering Initiative" to overhaul its policies, procedures, and forms. That initiative was meant to clarify the line between policies (statements "outlining a mandatory course of action") and procedures (statements "providing the how and when or how often for implementing the policies"), so that FedEx managers could better understand FedEx's expectations. Among the changes was Policy-007, reiterating that FedEx employees must adhere to the Operating Agreement in their interactions with drivers, that the terms of the Operating Agreement can't be modified, and, most significantly, that "*[n]o officer, agent or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results.*" (FedEx Exh. B-02 (emphasis in original)). Policy-007 repeats the language of Section 1.15 of the Operating Agreement as a policy and states that a violation of its terms may result in disciplinary action against the manager.

Dan Sullivan, who was FedEx's CEO until January 2007, testified that he "would expect [FedEx drivers] to follow policy within general parameters but provide a certain amount of discretion in the administration of these policies and procedures depending upon terminal location, the issues in each facility, those kinds of things which are all different." Sullivan Dep., p. 162. In explaining the manager's reliance on FedEx policies, Mr. Sullivan stated:

> Obviously, all policies are there for a reason. They should be considered by the management. The management should try to follow them, but the management also has discretion to do the right thing for the business, the right thing for the customer, the right thing for our people within the parameters of those policies and procedures . . . so that they are administered somewhat differently in each circumstance.

Sullivan Dep., pp. 163-164. FedEx's Executive Vice President and Chief Operating Officer Rodger Marticke testified that FedEx expects managers to "adhere to company policies to the extent that it makes good business sense." Marticke Dep., p. 92. Division Vice President and Former Managing Director James Primm testified that FedEx confers discretion on its senior managers as to how to apply procedures so long as that discretion doesn't result in not achieving company results or violating federal law. Primm Dep., p. 212.

*Regular and Integral Part of FedEx's Business*

FedEx drivers' work is a regular and integral part of FedEx's business. FedEx Vice President of Contractor Relations Robert Ostrov testified that

contractors are a cornerstone of FedEx's business. Ostrov Dep., pp. 192-193. Former CEO Dan Sullivan testified that the contractor is meant to be a "centerpiece" of FedEx's "work force" and is an "essential component of [FedEx's] business." Sullivan Dep., pp. 27, 106; *see also* Emmanuel Monti, Senior Manager of Contract Relations, Dep., p. 204 (describing FedEx drivers as being part of the FedEx "network"). It is undisputed that the drivers' work was performed within the usual course of FedEx's business.

*Approval Requirements for Contractors and Replacement Drivers*

FedEx has minimum eligibility requirements for people to become FedEx contractors. They must have no felony convictions, be 21 years of age or older, have a certain level of driving experience or undergo training, have the required driver's license, have a 36-month driving record that meets specific minimum requirements, undergo a drug screen and physical, and be able to obtain a delivery vehicle.

Contractors can run their own routes, hire helpers, or hire replacement contractors. Newman Decl., ¶¶ 15, 17. Non-driver helpers must be 18 years old and pass a background check. *See* Procedure: Authorization Process for Non-Driving Helper, CRL-566. Replacement drivers are subject to FedEx approval in other respects. The Operating Agreement says contractors may use others to assist them; all persons so utilized "shall be qualified pursuant to applicable

federal, state and municipal safety standards and [FedEx] Safe Driving Program standards." OA, ¶ 2.2. The Operating Agreement further requires that replacement drivers be "fully trained, at Contractor's expense, to operate the Equipment," and the contractor is responsible for ensuring that the replacement driver "conform fully to the applicable obligations undertaken by Contractor pursuant to this Agreement." Id.

The Safe Driving Program sets minimum experience, age, licensure, driving record, criminal record, and drug-and-alcohol abuse requirements. The program requires a showing of satisfactory work history and mandates compliance with basic safety and maintenance requirements. OA, Safe Driving Addend. FedEx policies state that all operators, including assistants and substitutes, must complete a road test, submit a driver information sheet, and (depending on work history) complete a FedEx-approved training course. *See* CRL-551, at 5-12 (Pl. Exh. 2:147-54) ("The individual must meet the minimum driver qualifications and requirements established by the Federal Motor Carrier Safety Regulations and FedEx."). Mr. Sullivan testified that the drivers must meet certain FedEx standards, such as grooming requirements, but terminal managers have discretion in assessing whether individuals meet FedEx's requirements to provide service. Sullivan Dep., pp. 210, 212.

FedEx is a registered motor carrier subject to the Department of Transportation's regulatory control. Scapellato Rept. (Nov. 8, 2007), p. 11. Federal

law for vehicles 10,001 pounds or more imposes many of FedEx's driver requirements; federal commercial driver's license and alcohol/drug testing are required for vehicles 26,001 pounds or more. FedEx expert witness James Scapellato stated that "[a]s the regulated motor carrier, FedEx . . . is ultimately responsible for the safe operation of all commercial vehicles providing transportation services under its DOT number." Scapellato Rept. (Nov. 8, 2007), p. 14. "As a regulated motor carrier, FedEx . . . must insure that each and every owner operator who operates under its DOT authority, as well as any driver working for an owner operator, achieves a satisfactory degree of safety compliance." Scapellato Rept. (Jan. 8, 2007), p. 6. For example, FedEx must keep a DOT file on each driver to provide "documentary proof that the driver . . . meet[s] standards imposed by federal safety requirements and that they can, by reason of experience, training, or both, safely operate the assigned commercial motor vehicle." Scapellato Rept. (Jan. 8, 2007), p. 14; *see also* 49 C.F.R. § 391.1 *et seq.* FedEx, however, has "adopted into policy many higher safety standards than those minimums prescribed in the federal motor carrier safety regulations to help business efficiency and reduce highway crashes." Scapellato Rept. (Jan. 8, 2007), p. 12.

*Training*

Contractors have the obligation to assure that everyone who operates the equipment is fully trained and capable of meeting the customer service standards set forth in the Operating Agreement. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. FedEx provides formal training to its drivers, but whether training is required varies from driver to driver. As of 2005, new FedEx contractors with six months' verified experience as a commercial motor vehicle operator within the previous five years aren't required to participate in Quality P&D Learning (QPDL), which, as FedEx explains, wasn't widely available until 2003 and isn't training, but a precondition, to becoming a contractor. Since November 2007, FedEx accepts training obtained from an "approved" FedEx vendor in lieu of prior experience or the FedEx QPDL course.

QPDL is a multi-day course consisting of a combination of classroom and on-the-road instruction meant to ensure compliance with federal safety regulations. The 2003 QPDL Participant Manual, however, addresses a number of topics, such as customer service skills, vehicle entrance and exit routines, route planning, terminal a.m. routines, delivery techniques, package handling techniques, scanning and sheeting, driver release of packages, and pick-up techniques. TM-205A (Aug. 2003). FedEx managers also hold weekly safety meetings that drivers should attend where managers address safety-related or operational issues. Attendance at certain safety meetings once was required, but is now voluntary, although managers still take attendance at those meetings.

FedEx also conducts an orientation program during contractors' first thirty days to familiarize them with various service quality procedures. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14 ("[FedEx] shall, during the first 30 days of the term of this Agreement, familiarize Contractor with various quality service procedures developed by [FedEx]."); *see also* FedEx Owner-Operator Familiarization Program, Pl. Exh. 5:306 (stating that the program is approximately ten hours). Drivers may enter the CARE training program to expunge a verified customer complaint from their record; managers often recommend that drivers attend such training for that purpose. The CARE program consists of the driver watching a video, receiving a manual, and participating in a follow-up business discussion (a documented meeting with the drivers' manager). The program instructs drivers on ways to achieve customer satisfaction and practices so as to avoid customer complaints.

FedEx used to distribute a Contractor's Companion to drivers, a document developed "to assist the contractor [in] the day-to-day administration of his or her duties." Sullivan Dep., p. 236. The Home Delivery Contractor's Companion is dated January 2003 and the Ground Contractor's Companion is dated December 2003. FedEx has described it as a summary of things that contractors should consider when performing their duties or a reference guide that gives contractors an idea of the best practices to use when interacting with customers. Sullivan Dep., pp. 235-236; Mark Byrum (Divisional Vice President) Dep., pp. 210-211. There are differences between the Home Delivery and Ground Contractor's

Companion, but generally they include information concerning customer service tips, scanner troubleshooting and status codes for deliveries, daily supply checklist, vehicle pre-trip inspection, C.O.D. handling, driver release guidelines and tips, service crosses and call tag processes, pick-up tips, and FAQs for different types of situations the driver might encounter. The Contractor's Companion is no longer available.

*Uniform and Appearance*

Drivers must wear the FedEx uniform and maintain a professional appearance. The Operating Agreement provides that the uniform should be "maintained in good condition" and the driver will "keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by [FedEx]." OA, ¶ 1.12. The uniform is required because "the presentation of a consistent image and standard of service to customers throughout the system is essential in order to be competitive . . . and to permit recognition and prompt access to customers' places of business." Id.

Senior Manager of Contract Relations Emmanuel Monti testified that the FedEx driver "is the most highly visible person out there . . . and his physical appearance, the way he interfaces with customers, tells a lot about the company and tells the customer basically whether they want to continue to do business

[with FedEx]." Monti Dep., pp. 202-203. Central Division Vice President Robert Holcombe testified that the drivers' "[a]ppearance is important because of the brand and the importance of brand image," which allows the drivers "access into customers' locations." Holcombe Dep., p. 216. Mr. Holcombe also testified that the FedEx logo is important for advertising and marketing of the brand. Holcombe Dep., pp. 259-260; *see also* Sullivan Dep., p. 263 (testifying that the drivers' uniform and truck are used to project FedEx's image).[3]

FedEx terminal managers generally observe drivers' appearance and check for compliance with paragraph 1.12 of the Operating Agreement. FedEx Admission (Set 1), No. 12, at 32. The terminal managers are supposed to make sure that the drivers are both in proper uniform and properly groomed before they go out to service FedEx customers. Sullivan Dep., p. 187. The senior manager has the authority to tell drivers they can't service customers if they aren't in proper uniform or aren't properly groomed. Sullivan Dep., pp. 187-188.

*Vehicles*

Contractors are responsible for obtaining their vehicles, and they bear all costs and expenses associated with their vehicles, such as vehicle payments, fuel, taxes, insurance, and maintenance. OA, ¶ 1.3 (contractor required to bear all

---

[3] Between 2004 and 2007, FedEx spent more than $1.1 billion in advertising and promoting its brand.

costs and expenses incidental to operation of the equipment, including risks of depreciation, maintenance, fuel, oil, tires, repairs, taxes, insurance coverage, etc.).

Each vehicle must be painted "FedEx White" and bear FedEx logos and advertising. While federal regulations require that FedEx's name be legibly marked on two sides of the truck, FedEx's marking requirements extend beyond federal regulations. Scapellato Rept. (Nov. 8, 2007), pp. 16-17 ("Although obviously not specifically required by the regulations, business markings and branding displayed on the vehicle obviously provide more effective notice to the public who is performing the transportation service."). The drivers can use their vehicles for other commercial or personal purposes when not actually carrying FedEx packages, as long as they mask or remove the identifying marks and logos. OA, ¶ 1.5.

The Operating Agreement provides that "subject to the determination of [FedEx] of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of Contractor." OA, ¶ 1.1. Vehicles must, though, meet FedEx's minimum specifications — *e.g.*, maximum height, width, and length; maximum bumper height; interior shelving requirements; and, in some cases, age restrictions. The vehicle goes through a FedEx approval process based on these specifications. Robert Flesher (Managing Director of Vehicle Maintenance) Dep., pp. 135-136 (2007), pp. 39-40 (2006). FedEx decides what size and configuration of truck is appropriate for a particular

route. FedEx's Answers to Interrogatories (Set 5) # 301, at 32. Senior Vice President of Terminal Operations Michael Mannion testified that FedEx reserves the right to approve or reject a particular vehicle if its size isn't sufficient to provide service to the primary service area. Mannion Dep., p. 239. FedEx managers "look at every single situation separately with every contractor and really understand what his business plan is going to be" when determining the proper size of a truck for a particular area. Mannion Dep., p. 239. A contractor with a vehicle that doesn't meet FedEx's minimum requirements can still request approval through an exception process. Flesher Dep., pp. 143-145.

Before 2008, FedEx purchased fleets of vehicles built to its specifications that contractors could buy or lease. FedEx also entered into relationships with outside vendors who offered financing or leasing of vehicles to contractors. In 2008, FedEx began outsourcing all its van sales to outside vendors and is now removed from the sales process.

FedEx has the right to evaluate contractors' trucks to ensure they comply with FedEx appearance standards and DOT guidelines. OA, ¶ 1.12 ("[T]he Equipment shall be maintained in a clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry."); James Krappa (Managing Director for Contractor Relations) Dep., pp. 156-157; Flesher Dep. pp. 83-84 (Sept. 2007). Terminal managers also must ensure proper completion of monthly maintenance record forms reflecting any

repairs or maintenance work the driver performed on his vehicle. RVEH-002 at 1 (Pl. Exh. 2: 1480); *see also* Ground OA ¶ 1.2 ("Contractor agrees to provide [FedEx] with proof of timely maintenance and inspection of the Equipment in accordance with the periodic mandatory vehicle maintenance and inspection regulations administered or required by any federal, state or municipal agency with jurisdiction over the operations described in this Agreement."). FedEx should conduct an inspection of the vehicle every thirty days. Terminal managers have discretion to remove a vehicle from service if it doesn't meet appearance standards or the driver fails to timely submit maintenance reports. *See, e.g.*, OA, ¶ 1.2. Alternatively, the manager can discuss the matter with the contractor.

FedEx expert James Scapellato explained that for vehicles weighing 10,001 pounds or more, FedEx, "as the responsible motor carrier, must periodically examine or inspect an owner-operator's vehicle to determine safety compliance with vehicle parts and accessories standards and out-of-service criteria." Scapellato Rept. (Nov. 8, 2007), p. 11; Scapellato Rept. (Jan. 8, 2007), p. 21; *see also* 49 C.F.R. § 396.3 (requiring inspection, repair, and maintenance of motor vehicles). Paragraph 1.2 of the Operating Agreement requires contractors to maintain their vehicle at their own expense, in accordance with the safety and equipment standards specified in applicable federal, state, and municipal laws.

*Tools and Instrumentalities*

Under the Operating Agreement, the contractor "shall not be required to purchase or rent any products, equipment, or services from [FedEx] as a condition to entering into [the agreement]." OA, ¶ 7. Contractors can obtain most of the tools, instrumentalities, and services they need, such as uniforms, scanners, printers and communications-related equipment, DOT inspections, and equipment washing services, from FedEx's Business Support Package. FXHD OA, ¶ 7 and Addend. 6; FXG OA, ¶ 7 and Addend. 7. Contractors pay for these supplies and services through deductions from their weekly settlement. FedEx's BSP is an optional program, but ninety-nine percent of contractors participate. The BSP also includes Contractor Assistance, which before June 2007 consisted of the following programs: battery program, back-up camera program, body repair program, hand truck program, preventative maintenance program, rear door program, and tire program. The Contractor Assistance was revised in June 2007 to eliminate the contractors' ability to purchase equipment or pay for maintenance under the program.

Contractors also can participate in the Maintenance Loan Program. In early 2006, the Maintenance Loan Program was added as a FedEx Home Delivery settlement component. Under this program, FedEx provides contractors with loans against the balance in their Service Guarantee Account[4] to fund maintenance

---

[4] FedEx maintains an interest-bearing fund for the contractor to save for unexpected expenses, which may be withdrawn at the contractor's discretion.

costs. FXHD OA, ¶ 5; FXG OA, ¶ 8. Contractors must repay the loans through deductions from their weekly settlement.

Typically, FedEx terminals have package handling equipment, belts for moving packages to the vehicles, a staging area, a "Quality Assurance area" for processing packages, assigned parking spaces for drivers to park their vehicle while loading, and a check-in area. FedEx also has developed proprietary automated overhead laser sorting technologies, computer systems and software for tracking packages, and processes for customer payments.

*Compensation and Benefits*

Contractors are paid weekly, and compensation rates and formulae are set forth in the Operating Agreement at ¶ 4.1 and Addendum 3; compensation includes daily rates, piece rates, and various bonuses, including a bonus for years of service and performance. The compensation amounts vary by individualized factors, such as the type of vehicle used, number of packages delivered and stops serviced, weight and nature of the packages, miles traveled, temporary core zone density, and time of service. Ground contractors participating in the "Flex Program" receive a daily "flex fee." OA, ¶ 4.1 and Addend. 3. When contracting with an entity, FedEx pays the entity, not the individual driver.

The temporary core zone density is paid to contractors providing services in low density, low package volume areas; the core zone payment is reduced or

eliminated as density or volume increases. OA, ¶ 4.1(c). Until 2007, core zone compensation was prorated if the driver provided pick-up or delivery services for less than seven hours in one day. FedEx removed the hours reference and now conditions full payment of the core zone settlement on the driver making a minimum number of stops, which assumes, in part, expected daily work hours.

Compensation rates aren't negotiated, though some contractors have requested and received changes to their core zone density settlement. *See* CRL-55, p. 2 ("A [driver] may . . . request a service ride to evaluate temporary core zone density settlement."). Contractors can choose to not sign a yearly modified settlement addendum.

Contractors also can receive the "Contractor Customer Service" bonus, a monthly performance-based bonus that drivers receive when they achieve certain safety and customer service goals — *e.g.*, no at-fault accidents, no verified customer complaints. FXHD OA, Addend. 8; FXG OA, Addend. 6. A contractor can expunge one verified customer complaint from his record and still receive the CCS bonus if he or his driver participates in the CARE training program. FedEx notes that the CCS bonus structure has changed over time — some requirements have been eliminated in the current version of the Operating Agreement — and the bonus applies differently to Ground and Home Delivery drivers.

At Ground, the CCS bonus includes a weekly "Pick-Up Service Bonus." The requirements for the Pick-Up Service Bonus have changed over time; today's

version indicates that contractors will receive the bonus when there are no missed pick-ups, all scheduled pick-ups are made within the requested windows (with a twenty-minute grace period at the end of the pick-up window), and the scanner is used to process all pick-up stops (with the allowance of two instances of non-compliance per month for late pick-ups and/or manual reconciliations for improper use of the scanner). FXG OA, Addend. 6.

Before 2007, the CCS bonus included a "Terminal Group Performance-related Bonus." Contractors were eligible for the bonus if their terminal met its inbound service goal for a particular period. The bonus was issued on a terminal-wide basis, so either all the contractors at the terminal received the bonus, or no one did. FXG 2004 OA, Addend. 6; FXHD 2004 OA, Addend. 8.

FedEx offers its contractors certain benefits, such as a driver-funded retirement plan, matching contributions to the "Service Guarantee Account," a college scholarship for drivers with children, and a time-off program based on seniority. FedEx has no responsibility to make deductions for, or to pay, health, welfare, and pension costs, withholding for income taxes, unemployment insurance premiums, Social Security taxes, or any other similar charges. OA, ¶ 4.2. FedEx issues contractors a Form 1099 at each year end, and the contractors report their taxes as independent contractors. Each contractor agrees to obtain and keep work accident or workers compensation insurance, but, at his option, can obtain coverage under a policy negotiated by FedEx. OA, ¶ 3.6.

FedEx drivers must record information about all package deliveries. OA, ¶ 1.10(d). Paragraph 1.10(d) of the Operating Agreement requires contractors to "provide such electronic and/or manual data pertaining to package handling," as necessary to achieve "efficient pick-up, delivery, handling, loading and unloading of packages and equipment." OA, ¶ 1.10(d). While package delivery information can be recorded manually, the vast majority of drivers use FedEx scanners. FedEx employees testified that a scanner isn't required, *see* Julie Brooks (Senior Manager for FHD) Dep., p. 303, but Mr. Sullivan testified that contractors must use a scanner so that customers can track their packages. Sullivan Dep., p. 214. FedEx manuals state that "[e]very package and Call Tag assigned to a P&D contractor for delivery must be scanned with a STAR scanner . . . [except in] contingency situations . . . . The P&D contractor records legible delivery information and obtains a legible recipient signature (when required) at the time of delivery." Pl. Exh. 2:282-283; Pl. Exh. 2:296-297. The scanners are connected to FedEx's computer system and transmit package tracking information to FedEx's website for customers to view.

Drivers are required to record on-duty, dispatch and return times, package tracking information, and odometer readings. As a motor carrier, federal regulations require FedEx to monitor the drivers' on-duty time and driving time. Scapellato Rept. (Nov. 8, 2007), p. 18. Certain shipping information, such as item

shipped, name of the shipper and consignee, and date of the shipment, also must be maintained under regulations.

*Days and Hours of Service and Daily Work Assignments*

FedEx drivers are required to provide service on the days FedEx is open for operation, meaning the days FedEx agrees to provide service to customers. OA, ¶ 1.10(a); Sullivan Dep., p. 171. The company has authority to change the days of service. Sullivan Dep., p. 182. Ground drivers generally work Monday through Friday, and Home Delivery drivers generally work Tuesday through Saturday. Under the Operating Agreement, "[t]he company reserves the right to name the work days preceding and following any holiday falling on or in conjunction with a weekend." OA, Addend. 3(II)(D).

There is no set time that a contractor must be at the terminal, but "[a] contractor is not supposed to leave the terminal [at the start of the day] until all his packages are available to him." Michael Mannion (Sr. V.P. Terminal Operations) Dep., p. 305. Mr. Mannion explained that this is more of an expectation for drivers' convenience, not a requirement. Mannion Dep., pp. 379-380. While at the terminal, either the driver or a FedEx employee loads the packages onto the truck. FedEx procedures indicate that drivers should perform a "check-out" with their manger before leaving the terminal. Managers may provide the drivers with a delivery manifest, review drivers' settlement report and

deliveries made the previous day, or discuss any DNAs (packages where delivery was not attempted) or other service failures with the driver. The manifest lists the packages for delivery that day; this information may be loaded directly on the scanner. Although drivers in the Home Delivery division are given turn-by-turn directions, these directions are only a tool for the contractors to use. FXHD OA, ¶ 1.14; FXHD OA, ¶ 1.15 ("[N]o officer, agent or employee of [FedEx] shall have the authority to prescribe . . . . what route the Contractor is to follow.").

Drivers are responsible for attempting delivery of every package in their work area each day and every package assigned under the Flex Program, if applicable. Although FedEx requires the contractors to try to make all deliveries assigned for that day, drivers can choose to hire someone to fulfill their route obligations. Drivers aren't required to appear at pick-up and delivery stops at specific times, except when FedEx negotiates a pick-up or delivery window at a customer's request; drivers then must make the appointed pick-ups or deliveries within that window of time or make other arrangements through FedEx or directly with the customer. For example, Ground drivers who pickup from a FedEx World Shipping Center or FedEx Kinko's can't do so before 5:00 p.m. and 6:00 p.m., respectively. FedEx also offers Home Delivery customers evening service that guarantees that the package will be delivered between 5:00 p.m. and 8:00 p.m. FedEx Home Delivery drivers must provide those services when FedEx requests or pass them over to another driver. Senior Manager of Home Delivery Julie

Brooks testified that she would consider a contractor's refusal to comply with those services a service failure. Brooks Dep., pp. 11-12.

Home Delivery drivers aren't required to return to the terminal at the end of their day, but Ground drivers who pick up customer packages must return by a certain time and perform a "check-in" process with their service manager. If Home Delivery or Ground drivers collect charges for C.O.D. packages, they are required to return the charges to the terminal at the end of the day. OA, ¶ 1.8 ("Contractor . . . agrees to collect any charges owed by shippers and recipients and to return all collected charges to [FedEx] at the end of each business day."). The drivers must mark and return to the terminal all undelivered packages. OA, ¶ 1.11. Managers are supposed to track daily the number of stops assigned to each driver and, at the end of the day, the actual number of stops made.

FedEx drivers typically are required to flex packages. Flexing is the daily expansion or contraction of a drivers' work area; it involves the movement of packages or stops from one work area to another if the volume of packages or stops is more than a driver reasonably can handle. P&D Planning Seminar Participant Manual, TM-410PRes, Version 2.0. Under the Home Delivery Operating Agreement, contractors agree to "[p]rovide daily delivery and pick-up service . . . within Contractor's Primary Service Area . . . and in such other areas as Contractor may from time-to-time be asked to service." FXHD OA, ¶ 1.10(a). Under the Ground Operating Agreement, drivers agree to provide services "in such

other areas as Contractor may be asked to provide service in the event Contractor elects to participate in the Flex Program." FXG OA, ¶ 1.10(a). More than ninety-nine percent of Ground drivers participate in the Flex Program. FXG OA, ¶ 9 ("By electing to participate, Contractor agrees to accept packages from outside Contractor's Primary Service Area for pick-up and delivery, up to daily pick-up and delivery capacity . . . when requested to do so by FedEx Ground terminal management."). Contractors previously were restricted from flexing packages informally among themselves.[5]

For both Ground and Home Delivery, the Operating Agreement states that "on any day where the volume of packages available for delivery or pick-up in the Contractor's Primary Service Area exceeds the volume that Contractor can reasonably be expected to handle on such day, [FedEx] may reassign a portion of such packages to another contractor." OA, ¶ 1.10(a).

The Operating Agreement says FedEx "will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment." OA, Background. To accomplish this, FedEx would try to structure the drivers' routes so vehicles are in use nine to eleven hours per day; this measurement was called the "Service Flex Range" and would vary between facilities. The Service Flex Range represented "the minimum and maximum

---

[5] The reengineered OPR-716 excludes any restriction on contractors' informally trading or "flexing" packages amongst themselves. *Compare* FedEx Exh. B-14 *with* FedEx Exh. B-27.

number of stops that can be delivered by a trained contractor working at 'industry standard' time [on that particular route]." Operations Management Handbook, Ch. 2 (2001). FedEx replaced the "Service Flex Range" in the Fall of 2005 with a metric guideline called the "Delivery Stop Guideline" that eliminates the minimum stops, but otherwise is similar to the "Service Flex Range." The new metric guideline also sets forth a maximum number of stops a driver, while utilizing his vehicle fully, reasonably can handle on any given day. These measurements are used to determine the flexing of packages.

*Management and Supervision*

FedEx managers are expected to conduct at least two business discussions each year with each contractor; in August 2005, this goal was clarified as not mandatory because it is a procedure, not a mandatory policy. OPR 560 (procedure); UNV-001 (describing difference between policies and procedures). Business discussions are a means for managers to provide recommendations and counseling to contractors in performing their contracted work. A manager or contractor might request a business discussion to review the contractor's overall performance or operation, to document agreed predetermined flexes, to discuss customer feedback or complaints, or to address issues that arise between the manager and contractor. CRL-560, at 1-2 (2006). For example, a FedEx manager can request a business discussion to discuss DNAs, missed pick-ups, or improper

documentation, to suggest ways the contractor can improve his performance, or to provide positive feedback on the contractor's safe driving or customer service skills. While FedEx may not be able to force the contractor to engage in a business discussion, not participating will reflect poorly on the contractor upon contract renewal. Mannion Dep., pp. 278-279. The manager documents the meetings on a FedEx form and keeps the information in the contractor's business discussions file. These documents can be used to support contract termination.

A FedEx driver's performance is reviewed through various audits and customer service rides. Managers are to conduct daily van service audits of every driver to ensure compliance with FedEx procedures for undelivered packages; the resulting reports reflect any packages the driver didn't try to deliver and the driver's scanning compliance rate. FedEx also hires security specialists to do random in-route van security reviews, during which they inspect drivers' vehicles to verify that drivers are securing the vehicles properly when delivering packages, *e.g.*, the vehicle isn't left running, the bulkhead door is closed, and packages are secured. *See* Loss Prevention Manual, Vehicle Security Review, p. 18, Pl. Exh. 4:587 (describing the procedure that loss prevention staff should follow during vehicle security reviews). Failing to secure a vehicle is a violation of the Operating Agreement and should result in a business discussion with the contractor.

At FedEx Home Delivery, FedEx reserves the right to perform driver release audits to ensure proper release of packages to customers without their signature.

A driver release audit involves the manager going out on a driver's route for about ten stops after the driver leaves the terminal. The manager follows the driver and sometimes interviews customers to determine whether the driver is releasing customers' packages properly. *See* HD Driver Release Audits Participant Manual, TM-406PRes (12/03), Pl. Exh. 4:521 ("The driver release audit program focuses on how to better serve the external customer by ensuring the proper methods are used when driver releas[es] packages . . . . As a service manager, you have an important role in communicating the most effective methods of driver releasing packages, and ensuring the contractors see the importance of being customer focused."). After the driver-release audit, the manager generally offers suggestions for improvement. FedEx presents evidence that the audits aren't applied uniformly company-wide and terminal managers have discretion in enforcing driver release procedures. The frequency of the audits has changed during the relevant period from quarterly to yearly, and the procedure is done only at residences.

Contractors approved for the Residential Driver Release Program won't be liable for loss resulting from a proper driver release. If no signature is required, the driver must leave the package in an approved area, out of public sight, and in a location that isn't accessible to animals or susceptible to weather damage. FXHD OA, "Residential Driver Release Program" Addend. The Driver Release Program indemnifies contractors for packages released to residences, not businesses. Drivers should leave packages at businesses without a signature only when the

driver has written approval from the recipient. DLV-005 - FedEx Procedure: Driver Released Packages, FXG.

Mr. Sullivan testified that driver release procedures for both residential and business deliveries are rules that contractors should follow. Sullivan Dep., pp. 226-227. Terminal managers should hold a business discussion with any contractor who doesn't follow the procedures, and the contractor might lose his CCS bonus. Sullivan Dep., p. 227. Conversely, Vice President of Contractor Relations Robert Ostrov described the driver release procedures as recommendations. Ostrov Dep., pp. 236-237.

FedEx managers must conduct two, but not more than four, customer service rides each year. CRL-555, p. 2. The customer service rides give managers a chance to see if drivers are complying with FedEx's customer service standards and to ensure that drivers are operating their vehicles safely. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14 ("[Q]ualified [FedEx] terminal personnel may, at their option, visit customer locations with Contractor four times annually to verify that Contractor is meeting the standards of customer service provided in this Agreement."). Managers' goals during the customer service rides might include reviewing pick-up and delivery methods, customer contact skills, safe driving techniques, and critical safe behaviors; developing accurate contractor service flex range (min/max); providing training on new scanner functions; and maintaining a positive relationship between the terminal management and driver. CSR

Participant Manual, Pl. Exh. 4:361. Robert Ostrov testified that "the customer service rides are an attempt to generally observe how the contractor is running his route, running his business, without drilling down on the specifics[,]" such as how he turns off the vehicle, what he does with his keys, how he puts the scanner in his belt, how he enters the rear portion of the truck, etc. Ostrov Dep., pp. 244-245.

The CSR Seminar document sets forth a number of items managers should observe during the ride, including the driver's check-out and check-in routines; how the driver operates, parks, and enters and exits the vehicle; the driver's delivery and pickup methods; and any delay time by the driver in performing the work. CSR Seminar, Pl. Exh. 4:451-462. For example, the CSR Seminar lists several things a manager should record when a driver makes a delivery:

√ The type of stop

√ The number of steps to reach point of delivery

√ Attracts immediate attention and walks at a direct steady pace

√ Looks for alternate delivery locations upon approach

√ Looks for proper Driver Release location upon approach

√ Introduces themselves and is pleasant/courteous to customers

√ Proper scanning procedures followed

√ Efficient in deciding when to driver release

√ Shows good judgment in indirect delivery

√ Leaves a delivery notice upon indirect delivery

√ Driver releases packages according to guidelines and common sense

√ Delivery notice is complete and legible

√ Efficient in handling 100+ lb. packages

√ Scan appropriate barcodes

√ Applies proper exception codes in timely fashion

√ Efficient in bulk stop methods

√ Puts address of next stop into the scanner on way back to van

CSR Seminar, Pl. Exh. 4:457. Managers' observations are used to make suggestions to the contractors to improve their work performance.

A standard FedEx Customer Service Ride Worksheet allows the manager and driver to report general information about the drivers' performance in the areas of package quality at delivery, quality assurance, driver release, professional appearance (uniform and vehicle), customer courtesy, and service. During some customer service rides, FedEx managers also must complete a worksheet entitled, "Primary Service Area Analysis Worksheet," to evaluate the contractor's flex range and core zone. FedEx managers document the time the driver arrives and departs from each stop, the number of minutes at each stop, the number of minutes between stops, the last three digits of the driver's odometer reading at each stop, and the approximate distance the driver must walk to pick up or deliver a package. CRL-555, at 3. FedEx presents evidence that managers vary in how they

conduct customer service rides, the number of rides they perform each year, and what they review during the rides.

In addition to customer service rides, managers should annually discuss with the driver his business plan. CRL-560, p. 3. In the annual business plan discussion, managers "document discussion areas, problems, solutions agreed upon, predetermined flex(es), and the expectations of an individual contractor." CRL-560, p. 3. The documentation provides a record of the mutual commitments undertaken by FedEx and the driver. CRL-560, p. 3. The form provides spaces for the manager to document or compile the following information: the contractor's total number of stops, packages, miles, and DOT hours of work; anticipated changes in the contractor's primary service area; the condition and appearance of the contractor's equipment; any deficiencies and expected correction dates; the number and type of complaints the contractor has received in the last twelve months; the contractor's contingency plan in the event of a vehicle break-down; and any comments or questions the contractor might have.

FedEx presents evidence that business discussions, customer service rides, and audits result in recommendations, not mandatory policies that must be followed. *See, e.g.*, 2003 OPR 555 (2003), p. 2 ("Terminal management is to use [Contractor Customer Service Worksheet] as a consulting tool to provide recommendations to contractor."); CSR Participant Manual (2005), Pl. Exh. 4:321 (stating that managers are consultants and can make recommendations, but can't

34

require a contractor to follow methods, manner, or means of achieving desired results; the manager is to observe and make recommendations). As part of FedEx's 2005 Document Reengineering Initiative, FedEx revised CRL-555 (formerly OPR 555) to make clear that feedback based on customer service rides constitutes a "recommendation," not mandatory instruction, and that "[t]he contractor is solely responsible for exercising independent discretion and judgment to achieve business objectives" addressed by possible recommendations. 2005 CRL-555, p. 1.

The customer service rides, audits, and resulting business discussions, however, are at times used to instruct contractors that they have violated the contract for having DNAs or customer complaints, improperly scanning or recording packages, missing pick-up windows, or not complying with safety regulations, among other service failures. Contractors sometimes are warned that violations might result in contract termination if not remedied. In fact, FedEx tracks information listing contractors in jeopardy of losing their contracts for having an at-fault accident, customer complaint, or missed pick-up. Pl. Exh. 4:187, Instructions for using worksheet "Contractors in Jeopardy."


*Reconfiguration, Expansion, or Sale of Primary Service Area*

FedEx can reconfigure a contractor's Primary Service Area upon five days' written notice, unless the driver shows during that period that he can continue

to service the area. FXHD OA, ¶ 6.2; FXG OA, ¶ 5.2 ("During such notice period, [FedEx] shall give Contractor the opportunity, using means satisfactory to [FedEx], to continue to provide in such Primary Service Area the level of service called for in this Agreement. In the event Contractor is not able to provide reasonable means to continue to service the Primary Service Area, [FedEx] may, in its sole discretion, reconfigure such area."). The Operating Agreement requires compensation to the contractor if reconfiguration results in less customers or accounts, FXHD OA, ¶ 6.4, Addend. 5; FXG OA, ¶ 5.3; contractors may also be able to sell excess stops as an alternative to reconfiguration. Managers should review work area alignment twice a year to improve pick-up and delivery productivity and service through the restructuring of work areas. The goal is to provide each contractor with a full day's work using the service flex range valuation. Management above the terminal level conducts what is called a "P&D Tune-up" about once a year to determine, in part, whether the terminal's work areas are configured appropriately to maximize terminal capacity. The P&D Tune-up normally results in a recommendation to reconfigure contractors' work areas.

Drivers can expand their routes by acquiring additional service areas from FedEx or other contractors as they become available, subject to FedEx approval. The opportunity to acquire additional routes depends largely on the terminal. OA, ¶ 2.1 ("Contractor may, with the consent of [FedEx] and consistent with the capacity of the terminal serviced by Contractor, own and operate more than one

vehicle, with any such additional vehicles to be driven by qualified operators employed by Contractor."). FedEx restricts the maximum number of routes a contractor can own at any one terminal, but FedEx's Chief Operating Officer or Chief Executive Officer can make exceptions to this rule. Until 2005, contractors were prohibited from obtaining a second route within their first year of contracting. Contractors with more than one route — multiple work area contractors — have a greater opportunity to profit from their routes than single work area contractors. The percentage of multiple work area contractors differs between terminals.

Contractors have a proprietary interest in their routes and can sell them upon thirty days written notice to FedEx. The new driver assignee must be acceptable to FedEx as qualified to provide services under the Operating Agreement. FXHD OA, ¶ 15; FXG OA, ¶ 18 (allowing contractors to assign their rights and obligations to an approved replacement contractor). The assignee must meet the same minimum requirements and is subject to the same screening as contractors and temporary drivers. CRL-551, at 5 ("An individual applying to be a contractor/temporary driver must be prescreened and/or extensively reviewed or tested prior to completing the CDAS online application."). A driver whose contract is terminated by FedEx for cause can't assign his contractual rights to others.

*Length and Termination of Operating Agreements*

Contractors enter into Operating Agreements for an initial term of one, two, or three years (depending on the contractor's election) that automatically renews for another one-year term if there is no notice of non-renewal. Non-renewal of the contract is permitted by either party upon thirty days written notice before the term expires. FXHD OA, ¶ 8.2; FXG OA, ¶ 11.2. The Operating Agreement allows termination: (1) by the parties' mutual agreement; (2) if the contractor or his driver(s) engages in intentional misconduct or reckless or willful negligent operation of the vehicular equipment; (3) by either party "if the other party breaches or fails to perform the contractual obligations imposed by [the] Agreement[;]"(4) if FedEx stops doing business in all or part of the terminal service area or, as a result of decline in business, reduces operations in all or part of the service area; or (5) upon termination by the contractor upon thirty days' written notice. FXHD OA, ¶ 9.1; FXG OA, ¶ 12.1.

FedEx sets forth procedures that managers should use if they decide to recommend termination of a "contractor who has breached or failed to perform . . . contractual obligations, as evidenced by repeated customer complaints, failure to service his/her work area, integrity issues, unsafe driving, D.O.T. and/or maintenance violations, or other such problems." RCRL-162, at 5, Pl. Exh. 2:786. Managers should compile documentation of specific contract violations that would support a recommendation to terminate and use FedEx's business discussion

process to tell the contractor if his contract is in jeopardy. Managers then discuss the recommendation with the regional managing director, who also considers whether contract termination is appropriate, *i.e.*, whether the supporting documentation is complete, accurate, and legible; whether steps were taken to counsel, train, and otherwise help the contractor in overcoming the documented shortcomings; and how the contractor's performance compares with other contractors at the same terminal.

If the regional managing director agrees that contract termination is appropriate, the file is forwarded to Contractor Relations for more internal review. Contractor Relations independently reviews the submitted record for breaches of the Operating Agreement. Contractor Relations has at times declined to concur and denied a proposed termination if valid grounds for doing so under the Operating Agreement were lacking. If Contractor Relations concurs that termination is warranted, FedEx's legal department reviews the file.

After the internal review process is complete, the regional managing director notifies the senior manager/operations manager of the appropriate actions to take. RCRL-162, at 5-5, Pl. Exh. 2:786-787; OP-162, Pl. Exh. 3:7-8. The Operating Agreement contains a mandatory arbitration clause if the contractor asserts a claim for wrongful termination. FXHD OA, ¶ 9.3 and Addend. 7; FXG OA, ¶ 12.3. If the arbitrator decides that termination wasn't within the terms of the Agreement, FedEx can either reinstate the contractor with damages from the date

of termination through the date of reinstatement or, alternatively, terminate the contractor with damages from the date of termination through expiration of the contract term. FXG OA, ¶ 12.3(e); FXHD OA, Addend. 7, ¶ 5).

## II. EVIDENTIARY ISSUES

The parties have filed cross-motions for summary judgment on the issue of whether the Kansas plaintiffs are FedEx employees or independent contractors. Before the court can address the motions for summary judgment, it must resolve several evidentiary issues raised by the parties. First, FedEx argues that the Operating Agreement's merger clause limits the court's review of the evidence to the four corners of the agreement. Second, FedEx has moved to strike plaintiffs' individualized proof submitted in support of their summary judgment motions. Finally, the plaintiffs have filed three motions to augment the record.

### A. MERGER CLAUSE

FedEx bases its summary judgment motion on the terms in the Operating Agreement alone, contending that the merger clause in the Operating Agreement prevents the plaintiffs from relying on outside evidence, including FedEx policies and procedures. The merger provision states: "This Agreement, the Addenda hereto, and the Attachment to the Addenda, constitute the entire agreement and understanding between the parties . . . . This Agreement, the Addenda and

Attachments shall not be modified, altered, changed or amended in any respect unless in writing and signed by both parties." FXG OA, ¶ 13, FXHD OA, ¶ 10. FedEx Policy-007 similarly provides that the Operating Agreement and its addenda can't be modified unless in writing signed by both parties. Policy-007 states that the Operating Agreement and addenda "set forth the mutual obligations and objectives of FedEx Ground and the independent contractor owner-operators and must be adhered to by all officers, managers, agents and employees of FedEx Ground." The Operating Agreement doesn't generally incorporate FedEx policies and procedures.

FedEx reasons that the Operating Agreement alone governs the parties' relationship and doesn't contain any provisions requiring contractors to follow FedEx's policies and procedures. The policies and procedures are, on their face, directed to FedEx employees, not to the plaintiffs. FedEx asserts that the policies and procedures generally aren't shared with contractors because contractors aren't bound by them. The policies and procedures, according to FedEx, "do not -- and cannot -- reserve any rights that would conflict with the terms of the OA and its disclaimer of a right to control."

The drivers respond that the court isn't deciding whether the Operating Agreement creates an enforceable independent contractor relationship under contract law. Rather, they assert that the Operating Agreement and FedEx's generally applicable corporate policies and procedures provide relevant evidence

concerning the relationship between FedEx and its drivers. The drivers reason that FedEx can't contractually restrict the sources of relevant evidence bearing on the employment status inquiry. The corporate policies that empower FedEx's managers to direct the drivers' daily work activities, the drivers contend, are proof of FedEx's retained right to control how drivers perform their work and are probative of the ultimate issue of whether the independent contractor label in the Operating Agreement is legally inaccurate.

The court generally agrees with the drivers. Pennsylvania law governs interpretation and construction of the Operating Agreement. FXHD, ¶ 16, FXG OA, ¶ 19. Were this a breach of contract dispute, the merger provision would, absent an ambiguity, fraud, or mistake, generally restrict the court's review to the four corners of the agreement. Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 437 (Pa. 2004). But this isn't a breach of contract dispute; it's an employment dispute under the Kansas Wage Payment Act, and contract interpretation principles don't necessarily apply. For example, the Kansas Supreme Court explained that when resolving employment status, "language in a contract that characterizes an individual as an independent contractor, rather than an employee, is not controlling." Hartford Underwriters Ins. Co. v. Kansas Dep't of Human Res., 32 P.3d 1146, 1154 (Kan. 2001). The Hartford Underwriters court stated that "such provisions in a contract are not effective to keep an

employer outside the purview of the [employment statute] when the established facts bring him within it." Id.

The court's focus should be on "what is done under the contract and not what it states." Hartford Underwriters, 32 P.3d at 1154. Accordingly, "[t]he relationship of contracting parties depends on *all* the operative facts; the label which they choose to employ is only one of those facts." Hartford Underwriters, 32 P.3d at 1154 (emphasis in original); *see also* Knoble v. National Carriers, Inc., 510 P.2d 1274, 1281 (Kan. 1973) ("[M]ere terminology cannot bind a court or prevent it from assessing the effect of the overall conduct of the parties.").

The Operating Agreement's merger clause doesn't restrict the court to the four corners of the agreement when deciding employment status. FedEx notes, though, that the court has certified classes on the issue of right to control, not actual exercise of control. While FedEx is correct, the court finds it appropriate to review the policies and procedures that FedEx managers rely on when interacting with drivers to determine right to control. The court isn't required to turn a blind eye to FedEx's procedures implemented on a class-wide basis.

FedEx policies and procedures that fill out the broad terms of the Operating Agreement with more specific standards that FedEx managers are authorized and generally expected to enforce are probative of employment status. FedEx implemented these documents to guide the managers in their relationship with the drivers and to give meaning to what is more specifically expected under the

Operating Agreement. By putting such policies and procedures into place, FedEx acknowledges that the Operating Agreement depends on sources outside its four corners for implementation.

Further, Policy-007 doesn't render other policies and procedures meaningless. The undisputed evidence establishes that FedEx management employees are expected to know the relevant policies and procedures and, to the extent it makes good business sense, follow them. FedEx's right to control is restrained by the terms in the Operating Agreement, but to the extent the policies and procedures explain or more clearly or specifically define those terms, they are relevant and should be considered.

The court therefore finds it appropriate to consider the Operating Agreement and policies and procedures, as well, in deciding whether FedEx has a right to control its drivers on a class-wide basis.

### B. FedEx's Motion to Strike

FedEx says more than 1,600 pages of documents the plaintiffs filed with their summary judgment motions in class action states should be stricken because they contain individualized evidence. In its March 2008 class certification order (doc. # 1119), this court stated that it "has resolved these motions with the correlative assumption that the plaintiffs will not, at the summary judgment or trial stages, present evidence other than the Operating Agreement and generally

applicable FedEx policies." Throughout the order, the court recognized the common application of the Operating Agreement and FedEx policies and procedures in determining the merits of class action cases, but indicated it wouldn't consider any individualized evidence of the parties' relationship.

In April 2008, the plaintiffs filed a Statement of Intent listing seven categories of evidence on which they intended to rely, asserting that such evidence is "common proof applicable to members of the class as a whole." The court issued an order explaining that it didn't read plaintiffs' Statement of Intent to include "individualized evidence of driver intent and/or experience" and FedEx could file a motion to strike if plaintiffs included individualized evidence in their summary judgment motions. FedEx has filed its motion.

FedEx moves to strike the following evidence from the summary judgment record:

- A report listing hundreds of FedEx "Contractors in Jeopardy" of termination as a result of potential breaches of specific contractual obligations owed in the performance of the contractors' duties

- Business discussion notes between managers and individual contractors

- Contractor Customer Service Ride Worksheets created during and at the conclusion of a contractor's individual customer service "ride-along"

45

- Primary Service Area Analysis Worksheets detailing the package and load characteristics of a given contractor's work area

- Business Plan Meeting Notes reflecting individual contractor's circumstances, experiences, business goals, and approach to business

- Operator and Equipment Appearance Standard A.M. Checks (completed once per month) reflecting certain contractor's circumstances on a particular day

- Safety Meeting Reports reflecting discussions at periodic voluntary safety meetings that take place in terminals around the country

FedEx asserts that those documents are contractor specific and anecdotal in nature and don't represent the experiences of all contractors. By offering this evidence, FedEx contends the plaintiffs shift the substantive inquiry from the "right to control" under the Operating Agreement to an examination of the "reality of the relationship between drivers and FedEx across-the-board" and what managers across the country do "in fact."

In response, the plaintiffs explain the relevance of the documents to the class-wide plaintiffs. They say that the report listing hundreds of FedEx "Contractors in Jeopardy" illustrates that drivers who have had an accident, customer complaint, or missed pickup are "in jeopardy" of contract termination. Further, the plaintiffs point out that the samples of completed forms submitted

show that FedEx managers document their regular oversight of drivers' work performance, assignments, and training pursuant to FedEx policy. According to plaintiffs, the 128-page summary index of business discussion notes represents about two percent of the business discussion notes produced by FedEx. As FedEx policies require, FedEx managers throughout the country wrote those notes to document systematic counseling of drivers about a wide range of topics.

The plaintiffs offer these documents to prove that FedEx managers (1) systematically and routinely counsel drivers about compliance with a myriad of work methods established by FedEx; (2) follow FedEx's written policies and procedures, including those applicable to drivers' work methods; (3) evaluate, warn, discipline, and threaten to terminate drivers for violations of FedEx policies, procedures, and practices; (4) believe that the Operating Agreement and polices and procedures provide them with broad rights to control; and (5) limit drivers' decision-making.

For the most part, the court agrees with FedEx. In class action summary judgment motions, the drivers can't rely on individual contractors' experiences — whether that information is in the form of a list of contractors in jeopardy, completed FedEx forms, or business discussions — to show FedEx's right to control drivers on a class-wide basis. The detailed information the drivers produced represents anecdotal evidence of how FedEx treated individual drivers. Those instances amount to efforts to use actual control to show right to control.

The court has already explained that the plaintiffs can't submit such individualized evidence in the class action lawsuits to prove employment status.

The substance of the drivers' experiences contained in the submitted documents may differ from driver to driver, from manager to manager, and from terminal to terminal. For example, while each driver might have engaged in business discussions, the topic, number, and tone of the discussions would differ between drivers. FedEx presented evidence that managers have discretion in how and how often they conduct business discussions and what issues are addressed and their intended effect. Were the court to allow the plaintiffs to introduce evidence to show the substance of FedEx managers' interaction with selected drivers, it would then have to allow FedEx the opportunity to produce contradictory evidence showing that other drivers weren't treated in a similar fashion. Class actions can't be based on such individualized evidence.

The plaintiffs have asked the court to review hundreds of "samples" of completed forms and business discussions and make generalizations about how all FedEx drivers were treated based on the experiences of the sample drivers. The court can't make generalizations about the class as a whole from a review of the actual control FedEx exercised over a segment of drivers. The court's analysis will focus on FedEx's right to control all drivers based on the Operating Agreement and generally applicable polices and procedures.

The court does, however, look to the submitted evidence to see generally how FedEx implemented its policies and procedures on a class-wide basis, *i.e.,* what forms managers used to evaluate drivers' work methods, the information managers were expected to input, the information FedEx tracked for all drivers, and the general topics addressed between managers and drivers. For example, the court relies on the "Contractors in Jeopardy" to show that FedEx tracks contractors who have had an at-fault accident, complaint, or missed pick-up. The court also relies on the submitted documents to show that customer service rides, audits, and resulting business discussions are used at times to let contractors know they are in violation of their contract for service failures, which, if not remedied, could result in contract termination.

The court GRANTS FedEx's motion to strike (doc. # 1389) to the extent the plaintiffs rely on the submitted documents to show individual contractors' experiences in class certification cases. The court will consider the evidence to show generally how FedEx implemented its policies and procedures on a class-wide basis. This ruling doesn't apply to summary judgment motions filed in non-class action cases.

## C. Plaintiffs' Motions to Augment Record

The plaintiffs have moved to augment the summary judgment record with newly produced documents. In their first motion, the drivers seek to offer four

newly promulgated Addenda to the FedEx Operating Agreement and four newly-produced IRS Notices of Proposed Assessment analyzing whether FedEx drivers are employees or independent contractors under the IRS's right to control test. In their second motion, the drivers seek to offer FedEx's Contractor Incorporation and Compliance Disclosure Announcement and a notification from FedEx's president that Operating Agreements won't be renewed, both dated May 2010. In their third motion, the plaintiffs seek to offer a decision of the Tennessee Department of Labor and Workforce Development and settlement between FedEx and the Department, a settlement agreement between the State of Massachusetts and FedEx, and transition announcements and ISP Transition guides in Tennessee, Massachusetts (including Albany, NY), Rhode Island, Vermont, Illinois, and Minnesota dated June or July 2010, explaining FedEx's transition to its "Independent Service Provider Model." The plaintiffs seek to offer these documents without further briefing.

The plaintiffs explain the materials they seek to introduce were produced after briefing concluded. The revisions to the Operating Agreement, the plaintiffs contend, are relevant and should be considered in deciding whether FedEx reserves any right to control the method, manner, or means of the drivers' performance. The plaintiffs reason that the revisions show FedEx's right to set and change at-will the continuing relationship between FedEx and its drivers and the compensation and means FedEx might use to enforce compliance with its rules.

FedEx responds that the newly-added Addenda should be rejected as cumulative because the documents are merely revisions of routine annual contract updates.

The Modified Term Addendum was given to drivers to sign in November or December 2009. It set a new contract termination date of May 15, 2010 for drivers who sign the Addendum. FedEx notes that this revision was for a limited number of contractors whose routes are based in or operate out of Maryland. Unless a contractor chooses to adopt the Modified Term Addendum and participate in the Maryland transition, the existing Operating Agreements and their terms remained in place.

The Employment Eligibility and Compliance Addendum, also given to drivers to sign in November or December 2009, requires E-Verify for all new hiring. FedEx explains that federal immigration laws require the E-Verify system. As a federal contractor, FedEx is required to ensure that subcontractors use E-Verify.

The Safe Driving Program and CCS Addendum were provided to drivers in January 2010, and revised versions were provided to contractors later. FedEx's new Safe Driving Program imposes more restrictions on contractors' ability to hire and retain workers. The drivers explain that the Program supercedes various Operating Agreement provisions and requires contractors to review and disqualify existing helpers or assistants who don't meet the new requirements, authorizes FedEx to judge the "guilt" of a driver arrested for various infractions and temporarily disqualify those it finds likely to be found guilty, and mandates

termination of drivers for certain traffic offenses. The CCS Addendum changes the terms of the CCS bonus by precluding a contractor from receiving the bonus for three consecutive months upon disqualification under the "Safe Driving Addendum."

FedEx notes that participation in the Enhanced CCS Program is contingent upon participation in the new Safe Driving Program. The revised Safe Driving Program Addendum was specifically "developed to further improve safety performance by rewarding contractors who operate safely each and every day." A contractor who chooses to follow the requirements of the Enhanced CCS Program is "eligible to be paid . . . an individual, performance-related bonus." These programs are optional, and a contractor who elects not to participate in the revised programs continues to operate under the existing Safe Driving Program and CCS bonus program in his Operating Agreement.

The drivers also seek to introduce IRS Notices of Proposed Assessment (NOPAs). On December 28, 2009, this court affirmed the magistrate judge's decision ordering FedEx to produce the IRS's four draft NOPAs, finding that the NOPAs are relevant and FedEx has placed the IRS's opinion of its driver model at issue. The drivers now seek permission to offer the notices to supplement the record. The drivers explain that the 2007 and 2009 NOPAs include a lengthy and detailed analysis of the relationship of the drivers to FedEx and each reaches the

conclusion that FedEx drivers are employees under the IRS Code's right-to-control employment test.

FedEx says the NOPAs are irrelevant and don't represent the IRS's position because the 2007 NOPA was a draft and the 2009 NOPA has been withdrawn. Further, FedEx asserts that according to applicable law and the IRS's own procedures, the application of Section 530 of the 1978 Revenue Act (safe harbor) renders the draft NOPAs of no substantive effect in establishing that any plaintiff or absent class member is an employee.

The plaintiffs respond that under the NOPAs' plain language, the IRS found, after detailed analysis, that FedEx contractors are employees under the common law right-to-control test applied by the IRS. The drivers assert that the right-to-control analysis in the NOPAs provides persuasive authority that this court should consider. The IRS ultimately decided that the "safe harbor" prevented it from seeking back taxes from FedEx, so it didn't issue a final determination of employee status. The drivers reason that the IRS's "safe harbor" ruling doesn't undercut the substance of the IRS's prior analysis and conclusion that FedEx reserves the right to control how the drivers perform their work.

The drivers also seek to include documents provided to FedEx contractors in May 2010. The first document is the Contractor Incorporation and Compliance Disclosure Announcement, which provides generally that FedEx will contract only with incorporated entities, registered in good standing, who agree to treat all

personnel who provide services under the Operating Agreement as employees. Contractors must sign and submit a new Addendum once FedEx confirms these standards have been satisfied. The Announcement provides that all Operating Agreements will be non-renewed. Contractors fulfilling the terms of the Agreement will be eligible to continue a relationship with FedEx if they satisfy the new standards at least thirty days before their contract expiration date. The second document is a related letter from FedEx's president. The drivers contend that the Announcement and letter show that FedEx retains the right to terminate at-will contracts unless and until the contractor conforms to FedEx's latest business edict.

Finally, in the third motion to augment, plaintiffs seek to introduce a decision from the Tennessee Department of Labor and Workforce Development determining that under the Tennessee Employment Security Law, FedEx drivers are employees for certain purposes. FedEx appealed, and the Department and FedEx entered into a settlement agreement. The plaintiffs similarly seek to introduce an agreement entered into between FedEx and Massachusetts in response to an administrative finding that the drivers were employees under Massachusetts law. The plaintiffs contend that the settlement agreements reflect FedEx's abandonment of its current business model and the introduction of its "Independent Service Provider Agreement," including the non-renewal of all Operating Agreements in these states.

Beginning in June 2010, FedEx provided documents to drivers introducing its transition to the "Independent Service Provider Model" in Tennessee, Massachusetts, Rhode Island, Vermont, Illinois, and Minnesota and to certain contractors who work out of "cross-border" FedEx stations in neighboring states. According to the transition documents, for contractors to continue their relationship as FedEx pickup and delivery drivers, they must incorporate by a certain date, acquire at least three primary service areas within one terminal by a date certain, register with the state, and execute certain forms. The transition documents also indicate that Operating Agreements are non-renewed and swing routes will "cease to exist." FedEx has offered incentives for drivers to terminate their current contracts and meet the requirements for this new model. The plaintiffs argue that these documents evidence FedEx's right to dictate the method of the drivers' performance and shows FedEx's right to terminate and non-renew contracts at-will.

Federal Rule of Civil Procedure 56(e) provides in pertinent part that the "court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits." FED. R. CIV. P. 56(e)(1). The court has discretion to allow the drivers to supplement the summary judgment record. Wren v. McCain, 23 F.3d 411 (Table), No. 93-2183, 1994 WL 142884, at *2 (7th Cir. Apr. 20, 1994) (affirming magistrate judge's decision permitting party to supplement summary judgment record after motion had been filed). The court

concludes that the submitted documents are relevant to only a small segment of the plaintiff classes, cumulative of the evidence already submitted, or of little evidentiary value. Accordingly, the court declines to allow the plaintiffs to supplement the record.

The Addenda to the Operating Agreement — Modified Term Addendum, Employment Eligibility and Compliance Addendum, Safe Driving Program and CCS Addendum — were provided to drivers in late 2009 or early 2010 and apply only to a small segment of the plaintiff classes: those working for FedEx in the last seven months who signed the new Addenda. The plaintiffs contend the Addenda evidence FedEx's right to control the drivers by illustrating FedEx's ability to change the terms of the parties' agreement, but these Addenda are voluntary. It's undisputed that FedEx can change the terms of the Operating Agreement upon the contractor's voluntary signature to an Addendum and has retained the right to not renew contracts upon expiration of the contract term. Accordingly, further evidence showing FedEx's ability to change the Operating Agreement's terms by agreement of the contractors or by non-renewal of their contracts is cumulative.

The evidence is also of limited relevance. The Modified Term Addendum only applies to drivers whose routes are based in or operate out of Maryland and isn't necessarily applicable to other classes. Federal immigration laws require the Employment Eligibility and Compliance Addendum. The Safe Driving Program imposes more restrictions on drivers' ability to hire and retain workers, but is a

voluntary program tied to the Enhanced CCS Program. To receive the CCS bonus already in effect, contractors had to similarly comply with certain FedEx standards. These Addenda are cumulative of documents already in the record and of little relevance to the pending motions for summary judgment.

The Contractor Incorporation and Compliance Disclosure Announcement and letter from FedEx's president were provided to FedEx contractors in May 2010, so their relevance is limited to drivers who were working for FedEx in the last several months. Because the documents illustrate FedEx's right to not renew contracts after the stated term and to change the terms of new contracts, the evidence is cumulative and doesn't shed additional light on the class members' relationship with FedEx during the relevant class period. The court declines to augment the record with new Addenda that apply only to a small segment of contractors and are submitted for the purpose of showing that FedEx has the right to not renew the contractors' agreements at the end of their term.

Further, the transition documents offered in plaintiffs' third motion to augment only relate to eight states and are dated in June or July 2010. In those states, FedEx has changed its current business model and implemented the ISP Model in response to particularities of the states' law. The new business model isn't at issue in the cases in this docket. The documents merely show FedEx's ability to non-renew contracts and to enter into new contracts with entities of its choosing; a right FedEx has retained under the Operating Agreement. FedEx has

also given the parties the option of ending their contracts early by offering transition incentive payments. The transition documents, therefore, are of limited relevance for the same reasons as the newly submitted Addenda.

Although the NOPAs may have some persuasive value, their value is limited because they don't represent a final determination. This court required FedEx to produce the documents because they are relevant and material to this litigation, but relevancy for discovery can differ from relevancy for summary judgment purposes. The determination that FedEx drivers are employees under the common law right-to-control test as applied by the IRS is of little value without some showing that the applicable state or federal law at issue in the class action suit would give weight to such opinions.

Further, the Tennessee and Massachusetts settlements addressed in the plaintiffs' third motion to augment the record are also of limited relevancy and not admissible to show liability. *See* FED. R. EVID. 408(a). The decision that resulted in the Tennessee settlement is also of limited persuasive authority because it doesn't represent a final judgment on the merits. To the extent it has any persuasive authority, the court will only consider it in the Tennessee class action.

At this stage in the litigation, the relevancy of the newly submitted documents to the summary judgment motions doesn't justify augmentation of the already voluminous record. The court therefore DENIES the plaintiffs' motions to augment the record (docs. ## 1992, 2064, and 2087).

III. Motions for Summary Judgment

A. Standard

The plaintiffs and FedEx have filed cross-motions for summary judgment. Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact couldn't find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Crull v. Sunderman, 384 F.3d 453, 459-460 (7th Cir. 2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).

When cross motions for summary judgment confront the court, it must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *See* McKinney v. Cadleway Props., Inc., 548 F.3d 496, 504 n.4 (7th Cir. 2008) ("The motions are treated separately."); Midwest Title Loans, Inc. v. Ripley, 616 F. Supp. 2d 897, 902 (S.D. Ind. 2009) ("[C]ourts

must consider each party's motion individually to determine if that party has satisfied the summary judgment standard."). The standard for determining whether summary judgment should issue is unchanged from that which applies when only a single party has moved for the relief. McKinney v. Cadleway Props., 548 F.3d at 500.

Whether an individual is an employee or an independent contractor generally is considered a question of fact for the jury or trier of fact. McCubbin v. Walker, 886 P.2d 790, 795 (Kan. 1994). When the facts are undisputed or the evidence is susceptible of only a single conclusion, however, it is a question of law for the court. Id.

## B. Discussion

The Kansas plaintiffs allege that FedEx's classification of Kansas pickup and delivery drivers as independent contractors violates the Kansas Wage Payment Act. The Act circularly defines an employee as "any person allowed or permitted to work by an employer," KAN. STAT. ANN. § 44-313(b), so courts look to various facts and circumstances surrounding the parties' relationship to determine the package and delivery drivers' employment status. Herr v. Heiman, 75 F.3d 1509, 1512 (10th Cir. 1996) (Kansas Wage Payment Act) (*citing* Wallis v. Secretary of Kan. Dep't of Human Res., 689 P.2d 787, 792 (Kan. 1984) (Kansas Employment Security Act)).

Kansas courts appear to use the same test to determine employment status for claims brought under various employment statutes and for respondeat superior liability. FedEx contends the court shouldn't give weight to cases deciding employment status under the Worker's Compensation Act because those cases reflect a policy favoring employee status and so don't afford the same "considerable weight" to the parties' intent as is required here. The court disagrees. The cases determining employee status under the Kansas Worker's Compensation Act set forth an employment test that is similar to the test under the Kansas Wage Payment Act. Under the applicable common law test, intent is just one factor to consider in determining employment status; the right to control is the most significant factor. The court therefore finds these cases persuasive in deciding whether FedEx drivers in Kansas are employees or independent contractors.

There is no absolute rule for determining whether an individual is an independent contractor or an employee. Wallis v. Secretary, 689 P.2d at 792; *see also* Hartford Underwriters Ins. Co. v. Department of Human Res., 32 P.3d at 1151 (Kansas Employment Security Act). The facts and circumstances of each case determine whether one is an employee or an independent contractor, taking into consideration broad legal principles. Wallis v. Secretary, 689 P.2d at 792; McCubbin v. Walker, 886 P.2d at 794.

"An independent contractor is generally described as one who . . . contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work." <u>Wallis v. Secretary</u>, 689 P.2d at 792. The primary test used in determining whether an employment relationship exists is "whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished." <u>Id.</u> The existence of the right or authority to interfere or control by the employer, not the actual interference or exercise of control, renders one an employee rather than an independent contractor. <u>Id.</u>; <u>Hartford Underwriters</u>, 32 P.3d at 1151.

The right to control the manner and methods of the worker is the single most important factor in determining a worker's status, <u>McCubbin v. Walker</u>, 886 P.2d at 794, but it isn't exclusive and other relevant factors should be considered. <u>McDonnell v. Music Stand, Inc.</u>, 886 P.2d 895, 899 (Kan. Ct. App. 1994) (*citing* <u>Jones v. City of Dodge City</u>, 402 P.2d 108, 111 (Kan. 1965)). Other relevant factors include: whether there is an agreement to perform a  certain kind of work for a definite period of time; whether the employer has the right to discharge the worker at any time; whether the worker must furnish necessary tools, supplies, and materials; whether the worker is paid by the hour or by the job; whether the work is part of the regular business of the employer; whether the worker's business is

independent in nature; and whether the worker has the right to employ assistants and supervise their work. *See, e.g.*, McCubbin v. Walker, 886 P.2d at 794 (length of contract, independent nature of business, employment of assistants, furnishing equipment, method of payment, and regular part of business); Wallis v. Secretary, 689 P.2d at 792 (right to discharge, method of payment, furnishing equipment); McDonnell v. Music Stand, 886 P.2d at 899 (length of agreement, power to terminate, and method of payment).

Other cases have relied on similar factors as set forth in the RESTATEMENT (SECOND) OF AGENCY § 220(2):

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*See* Knorp v. Albert, 28 P.3d 1024, 1028 (Kan. Ct. App. 2001) (respondeat superior liability); Travelers Indem. Co. of Ill. v. Challenger Fence Co., 119 P.3d 666, 668 (Kan. Ct. App. 2005) (Worker's Compensation); *see also* Herr v. Heiman, 75 F.3d 1509, 1512 (10th Cir. 1996) (action brought under Kansas Wage Payment Act, considering twenty similar factors used by Kansas Department of Human Resources to determine employment status). "[T]here are numerous factors which may be considered in determining an individual's employment status, and many of those factors overlap." Hill v. Kansas Dep't of Labor, Div. of Workers Comp., 210 P.3d 647, 655 (Kan. Ct. App. 2009).

Several Kansas courts have applied the right to control test to find employee status when the employer retained control over numerous aspects of the employer's work. In Wallis v. Secretary, 689 P.2d at 789, the issue was whether individuals who were dealers of Kirby Vacuum Cleaners were employees of Mr. Wallis or independent contractors. The court held that the district court

incorrectly determined that the salesmen were independent contractors based on the adopted findings of fact from the Department of Human Resources. Id. at 795.

Mr. Wallis recruited potential "dealers" to sell vacuum sweepers within his distributorship and had the dealers sign what was designated as an independent dealer agreement. The newly associated dealers took a training course carried out by Mr. Wallis in which they were oriented with the product and counseled with regard to sales techniques. During the early course of their sales experience, new dealers were accompanied by more experienced dealers. The dealers were free to establish their own hours of service and the territories they serviced. Mr. Wallis didn't compensate or reimburse them for their expenses or provide them office space. The dealers didn't sell competing products. They could negotiate the product's price with the customer, but the distributor reviewed the sale for acceptance. Either party could terminate the "independent contractor" agreement upon thirty days written notice. Mr. Wallis could terminate the contract "in those instances wherein he finds the dealer to be not representative of the product or product line." 689 P.2d at 789-790.

In holding that the dealers were employees, the court noted that Mr. Wallis maintained direction and control with respect to training the dealers and the prices of the products. For example, experienced dealers initially accompanied new dealers during their door-to-door sales. Further, the dealers had to be authorized through Mr. Wallis, and he retained the right to terminate the contract

without cause upon thirty days notice. The court reasoned that although the dealers could sell the products in whatever method they chose, Mr. Wallis could terminate the contract with the dealer if he found that the dealer wasn't representative of the product or product line. The dealers didn't service the equipment and weren't responsible for repossession of the vacuum cleaners when installment contracts fell through. The court found, based on these facts, that the distributor had the right to control the dealers, even if he hadn't exercised that right. 689 P.2d at 795.

In <u>Danes v. St. David's Episcopal Church</u>, 752 P.2d 653 (Kan. 1988), the court affirmed the district court's order classifying a church organist as an employee. The plaintiff organist entered into an agreement with the defendant church to provide services as organist and choirmaster. Although the church didn't withhold Social Security or income tax from the organist's wages, the church rector had the authority to determine when the organist performed, to make final decisions concerning the amount, nature, and type of music that was played, and to make final selections of the music. The church paid the organist by the month and could fire him upon ninety days' notice. The church supplied the church organ, which was the basis of the organist's service. In light of these facts, the court held that the district court correctly determined that the plaintiff was an employee rather than independent contractor. 752 P.2d at 660.

In other cases, Kansas courts have found independent contractor status when the purported employer gave the hired worker general instructions to follow, but didn't control the means and manner of the work. In <u>Home Design, Inc. v. Kansas Dep't of Human Res.</u>, 2 P.3d 789 (Kan. Ct. App. 2000), the court held that siding installers were independent contractors. The court noted that the siding installers were free to set their own hours as long as the job was completed within a reasonable time frame (with only the minimal requirement that they should be there at a decent time, in decent clothes, and put in a day's work). They were paid by the job and free to turn down work, work for other siding companies, or negotiate better deals. There wasn't continuity in the relationship between Home Design and the installers; the installers could refuse to accept a relationship or an assignment as they desired. Home Design provided the siding materials for the job, but didn't provide the tools, equipment, or training to the installers. The siding installers had to carry liability insurance and workers compensation insurance, but could be added to Home Design's policies for a fee. 2 P.3d at 792-793.

The <u>Home Design</u> court held that the general instructions given to the installers "were nothing more than what would be expected of any subcontractor working under the overall auspices of a general contractor." 2 P.3d at 793. There was no evidence that Home Design actually controlled the work of the siding installers or instructed them on how to perform their task or install the siding.

The court explained that Home Design or one of its salespersons would visit the job site to check the progress and address any problems the siding installers were encountering, but the company didn't supervise the siding jobs in the true sense of the word. Checking the job site for progress or problems, the court reasoned, was typical of any general contractor or architect. Accordingly, the court held that the siding installers weren't subject to Home Design's control in any meaningful sense other than as to results. 2 P.3d at 793.

The court in Crawford v. Department of Human Res., 845 P.2d 703 (Kan. Ct. App. 1989), addressed whether people who appear at stores or events to promote food or demonstrate how products work were employees or independent contractors. The administrative law judge ruled that the demonstrators were employees because Ms. Crawford exercised control by requiring a dress code and completion of recap sheets and retaining the right to terminate a demonstrator for cause.

The appellate court reversed. The court noted that the instructions and directions concerning the demonstrations came from the manufacturers of the products and the stores in which the demonstrations took place. Ms. Crawford merely transmitted the instructions to the workers; she had no part in formulating the instructions and didn't check on the workers or supervise them during the demonstrations. The court noted, too, that no training was provided, and Ms. Crawford didn't set the order or sequence of work or require that services be

provided personally by the demonstrators. Any set work hours were established by the store. Ms. Crawford didn't furnish tools, equipment, or materials, and demonstrators were paid by the job. Demonstrators could work for more than one demonstrating company and acceptance of each new job offer was a voluntary decision made by the worker. 845 P.2d at 704-707.

The Crawford court explained that the recap forms were simply a way of tracking the person and days worked, and the "appropriate dress" statement was merely a general instruction to not wear jeans and to dress appropriately. Because Ms. Crawford didn't appear to have much knowledge of the specific products demonstrated or of the manufacturers' instructions, nor did she supervise, direct, or control the workers doing the demonstrations, the court held that substantial evidence didn't exist to support a finding of employee status. Id. at 707-708.

These cases[6] illustrate that no single factor is dispositive when determining employment status, and the court must consider the facts as a whole when making this determination. Under the undisputed facts in today's summary judgment record, the totality of circumstances requires a finding of independent contractor status. Without question, there are facts in the record that cut both ways. But this case differs from Wallis v. Secretary and Danes v. St. David's because the Operating Agreement doesn't provide FedEx with the right to control

---

[6] The plaintiffs and FedEx have filed extensive supplemental authority on their summary judgment motions, but none specifically addressing Kansas law. The court has considered the supplemental authority offered by the parties, but doesn't find that the cases would change the effect of the application of Kansas law in this order.

the drivers' means and methods of work or the manner in which they complete their contractual obligations. Further, FedEx drivers can't be terminated without cause before the expiration of their contract term. *Cf.* <u>Wallis v. Secretary</u>, 689 P.2d at 790 (termination upon thirty days written notice); <u>Danes v. St. David's</u>, 752 P.2d at 660 (termination upon ninety days written notice).

FedEx has retained oversight and supervision over its drivers, but as in <u>Home Design v. Department of Human Res.</u>, FedEx provides general instructions that it expects drivers to follow, not requirements on how to perform daily tasks. FedEx reviews drivers' work to check their progress or address problems, but its right to control is limited to offering suggestions and best practices, not mandatory courses of action. FedEx's retained control is limited to the results of the drivers' work, not how the drivers' achieve those results. As in <u>Crawford v. Department of Human Res.</u>, FedEx doesn't set the order or sequence of the work or even require that services be provided personally by the contractors. Many general instructions set forth by FedEx are based on customer demands. FedEx's requirement that drivers meet these customer demands involves the results of the drivers' work. FedEx contractors can hire helpers or replacement drivers to perform their work and they can even sell their routes to other qualified drivers. The evidence, therefore, leads to one reasonable inference, *i.e.*, the plaintiffs are independent contractors.

*1. Intent of the Parties*

The court considers the parties' intent as expressed in their agreement when deciding employment status. <u>Knorp v. Albert</u>, 28 P.3d 1024, 1030 (Kan. Ct. App. 2001); *see also* <u>Lowe v. Surpas Res. Corp.</u>, 253 F. Supp. 2d 1209,1233 (D. Kan. 2003) (finding intent of parties to create independent contractor relationship evidenced by unambiguous language in the agreement was factor weighing heavily in favor of independent contractor status). The Kansas class plaintiffs, either individually or through a sole proprietorship or corporation, entered into Operating Agreements with FedEx acknowledging that they would provide services as independent contractors and not as employees. OA, Background.

In several provisions, the Operating Agreement says FedEx directs the results, but not the manner and means, of the plaintiffs' work. OA, Background, FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15 ("Contractor shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results . . . and no officer, agent or employee of [FedEx] shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results."). The Operating Agreement more specifically provides that FedEx can't "prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance." FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15.

Further, under the Operating Agreement, FedEx has no responsibility to make deductions for, or to pay, health, welfare, and pension costs, withholding for income taxes, unemployment insurance premiums, Social Security taxes, or any other similar charges with respect to the contractors or their employees. OA, ¶ 4.2. The contractors receive a Form 1099 at each year end and compute their income taxes as independent contractors.

The contractors understood they were classified as independent contractors and the parties intended to create an independent contractor agreement. This factor weighs strongly in favor of independent contractor status.

### 2. Right to Control

The Operating Agreement sets forth the basic parameters in which FedEx is required to operate in its interactions with drivers. While FedEx's policies and procedures provide specific guidelines that fill out the Operating Agreement's broad terms, FedEx's right to control ultimately is restrained by the parties' agreement. FedEx might actually exercise more control than authorized, but as explained, the court is limited in determining whether FedEx retained the right to control. The court relies on the policies and procedures to the extent they show how FedEx implemented its authority as retained by the Operating Agreement.

After reviewing the common undisputed evidence offered by the parties, the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis.

*a. Drivers' Obligation to Complete Daily Assigned Work*

Various provisions of the Operating Agreement authorize FedEx to control the days of service, the contractor's daily workload, and certain time windows when pick-ups and deliveries must be made. These requirements weigh in favor of employee status, but are more suggestive of a results-oriented approach to management when viewed with the totality of circumstances. FedEx has contracted for the performance of certain work and has the right to require that the work be completed as agreed. As long as contractors complete their daily assigned work, they can decide their work schedule. For example, they can hire helpers to finish their assigned work more quickly or, alternatively, hire a replacement driver to take over their route.

Drivers agree to provide daily pick-up and delivery services to customers in their primary service area on days and at times that are compatible with their schedules, as consistent with the competitive standards within the industry. OA, ¶ 1.10(a). Under this provision, FedEx has reserved the right to require contractors, or their approved replacement drivers, to provide service on days that

FedEx agrees to provide service to customers. FedEx also has authority to change the days of service.

A driver is responsible for delivering every package in his work area each day and every package assigned under the Flex Program, if applicable. OA, ¶ 1.10(a). To enable full use of their equipment as set forth in the Operating Agreement, FedEx structured the drivers' routes so each vehicle was in use nine to eleven hours per day. This measurement varies somewhat between facilities and has been modified recently, but essentially sets forth a daily expected workload for drivers. Requiring workers to accept assigned work weighs in favor of employee status. *Compare* <u>Knorp v. Albert</u>, 28 P.3d at 1029 (physician not permitted to refuse service to any patients, a factor weighing in favor of employment status); *with* <u>Home Design v. Kansas Dep't of Human Res.</u>, 2 P.3d at 792 (siding installers could refuse to accept relationship or assignment as they desired); <u>Crawford v. Department of Human Res.</u>, 845 P.2d at 707 (acceptance of each new job offer was voluntary decision made by worker).

In the Operating Agreement, though, FedEx says it will provide enough packages to make full use of the contractor's vehicle; FedEx is required to fulfill this obligation pursuant to the parties' agreement, so it isn't necessarily indicative of employee status. *See, e.g.*, <u>P.S. ex rel. Nelson v. The Farm, Inc.</u>, 658 F. Supp. 2d 1281, 1299 (D. Kan. 2009) (requirement that foster care agency accept custody of foster child within four hours of referral by the Social and Rehabilitation

Services didn't equate to control over scheduling because the contractual requirement bound SRS as well as the agency; SRS couldn't insist on shorter time frame absent modification of contract). Further, contractors can terminate their contracts upon thirty days' notice, in which case, they would be relieved of any future work assignments.

FedEx requires contractors to deliver packages outside their primary service area through the Flex Program. Home Delivery contractors must agree to flexing, FXHD OA, ¶ 1.10(a), but Ground contractors are given the option, FXG OA, ¶ 1.10(a). FedEx can also reassign packages to another driver under both the Ground and Home Delivery Operating Agreements when the packages in the driver's primary service area exceed the volume that he can reasonably be expected to handle that day. OA, ¶ 1.10(a).

FedEx also is authorized to reconfigure a contractor's primary service area upon five days' written notice, unless the driver is able to show during the notice period that he can continue to service the area. FXHD OA, ¶ 6.2; FXG OA, ¶ 5.2. FedEx's goal through restructuring is to provide each contractor with a full day's work (nine to eleven hours a day). FedEx must compensate the driver if the reconfiguration results in fewer customers or accounts. FXHD OA, ¶ 6.3, Addendum 5; FXG OA, ¶ 5.3. Even though FedEx has the right to control contractors' daily workloads by flexing and reconfiguration of primary service areas, FedEx is bound by the parties' agreement to provide full use of the

contractors' vehicles and can only reconfigure a primary service area under certain conditions. Employers generally aren't confined to such limitations.

FedEx places some restrictions on drivers' abilities to complete deliveries on their time schedule. Although drivers aren't required to appear at delivery stops at specific times, FedEx can negotiate pick-up or delivery windows upon a customer's request. FedEx requires drivers to make the appointed pick-ups or deliveries within the set window of time or negotiate a different time through FedEx or directly with the customer. FedEx also offers customers an evening service that guarantees delivery between 5:00 p.m. and 8:00 p.m. FedEx drivers must provide this service when FedEx requests or pass it on to another driver. Ground drivers must return to the terminal by a certain time at the end of the day, and Home Delivery or Ground drivers who collect charges for C.O.D. packages must return the charges to the terminal at the end of the day.

Within the confines of the Operating Agreement's terms, FedEx has retained the right to determine some time parameters for providing service to customers, but FedEx doesn't have authority to dictate what hours or how many hours drivers work. OA, ¶ 1.15. Drivers must work certain days of the week, deliver all packages assigned to them that day based on a nine to eleven hour work day, and, on occasion, meet pick-up and delivery windows, but aren't otherwise required to work a set schedule. These facts therefore aren't necessarily indicative of employee status. *Compare* Home Design v. Department of Human Res., 2 P.3d at 792

(expecting installers to arrive around 8 a.m. and put in a good day's work, not indicative of employee status), *with* <u>Danes v. St. David's Episcopal Church</u>, 752 P.2d at 660 (authority to determine when organist performed weighed in favor of employee status).

Further, FedEx establishes the pick-up and delivery windows based on customer requests, so those windows focus on the results of the drivers' work. *See* <u>Crawford v. Department of Human Res.</u>, 845 P.2d at 707 ("Any set work hours were established by the store and not by Crawford."). Although, unlike <u>Crawford</u>, FedEx decides what services are provided to customers and consults with customers to determine when those services can be provided, contractors nevertheless are hired to provide such services. FedEx can dictate the results it expects of contractors without creating an employment relationship.

No less importantly, contractors can hire replacement drivers to run their full routes or hire assistants to help with their routes, thereby freeing them from any time parameters or delivery duties. The replacement drivers are subject to certain approval requirements set forth by FedEx, some of which exceed DOT regulations, and the contractors ultimately are responsible for ensuring that their replacement drivers fulfill the same obligations the Operating Agreement requires of the contractors. OA, ¶ 2.2. Contractors' ability to hire assistants and replacement drivers, though, even under FedEx's approval requirements, allows them to have complete freedom in their schedules.

Accordingly, FedEx's retained right to control the days of service, daily workload, and certain parameters when pick-ups or deliveries must be made isn't strongly indicative of employee status under these facts, especially in light of FedEx's obligation to make full use of the vehicles, restrictions on reconfiguration of work areas, lack of control over drivers' specific work schedules, and the ability of contractors to hire assistants or replacement drivers to complete their assigned work.

### b. Driver Appearance and Vehicle Suitability Standards

FedEx has some right to control the drivers' personal appearance and the appearance and suitability of their vehicles. The Operating Agreement requires contractors to foster FedEx's professional image and good reputation, including adhering to vehicle identification and operator appearance standards. OA, ¶ 1.10(e). Drivers must wear the FedEx uniform and maintain it in good condition. Each driver is to "keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by [FedEx]." OA, ¶ 1.12.

FedEx has authority to prohibit drivers from servicing customers if they aren't in proper uniform or aren't properly groomed. FedEx dictates certain appearance standards for its drivers to reinforce its brand and maintain a professional image, but requiring proper attire isn't precisely the same thing as a

right to control the drivers' manner and means of work. *See, e.g.*, <u>Home Design v. Department of Human Res.</u>, 2 P.3d at 792-793 (mere instruction to dress appropriately wasn't indicative of employee status); <u>Crawford v. Department of Human Res.</u>, 845 P.2d at 707-708 (general instruction not to wear jeans and to dress appropriately wasn't indicative of employee status). FedEx's requirement to wear a uniform, though, is more than a general instruction to dress appropriately and so weighs in favor of employee status, but, ultimately, doesn't affect the means or methods of the drivers' work.

FedEx managers also have the right to evaluate drivers' trucks for appearance and maintenance standards and can inspect the vehicles every thirty days. Drivers must submit vehicle maintenance reports monthly. Even though FedEx drivers supply their own vehicles, FedEx requires each vehicle to be painted "FedEx White," bear FedEx logos and advertising, and meet FedEx's minimum bumper height; interior shelving requirements; and, in some cases, age restrictions. FedEx also decides what size and configuration of truck is appropriate for each particular route. *See* OA, ¶ 1.1 ("[S]ubject to the determination of [FedEx] of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of Contractor."). Other than these requirements, contractors have the right to determine what vehicle to purchase.

Federal regulations set commercial vehicle maintenance and marking requirements for vehicles of 10,001 pounds or more, but while the existence of those regulations "may indeed furnish reasons for at least part of the control exercised," FedEx's requirements go beyond federal regulations. Knoble v. National Carriers, Inc., 510 P.2d 1274, 1280 (Kan. 1973) ("While such regulations may indeed furnish reasons for at least part of the control exercised, they do not alter the fact of its existence."). Thus, FedEx's right to determine and enforce driver and vehicle appearance and vehicle suitability standards slightly favors employee status. As noted though, while appearance standards may indicate control, they don't dictate the manner in which contractors must perform their work.

### c. Supervision over Drivers' Work

Various Operating Agreement provisions set forth objectives that contractors must meet in performing their work. For example, FedEx requires contractors to make reasonable efforts to retain and increase their customer base and volume; handle and transport packages using methods designed to avoid theft, loss, and damages; provide package tracking information; and cooperate with FedEx's employees, customers, and other contractors to achieve efficient package pick-up and delivery. OA, ¶¶ 1.10(b), (c), (d). Drivers agree to conduct all business activities with integrity and honesty, in a professional manner and with proper decorum, and to operate equipment safely. OA, ¶¶ 1.10(e), (g), (h).

To ensure contractors meet these objectives, FedEx has established policies and procedures that managers are to consult when reviewing drivers' work. These policies and procedures set forth guideposts for supervising drivers and determining their compliance with FedEx's expected standards of conduct. FedEx's requirement that drivers comply with certain standards of conduct and obligations set forth in the Operating Agreement, however, illustrates FedEx's concern with the results of the drivers' work, not their method in performing the work. *See, e.g.*, Lowe v. Surpas Res. Corp., 253 F. Supp. 2d 1209, 1233 n.19 (D. Kan. 2003) (finding that "[bank's] right to review collection efforts reflects its concern with the result of [debt collection agency's] work, not the method of collection and such authority does not indicate the type of control that would create an agency relationship under Kansas law.").

FedEx offers training to new drivers on its customer service procedures, but under the Operating Agreement, contractors have the responsibility to ensure that any person operating the equipment is fully trained and capable of meeting the customer service standards set forth in the agreement. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. Depending on the applicant's experience, he might be required to take the FedEx QPDL training course as a precondition to becoming a contractor. As of 2007, contractors could take a substitute course from an approved vendor. The QPDL course teaches federal safety regulations and other customer service procedures. FedEx also conducts a ten-hour orientation program during drivers'

first thirty days to familiarize them with various service quality procedures. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. FedEx used to provide drivers with the Contractor's Companion — a reference guide to assist contractors in performing their work. FedEx also holds safety meetings that were previously mandatory. Training is factor weighing in favor of employee status. Wallis v. Secretary, 689 P.2d at 789.

FedEx offers bonus incentives to contractors who meet certain standards. Contractors receive the CCS bonus monthly if they have no at-fault accidents and no verified customer complaints. FXHD OA, Addend. 8; FXG OA, Addend. 6. Contractors can expunge one verified complaint from their record by participating in the CARE training program, which teaches ways to achieve customer satisfaction. Ground contractors can receive a weekly Pick-Up Service Bonus if they don't miss any pick-ups, all pick-ups are made within the drivers' requested windows (with a grace period), and the scanner is used to process all pick-up stops (with an allowance for two instances of non-compliance). FXG OA, Addend. 6. These bonuses, however, aren't mandates requiring the driver to perform in a certain manner. Incentives aren't controls.

FedEx has processes in place to track the drivers' performance. Drivers should perform a "check-out" with their mangers before leaving the terminal in the morning so that the manager might review the driver's settlement report and deliveries made the previous day and discuss any DNAs or other service failures with the driver. Drivers also must use a FedEx scanner to record information

relating to pick-up and deliveries. The scanners are connected to FedEx's computer system and allow package tracking information to be transmitted to FedEx.

FedEx reviews its drivers' performance through audits and customer service rides. Managers are authorized to conduct daily van service audits to ensure drivers are complying with FedEx procedures for undelivered packages. FedEx also hires security specialists who perform random in-route van security reviews to inspect drivers' vehicles to verify that drivers are properly securing them. At Home Delivery, FedEx reserves the right to perform driver release audits on the drivers, where the manager follows the drivers, and sometimes interviews customers, to see whether customers' packages are being driver-released properly.

Managers are to conduct at least two, but not more than four, customer service rides each year, giving managers a chance to see whether FedEx drivers are complying with FedEx's customer service standards and to ensure that drivers are operating their vehicles safely. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. FedEx procedures direct managers to review almost every aspect of the driver's work during these rides, including specific details about the driver's method and means of performance. For example, the manager is to observe whether the driver puts the address of the next stop into the scanner on his way back to the vehicle after a delivery. In general, managers review the contractor's package handling procedures, customer contact skills, safe driving techniques, and critical safe

behaviors. As noted though, FedEx managers can only go on four customer service rides a year, which binds FedEx from mandating additional oversight. *See, e.g.*, P.S. ex rel. Nelson v. The Farm, Inc., 658 F. Supp. 2d at 1299 (requirement not necessarily indicative of control where it also limited the purported employer from exercising more control).

FedEx managers discuss performance with the contractors at least twice a year through business discussions. During these discussions, managers make recommendations and counsel drivers in the performance of their contracted work. A wide range of topics can be raised during business discussions, such as overall performance, customer complaints or positive customer feedback, or violations of the Operating Agreement. While FedEx may not be able to force the contractor to engage in a business discussion, not participating will reflect poorly on the contractor upon contract renewal.

FedEx presents evidence that the purpose of the customer service rides, audits, and resulting business discussions is to provide contractors with recommendations, not requirements that must be followed. Under the Operating Agreement, FedEx doesn't have the right to determine the drivers' means and methods of work, but retains the right to exercise control over the results of the drivers' work. FedEx supervises drivers as to the means and methods of their work and provides them with suggestions they should follow, but, pursuant to their contractual arrangement, aren't required to follow. FedEx's supervision over the

drivers is therefore insufficient to show control over the means and methods of the drivers' work. *See, e.g.*, <u>Lowe v. Surpas Res. Corp.</u>, 253 F. Supp. 2d at 1233 (noting that even though the bank had great latitude to review SRC's collection activity, such facts don't suggest that the bank retained the type of control over SRC necessary to establish an agency relationship).

The managers' suggestions might have the intended effect to get drivers to behave in a certain manner, but FedEx's ability to enforce these suggestions is limited. FedEx can restructure drivers' routes, but only if the drivers aren't able to provide reasonable means to continue to service their Primary Service Area. If the reconfiguration results in less customers or accounts, the Operating Agreement requires compensation to the contractor.

FedEx also can terminate drivers, but only if they breach or fail to perform the contractual obligations imposed by the Operating Agreement. FedEx's policies and procedures indicate that contract termination might be justified for repeated customer complaints, failure to service work area, integrity issues, unsafe driving, DOT and/or maintenance violations, or other such problems. RCRL-162, at 5. FedEx therefore retains a right to terminate contractors only when they have failed to perform the contracted-for results set forth in the Operating Agreement. *Cf.* <u>Wallis v. Secretary</u>, 689 P.2d at 789-790 (possible discharge if distributor determines worker isn't representative of product was fact weighing in favor of employee status); *but see* <u>Crawford v. Department of Human Res.</u>, 845 P.2d 706-

707 (termination for cause not indicative of employee status). While FedEx has some discretion in deciding what actions constitute a violation of the broad terms of the Operating Agreement, its decision to terminate is subject to review by a neutral party. If contractors believe they have been wrongfully terminated, they can sue FedEx through arbitration and recover damages.

FedEx also can choose not to renew a driver's contract upon expiration of the contract's term, but such an option isn't atypical of an independent contractor relationship where a hiring party can simply decide not to re-hire a worker. Home Design, 2 P.3d at 793 (stating that the reliable siding installers "frequently received repeat business, but that is true with any prudent business which might wish to deal with reliable suppliers, middlemen, or subcontractors").

In sum, FedEx managers' right to supervise the drivers and provide suggestions of best practices isn't indicative of employee status given FedEx's restricted ability to enforce its suggestions. Similarly, in Nelson v. The Farm, 658 F. Supp. 2d at 1299, Social and Rehabilitation Services retained certain rights of control and oversight over the foster care agency, e.g., it required minimal qualifications for agency employees, use of certain forms, certain approaches for recruiting and assessing foster families, the acceptance of a foster child within four hours of referral, approval of changes in placement, 24-hour access to the agency, and certain information from the agency. The court stated that the right

to such oversight didn't grant SRS the right to control in a general sense the manner in which the agency performed its duties on a daily basis.

The court in <u>Home Design v. Department of Human Res.</u> also held that Home Design didn't supervise the siding jobs in the true sense of the word, even though it would visit the job site and check the progress and any problems the siding installers were encountering. The court explained:

> It strikes us that a general contractor on a major project . . . would develop, in conjunction with the engineers, very detailed and specific instructions as to the work desired of the subcontractors, including the exact way certain items should be installed or erected, along with very specific cutoffs and deadlines for completion of various phases of the project. Surely it would not be seriously argued that such indicia would turn subcontractors into employees.

2 P.3d at 793. Home Design didn't instruct the siding installers on how to perform their tasks, but the evidence in this case doesn't show that FedEx retained the right to require drivers to follow managers' instructions as to the manner in which they performed.

Even though FedEx controls the area each driver must service, the services drivers must provide for customers, the prices charged for services, and certain customer service standards that drivers should meet, those requirements are result-oriented and would generally be expected of any hired party. FedEx doesn't have the right to dictate the course contractors take in completing routes, specific times contractors must pick up or deliver packages (except for some delivery and pick-up windows requested by the parties' mutual customers), or specifics as to

how contractors must complete their contractual obligations. FedEx supervises contractors and provides incentives for them to perform their work according to its suggested best practices, but the evidence doesn't show that FedEx has a right to require contractors to follow its advice. FedEx is bound by the terms and limitations set forth in the Operating Agreement.

Some facts suggest control — driver and vehicle appearance requirements, training provided by FedEx, and supervision and monitoring over drivers' work — but the facts also show that FedEx didn't have the right to ultimately control the means and methods used to complete the work.


### 3 . Length of Job Commitment

If the length of the job commitment is short, the worker is less apt to subject himself to control as to details. RESTATEMENT (SECOND) OF AGENCY, § 220, cmt. j (1958). The Operating Agreements are for an initial term of one, two, or three years and automatically renew absent notice of non-renewal. Non-renewal of the contract is permitted by either party upon thirty days' written notice before expiration of the term. FXHD OA, ¶ 8.2; FXG OA, ¶ 11.2. The contractor also may terminate the contract upon thirty days' prior written notice. FXHD OA, ¶ 9.1; FXG OA, ¶ 12.1.

The Operating Agreement is for a definite term; FedEx can non-renew at the end of the term and the contractor can terminate upon thirty days' notice.

Although contractors aren't hired for short-term projects, the Operating Agreement doesn't necessarily contemplate a long-term relationship. This factor doesn't weigh strongly in favor of either party.

### 4. The Right to Employ Assistants

Contractors have the right to hire replacement drivers to run their routes or assistants to help with their routes, subject to FedEx's approval requirements. FedEx retains the right to monitor the replacement drivers' performance and hold the contractor responsible if the driver fails to comply with the requirements imposed upon the contractor. Contractors must, therefore, supervise their replacement drivers.

Because contractors can hire others to help perform their contractual obligations, they aren't personally subject to FedEx controls with respect to days, hours, or amount of work, leaving them free to work part-time or perform other jobs. Subject to FedEx approval, contractors can own more than one service area and hire other drivers to run their additional routes, providing the contractor with an opportunity to expand his business and income.

The contractors' ability to hire others to complete their work affords contractors more autonomy in running their business. This factor, therefore, weighs in favor of independent contractor status. <u>Crawford v. Department of Human Res.</u>, 845 P.2d 707-708 (Crawford didn't require services be provided

personally by the demonstrators, a factor weighing in favor of independent contractor status).

*5. Proprietary Interest in Routes*

Contractors have a proprietary interest in their routes and as long as they are in good standing under the Operating Agreement, they can sell the route upon thirty days' written notice to FedEx. The new driver assignee must be acceptable to FedEx as qualified to provide services under the Operating Agreement. FXHD OA, ¶ 15; FXG OA, ¶ 18. The new driver, therefore, must meet the same minimum requirements and is subject to the same screening as contractors and temporary drivers. CRL-551, at 5. If FedEx terminates a contractor's agreement for cause, he cannot assign his contractual rights.

Contractors also have the ability to expand their routes by acquiring additional service areas from FedEx or other contractors as they become available, subject to FedEx approval. The contractor can own and operate more than one vehicle with the qualification that additional vehicles be driven by qualified operators. FedEx has certain restrictions on the maximum number of routes a contractor can own at any one terminal. Multiple work area contractors have a greater ability to profit from their routes than single work area contractors and so have greater entrepreneurial opportunities.

A contractor's proprietary interest in his route — *i.e.,* the right to sell the route or ability to obtain additional routes — weighs in favor of independent contractor status.

### 6. Furnishing of Necessary Tools, Supplies, and Materials

That a worker supplies his own tools is some evidence that he isn't an employee. RESTATEMENT (SECOND) OF AGENCY, § 220 cmt. k (1958); *see also* <u>Home Design v. Department of Human Res.</u>, 2 P.3d at 793 (requirement that siding installer supply his own tools, while Home Design provided no equipment, weighed in favor of independent contractor status). The Operating Agreement provides that contractors "shall not be required to purchase or rent any products, equipment, or services from [FedEx] as a condition to entering into [the agreement]." OA, ¶ 7.

FedEx supplies contractors with software and a computer network for tracking packages and provides terminals and sorting equipment for packages, sales and marketing services, and customer service personnel. Contractors are responsible for obtaining other necessary equipment and supplies, including their vehicle. Contractors must maintain and bear all costs and expenses associated with their vehicles. OA, ¶¶ 1.2, 1.3. They can use their vehicles for other purposes when not carrying FedEx packages as long as identifying FedEx marks and logos are masked or removed. OA, ¶ 1.5.

FedEx dictates certain specifications for the equipment and supplies contractors must use. While contractors supply their own vehicles, the vehicles must meet FedEx's minimum specifications. FedEx decides the size and configuration of the vehicle appropriate for a particular route, and vehicles must be painted FedEx White and bear FedEx logos according to FedEx's specifications. Contractors must also obtain certain tools and supplies dictated by FedEx, some of which are FedEx specific, *e.g.,* uniform and scanners.

FedEx provides contractors an option of purchasing or renting supplies — FedEx uniforms, scanners, printers, and communications-related equipment — through FedEx's Business Support Package. Under that program, FedEx deducts the cost of the items purchased from the contractor's weekly settlement. FXHD OA, ¶ 7 and Addend. 6; FXG OA, ¶ 7 and Addend. 7. Prior to 2008, drivers could also purchase or lease vehicles directly from FedEx. Alternatively, contractors may purchase equipment and supplies through outside vendors who are generally recommended by FedEx.

Even though FedEx dictates certain specifications for the equipment and supplies and gives contractors the option of purchasing them through FedEx or recommended vendors, the responsibility for acquiring equipment and supplies ultimately rests with the contractors. The option to participate in certain programs doesn't establish a right to control. Because contractors are responsible for acquiring their vehicles and most other supplies necessary to the performance of

their work (excluding infrastructure), this factor weighs slightly in favor of independent contractor status.

### 7. Regular Business of the Employer

FedEx provides small-package pick-up and delivery services through a network of pick-up and delivery drivers. Home Delivery generally is responsible for residential delivery of packages and FedEx Ground generally is responsible for pick-up and delivery of packages to businesses.

The parties don't dispute that FedEx drivers' work is a regular and integral part of FedEx's business. FedEx Vice President of Contractor Relations Robert Ostrov testified that contractors are a cornerstone of FedEx's business. Ostrov Dep., pp. 192-193. Former FedEx CEO Dan Sullivan testified that the contractor is intended to be a "centerpiece" of FedEx's "work force" and is an "essential component of [FedEx's] business." Sullivan Dep., pp. 27, 106. This factor weighs in favor of employee status.

### 8. Compensation and Benefits

A court determining employment status also considers the method of payment, type of compensation, and negotiation of pay rates. "[P]ayment by the hour or the day is more indicative of an agency relationship, while payment by the job is more indicative of an independent contractor relationship." McDonnell v.

Music Stand, 886 P.2d 895, 899 (Kan. Ct. App. 1994). FedEx drivers aren't paid by the hour and not necessarily by the job. They are paid weekly and their compensation formula is based on fixed and variable factors, including a daily rate, piece rates, and bonuses. OA, ¶ 4.1 and Addend. 3. This method of payment doesn't weigh strongly in favor of either party.

FedEx also offers its drivers benefits, such as a driver-funded retirement plan, matching contributions to the "Service Guarantee Account," a college scholarship for drivers with children, and a time-off program based on seniority. But FedEx contractors can choose not to participate in these programs. That FedEx merely offers such benefits, therefore, doesn't weigh in favor of employee status.

Compensation rates aren't negotiated, except that contractors can choose not to sign yearly modified settlement addendum and others have requested and received changes to their core zone density settlement. *Compare* Lewis v. ASAP Land Express, Inc., 554 F. Supp. 2d 1217, 1225 (D. Kan. 2008) ("The record contains evidence that plaintiff could not negotiate pay based on his level of experience, which suggests employee status."); *with* Home Design v. Department of Human Res., 2 P.3d at 792-793 (noting that some more experienced installers would negotiate price with Home Design, a fact in favor of independent contractor status). Contractors' limited ability to negotiate compensation rates weighs slightly in favor of employee status.

On the other hand, FedEx has no responsibility to make deductions for, or to pay, health, welfare, and pension costs, withholding for income taxes, unemployment insurance premiums, Social Security taxes, or any other similar charges with respect to the contractors. OA, ¶ 4.2. Drivers must obtain and keep work accident or worker's compensation insurance. OA, ¶ 3.6. FedEx issues contractors a Form 1099 at the end of each year. These facts weigh in favor of independent contractor status. *See* Travelers Indem. Co. of Ill. v. Challenger Fence Co., Inc., 119 P.3d 666, 669 (Kan. Ct. App. 2005) (purported employer didn't pay taxes, unemployment insurance, disability insurance, or provide other benefits to plaintiff and plaintiff wasn't provided W-2 wages; these facts weighed in favor of independent contractor status); *cf.* Danes v. St. David's Episcopal Church, 752 P.2d at 660 (not withholding Social Security or income tax from agent's compensation doesn't alone establish agent's status as independent contractor).

### 9. Termination At Will

The inability to terminate a worker at will supports independent contractor status. *See* McDonnell v. Music Stand, 886 P.2d at 899 ("[S]ince the contract required a 30-day notice, termination at will was not permitted"; a factor favoring independent contractor status). The Operating Agreements allow termination under five limited circumstances, including by either party "if the other party breaches or fails to perform the contractual obligations imposed by [the]

Agreement," or by the contractor upon thirty days prior written notice. FXHD OA, ¶ 9.1; FXG OA, ¶ 12.1.

FedEx managers can recommend contract termination by documenting reasons for termination and discussing the contractor's file with the regional managing director. If the regional managing director agrees with the recommendation after reviewing supporting documentation, the file is forwarded to Contractor Relations for review and then to FedEx's legal department. Under the Operating Agreement, if a contractor believes he has been wrongfully terminated, he must submit his claim to arbitration. FXHD OA, ¶ 9.3 and Addend. 7; FXG OA, ¶ 12.3.

FedEx drivers aren't terminable at will. FedEx may terminate for breach of the Operating Agreement after several layers of review by FedEx management, and contractors can assert claims of wrongful termination through arbitration. *See* Richards v. Bryan, 879 P.2d 638, 645 (Kan. Ct. App. 1994) (employer couldn't terminate employment contract "for any reason, at its pleasure" where contract provided for discharge only in event plaintiff failed to "perform his duties credibly"); PaineWebber, Inc. v. Agron, 49 F.3d 347, 352 (8th Cir. 1995) (construing Kansas employment at-will doctrine and stating that contemplation of arbitration procedures "necessarily alters the employment relationship from at-will to something else — some standard of discernable cause is inherently required in this context where an arbitration panel is called on to interpret the

employment relationship"). This factor weighs in favor of independent contractor status.

### 10. Skill, Independent Business, and Kind of Occupation

The amount of skill required to complete a job is indicative of employment status. The skill factor focuses on whether the work requires performance by someone who is "highly educated or skilled" because such workers are less likely to submit to the hiring party's control. RESTATEMENT (SECOND) OF AGENCY, § 220 cmt. h (1958). The Operating Agreement requires the contractor to have a certain number of skills, including management of business expenses and costs (¶ 1.3), compliance with federal, state, and local licensing and regulatory requirements (¶¶ 1.6, 1.10), and training and management of additional drivers (¶ 1.14). Such skills aren't highly specialized; most of the contractor's required skills, such as driving and customer service skills, can be learned in the workplace, either through training (company orientation or QPDL when applicable) or on-the-job supervision. Multiple area contractors, on the other hand, must manage multiple routes and employees effectively and so must have a greater degree of business management skills than single area contractors. Drawing all reasonable inferences in favor of plaintiffs, this factor weighs in favor of independent contractor status for multiple area contractors, but not single area contractors.

Another factor the court should consider is whether the contractors are engaged in a distinct occupation or business. Some contractors have their own business and contract with FedEx through sole proprietorships or corporations. Contractors can be engaged in another occupation, especially if they choose to hire assistants or replacement drivers to help run their routes. Contractors can use their vehicles for other commercial or personal purposes when not actually carrying FedEx packages as long as identifying FedEx marks and logos are masked or removed. OA, ¶ 1.5. Since anecdotal evidence is excluded, the record contains no evidence that any contractor was engaged in a distinct occupation or business as a package pick-up or delivery driver. *Cf*. Lowe v. Surpas Res. Corp., 253 F. Supp. 2d at 1233 (debt collection agency hired by bank was in the business of collecting debts; a factor weighing in favor of independent contractor status). But the Operating Agreement doesn't give FedEx the right to prevent contractors from using their vehicles for other commercial purposes. This factor, therefore, weighs slightly in favor of independent contractor status.

The kind of occupation also can be indicative of employment status, depending on whether the work is usually done under the principal's direction or by a specialist without supervision. UPS, one of FedEx's primary competitors in the small package and delivery industry, performs its pick-up and delivery functions using employees. Other competitors — USPS and DHL — sometimes use contract carriers to pick-up and deliver packages. This factor weighs more in favor

of employee status because, in general, FedEx's primary competitors use employees to deliver and pick-up packages.

## 11. Totality of Circumstances

All of these factors are important when deciding employment status, but the most significant factor is the right to control. *See* <u>McCubbin v. Walker</u>, 886 P.2d at 795 ("The single most important factor in determining a worker's status as an employee or independent contractor is whether the employer controls, or has the right to control, the manner and methods of the worker in doing the particular task."). The court must determine whether FedEx has the right of control and supervision over the drivers' work, and the right to direct the manner in which the work is performed, as well as the result that is to be accomplished. <u>Wallis v. Secretary of Kan. Dep't of Human Res.</u>, 689 P.2d at 792. The court considers the totality of all the relevant facts when determining employment status.

When the facts in the record are undisputed or susceptible to only a single conclusion, the issue of employment status is a question of law for the court. <u>Mitzner v. State Dep't of SRS</u>, 891 P.2d 435, 438 (Kan. Ct. App. 2001). When all reasonable inferences are drawn in plaintiffs' favor, the evidence is insufficient to show that FedEx retained the right to control the plaintiffs and direct the manner in which they performed their work.

The evidence shows that FedEx retains the right to control the days of service, daily workload, and certain parameters when pick-ups or deliveries must be made. FedEx also retains the right to determine and enforce driver and vehicle appearance and vehicle suitability standards. FedEx offers training, supervises and monitors the drivers' work, and suggests best practices to drivers to follow in the performance of their work. While these facts weigh in favor of employee status, they are insufficient to show a right to control the manner and means of the drivers' work. FedEx can't control the drivers' specific work schedule, and contractors can hire assistants or replacement drivers to complete their assigned work, relieving them of any time restrictions or workload requirements. The evidence doesn't establish that FedEx has a right to require drivers to follow its suggested best practices; contractors can choose the best way to manage their routes as long as they are meeting the customer service obligations set forth in the Operating Agreement. FedEx's customer service requirements focus on the results expected of contractors in performing their assigned work, not the means and methods of their performance. Control over the results of the work — telling the worker what work must be accomplished — doesn't indicate employee status. McCubbin v. Walker, 886 P.2d at 799. Accordingly, while there are facts pointing to FedEx's right to control, they don't raise to the level of control necessary to show employee status.

If several other factors weighed strongly in favor of employee status, the right to control analysis, standing alone, might not be enough under these facts to establish independent contractor status. But many of the other factors also point to independent contractor status, and when viewing all the various factors together, the court finds that the drivers are independent contractor as a matter of law.

Importantly, the parties' intent pursuant to the terms in the Operating Agreement was to enter into an independent contractor relationship. The court in Lowe v. Surpas Res. Corp., held that the bank's great latitude to review the debt collection agency's collection activity didn't overcome the unambiguous intent of the contracting parties to establish an independent contractor relationship. 253 F. Supp. 2d at 1233. Similarly, the type and extent of control FedEx exercises doesn't outweigh the parties' unambiguous intent to create an independent contractor arrangement.

Other factors also weigh in favor of independent contractor status. Contractors have the ability to hire others to complete their work, which gives them more freedom in running their business. Contractors have a proprietary interest in their routes and can sell them to another qualified driver. If they become multiple area contractors, they can increase their entrepreneurial opportunities and ability to earn profits. Contractors are responsible for acquiring a vehicle and can use the vehicles for other commercial purposes. Finally,

contractors aren't terminable at will; FedEx can only terminate for breach of the Operating Agreement after several layers of review by FedEx management, and contractors can assert claims of wrongful termination through arbitration.

Although the contractors' work is a regular and integral part of FedEx's business, the skill required for single area contractors isn't highly specialized, and FedEx's competitors generally use employees to complete pick-up and delivery services, the other relevant factors favor independent contractor status. Accordingly, the court holds that after considering all the relevant factors, the drivers are independent contractors as a matter of law. Pursuant to the plaintiffs' agreement during class certification, the court notes that it makes this finding based on a limited review of the evidence relevant to the right to control, not actual exercise of control.

## IV. CONCLUSION

For these reasons, the court GRANTS IN PART FedEx's motion to strike individualized proof (doc. # 1398); DENIES the plaintiffs' motions to augment the record (doc. ## 1992, 2064, 2087); DENIES FedEx's request for oral argument (doc. ## 1400 and 1471); DENIES the plaintiffs' motion for summary judgment (doc. ## 1163 and 1248); and GRANTS FedEx's motion for summary judgment (doc. # 1215).

In class action cases where summary judgment motions pend, the court INSTRUCTS the parties to file a supplement statement within thirty days, not to exceed five pages, indicating why the outcome should be different or the same as this Kansas opinion.

SO ORDERED.

ENTERED:   August 11, 2010

/s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge
United States District Court